UNITED STATES DISTRICT COURT
NORTHERN DISTRICT OF ILLINOIS
EASTERN DIVISION

|  |  |  |
|---|---|---|
| IN THE MATTER OF THE | ) | |
| EXTRADITION OF | ) | |
|  | ) | No. 08 M 85 |
| BRENDA QUEVEDO-CRUZ | ) | |
|  | ) | Hon. Martin C. Ashman |
|  | ) | |

**DEFENDANT'S BRIEF
IN OPPOSITION TO REQUEST FOR EXTRADITION WARRANT**

NOW COMES BRENDA QUEVEDO-CRUZ, through her attorney Stanley J. Horn and submits this brief in opposition to the extradition proceedings against her and states the following:

STATEMENT OF THE CASE

BRENDA QUEVEDO-CRUZ (hereinafter "QUEVEDO-CRUZ") is sought by the Mexican government in connection with the kidnapping of a Mexican citizen, Hugo Alberto Wallace Miranda (hereinafter "Miranda"), on July 11, 2005. QUEVEDO-CRUZ allegedly participated in the kidnapping of Hugo Alberto Wallace Miranda. A warrant for her arrest was issued on April 6, 2006 by the Sixteenth District Judge of the Federal Criminal Proceedings in Mexico.

The U.S. Immigration and Customs Enforcement arrested QUEVEDO-CRUZ for an immigration violation and instituted removal proceedings against her. On January 28, 2008 QUEVEDO-CRUZ filed an application for withholding of removal under the Convention Against Torture with the Immigration Judge because she fears that the Mexican police will

torture her in order to obtain her confession regarding her involvement in the crime against Miranda should she return to Mexico. The Immigration Judge administratively closed the removal proceedings because QUEVEDO-CRUZ was turned over to U.S. Marshals Service in Chicago, Illinois on March 10, 2008, pursuant to a warrant for arrest issued on March 5, 2008 in response to a complaint for provisional arrest with a view towards extradition filed by the U.S. government.

The U.S. government now seeks certification of the arrest warrant so the U.S. Secretary of State may decide whether to extradite QUEVEDO-CRUZ to Mexico.


## STATEMENT OF FACTS

QUEVEDO-CRUZ was born on August 24, 1980 in Mexico. She entered the United States without inspection by the U.S. Customs and Border Patrol on or about May 1, 2007. She was subsequently detained by the U.S. Immigration and Customs Enforcement on or about November 28, 2007.

The kidnapping of Miranda allegedly took place in the late evening hours of July 11, 2005. Miranda has since then vanished and his body has yet not been found.

In the Mexican government's theory of the case, QUEVEDO-CRUZ along Jacobo Tagle Dobin, Juana Hilda Gonzales Lomeli, Cesar Freyre Morales, Alberto and Tony Castillo Cruz all plotted to kidnap Miranda in order to obtain a ransom. After visiting the movies Juana Hilda Gonzales Lomeli took Miranda to her apartment where the others were waiting in order to carry out their plan to kidnap him. Once Miranda had entered the apartment the others emerged from different rooms and subdued him. He allegedly died in the course of the kidnapping.

2

QUEVEDO-CRUZ allegedly took pictures of the dead victim in a way that made it appear as if he was still alive and mailed them to Miranda's family requesting a ransom for his release. The Mexican police concluded that the perpetrators cut him up in pieces with a chain saw and disposed of the body part at an unknown location.

The Mexican government charges QUEVEDO-CRUZ with participating in the kidnapping and disposing of the body.

The allegations against QUEVEDO-CRUZ are based mainly on the testimony of (1) Juana Hilda Gonzales Lomeli who confessed to an agent of the Federal Public Prosecutor assigned to the Specialized Investigative Kidnapping Unit of the Office of the Attorney General on February 8, 2006, (2) Alberto Castillo Cruz before a Federal Public Prosecutor assigned to the Specialized Investigative Kidnapping Unit on March 8, 2006, and (3) Tony Castillo Cruz before a Federal Public Prosecutor assigned to the Specialized Investigative Kidnapping Unit on March 22, 2006.

There is significant evidence which shows that the testimony of those witnesses was obtained through coercion and means that amount to torture by the Mexican government.

Furthermore, the testimony of other witnesses is only circumstantial and does not link QUEVEDO-CRUZ to any wrong doing at all. It merely shows that she knew the other individuals who were allegedly involved in the crime or was seen with them without linking her otherwise to the crime.

<u>ARGUMENT</u>

Pursuant to 18 U.S.C. §3184 the court must certify to the Secretary of State that (1) the crime, with which QUEVEDO-CRUZ is charged, is extraditable and (2) there is probable cause to sustain the charges against her.

The evidence submitted by the Mexican government does not warrant certification of the extradition warrant for lack of proximate cause for QUEVEDO-CRUZ's participation in the crime against Miranda even if the court determines that QUEVEDO-CRUZ is charged with a crime that renders her extraditable pursuant to the extradition treaty in force between the United States and Mexico,.

Although the court does not need to weigh conflicting evidence and make factual determinations the court shall determine whether there is competent evidence to support the belief that the accused has committed the charged offense *Quinn v. Robinson, 783 F.2d 776 (9th Cir. 1986)*. The credibility of witnesses and the weight to be accorded their testimony is within the province of this court. *See Garcia-Guillern v. United States*, 450 F.2d 1189, 1192 (5th Cir. 1971).

In determining probable cause, the court may consider hearsay. Barring hearsay from extradition proceedings would thwart one of the objectives of bilateral extradition treaties by requiring the requesting nation to send its citizens to the extraditing country to confront the accused. *Zanazanian v. United States*, 729 F.2d 624, 627 (9th Cir. 1984)

**a) Juana Hilda Gonzales Lomeli's confession and testimony is not sufficient to sustain the charges against QUEVEDO-CRUZ**

Juana Hilda Gonzales Lomeli's (hereinafter "Lomeli") confession and testimony is

4

insufficient to establish probable cause for QUEVEDO-CRUZ's involvement or participation in the kidnapping of Miranda because it was obtained through coercion and given involuntary. Lomeli reported in her April 16, 2007 declaration, which was filed with the Mexican Front for Human Rights of the Federal District Association, physical abuse, threats, and coercion to which she was subjected during the February 8, 2006 interrogation by the agents who conducted the interrogation (Exhibit 1, Report filed with Mexican Front for Human Rights and certified translation). The report states that an agent grabbed her by her hairs, put her head on the floor and a gun to her head while threatening to detain her brother if she would not cooperate. She further reported that she was sexually molested by police officers during the interrogation. After hours of verbal abuse and threats, Lomeli signed a confession statement that was prepared by the police without knowing its contents in order to end the treatment by the police agents. She reported that she never consciously signed the statement and suspects that she was drugged by her interrogators because she did feel dizzy and extremely tried at this time after having been given something to drink.

Lomeli's report and the circumstances of the interrogation are confirmed by her attorney Ambar Trevino Perez (hereinafter "Perez"), whom she retained shortly after the incident on February 11, 2206 (Exhibit 2, Affidavit of Perez). Perez confirms her account of the February 8, 2006 interrogation and his observation of injuries indicating that Lomeli was physically mistreated.

Before he was retained by Lomeli, Perez had met her on February 4, 2006 at the jail when accompanying another individual accused of the crime against Miranda. He recalls that at this time Lomeli did not have bruises on her neck and face, was not wearing a cast on her right arm, and did not have scars on her left arm. He further confirms Lomeli's suspicion of being

drugged while interrogated because she told him that felt week and dizzy when she signed the confession prepared by her interrogators.

Furthermore, on February 10, 2006 Perez filed a motion to withdraw Lomeli's involuntary confession because it was given involuntary. The motion has not been ruled on yet.

**b) Alberto and Tony Castillo Cruz's testimony is not sufficient to sustain the charges against QUEVEDO-CRUZ.**

Perez was also informed in early March 2006 by Helena Bustamante, the mother of Alberto and Tony Castillo Cruz, about the mistreatment of her sons by the police. The brothers, who are also accused of the crime against Miranda, were repeatedly beaten and threatened by police officers who demanded 200,000 peso to stop the beating according to her report. When meeting Alberto Castillo Cruz in March 2006, Perez observed bruises in his face and right eye (Exhibit 2, Affidavit of Perez).

**c) Testimony and Affidavit of QUEVEDO-CRUZ's mother before the Immigration Judge contradicts any involvement in the crime.**

QUEVEDO-CRUZ's mother, Pasiana Enriqueta Cruz-Gomez, testified in the removal proceedings before the Immigration Judge on February 15, 2008 that QUEVEDO-CRUZ told her that she had never met Miranda. She further testified that QUEVEDO-CRUZ had ended a brief relationship with Jacobo Tagle Dobin, one of the suspects in the case, before the alleged kidnapping of Miranda.

Furthermore Pasiana Enriqueta Cruz-Gomez testified that a Mexican police squad was searching her home after the alleged kidnapping when she came home. The officers pointed a loaded gun at her from short distance and physically abused her in order to learn about the

whereabouts of her daughter (Exhibit 3, pages 43 to 51 Transcript of the February 15, 2008

hearing before the Immigration Court Chicago).

Pasiana Enriqueta Cruz-Gomez also confirmed the mistreatment and intimidation of

Alberto and Tony Castillo Cruz by police officers and their demand for 200,000 pesos to stop

their harassment (Exhibit 3, pages 66 to 71 Transcript of the February 15, 2008 hearing before

the Immigration Court Chicago).

Pasiana Enriqueta Cruz-Gomez further signed an affidavit about the Mexican police's

harassment and interrogation tactics in order to obtain her confession to her daughter's

involvement in the alleged crime and refusal of counsel. (Exhibit 4, Affidavit and translation of

Pasiana Enriqueta Cruz-Gomez).


**d) Violent and torturous interrogation practices by the Mexican police has been reported in the past and casts considerable doubt on the evidence that forms the basis for the arrest warrant issued by the Mexican authorities.**


Although in certifying the arrest warrant to the Secretary of State the court is not required

to consider humanitarian or other concerns outside the scope of the extradition treaty that could

bar QUEVEDO-CRUZ's extradition, it should review the evidence submitted by the Mexican

government and the U.S. government's complaint in light of the interrogation practices of the

Mexican police in order to determine whether it shows proximate cause for QUEVEDO-CRUZ

involvement in the crime against Miranda.

"Torture continues to play a key role in Mexico's criminal justice system – it is still

widely used by state agents and forms the basis of numerous unfair convictions" per an 2007

Amnesty International report (Exhibit 5).  Furthermore, the Human Rights Watch World Report

for 2007 also states "[t]orture remains a widespread problem within the Mexican criminal justice

system" (Exhibit 6).

The reports support the evidence about interrogation practices in violation of U.S. and international law by the Mexican police and government in obtaining testimony that implicates QUEVEDO-CRUZ in the alleged crime and are further proof for lack of proximate cause to sustain the charges against her.


WHEREFORE, the government's request for certification of the extradition warrant should be dismissed for lack of probable cause for QUEVEDO-CRUZ's involvement in the alleged crime.

Respectfully submitted,
BRENDA QUEVEDO-CRUZ


BY: s/Stanley J. Horn
STANLEY J. HORN
Attorney for Plaintiff
Horn, Khalaf, Abuzir, Mitchell & Schmidt
2 North LaSalle, Suite 630
Chicago, IL 60602
Telephone: (312) 281-5444
Fax: (312) 558-9075
E-mail: shorn@hkamlaw.com

UNITED STATES DISTRICT COURT
NORTHERN DISTRICT OF ILLINOIS
EASTERN DIVISION

IN THE MATTER OF THE )
EXTRADITION OF )
)                    No. 08 M 85
BRENDA QUEVEDO-CRUZ )
)                    Hon. Martin C. Ashman
)

CERTIFICATE OF SERVICE

I, Stanley J. Horn, hereby certify that the following document: DEFENDANT'S BRIEF IN OPPOSITION TO REQUEST FOR EXTRADITION WARRANT was served on July 14, 2008 in accordance with Fed. R. Crim. P. 49, Fed. R. Civ. P. 5, LR 5.5, and the General Order on Electronic Case Filing (ECF) pursuant to the district's system as to ECF filers, in the above captioned case was sent by first-class mail on July 14, 2008 to: Shoshana Leah Gillers, United States Attorney's Office (NDIL), 219 S. Dearborn Street, Suite 500, Chicago, Illinois 60604.

Respectfully submitted,
BRENDA QUEVEDO-CRUZ

BY: s/Stanley J. Horn
STANLEY J. HORN
Attorney for Plaintiff
Horn, Khalaf, Abuzir, Mitchell & Schmidt
2 North LaSalle, Suite 630
Chicago, IL 60602
Telephone: (312) 281-5444
Fax: (312) 558-9075
E-mail: shorn@hkamlaw.com

**The following translation is an extract from an annex to Juana Hilda Gonzalez Lomeli's declaration. I have extracted page 1 for title purposes, pages 8-15, and the last page (pg. 23) to finish and highlight her declaration.**

**Mexican front Pro Human Rights**
**Of the Federal District Civil Association**
**"Peace, Justice and Freedom"**
**Notarary record 54270**

No. of Folio_____

MEXICO, Mexico City, on <u>16</u> OF <u>APRIL</u> OF <u>2007</u>

C. PRESIDENT OF THE ADVICE
EXECUTIVE OF THE FEDERAL DISTRICT, A.C.
PRESENT

HE O SHE WHO SIGNS C. <u>JUANA HILDA GONZALEZ LOMELI</u>
AGE <u>31</u> SEX <u>FEMALE</u> NATIONALITY <u>MEXICAN</u>
WITH DOMICILE IN: <u>TENORIOS 91 CASA 5-C</u>
COLONY OR RANCH <u>COAPA</u>
DELEGATION, MUNICIPAL OR DEPARTMENT <u>IZTAPALAPA</u>
_____ C.P. _____
TELEPHONE <u>55191778</u>   COUNTRY <u>ICO</u>
MAKES IT KNOWN OF ILLICITS OF THE PERSON WITH MORAL AUTHORITY OR PUBLIC, THE ONE WHO ANSWERS TO THE NAME OF <u>SIXTEENTH COURT OF DISTRICT OF PENAL FEDERAL PROCESSES</u>
CON PARENTESCO O CARGO DE <u>P.G.R. GENERAL LAWYER'S OFFICE OF THE REPUBLIC</u>
THAT IS LOCATED IN _____
HECHOS: Everything began 12 July (2005) around 1700, I came down for some Sushi I ordered, I was at the domicile Perugino #6, Apartment 4, Colony Extremadura Insurgentes, around 1600 hours I had solicited my order of Sushi by telephone, when I come down and open the door of my building, I notice that a lot of police and civil personnel and others enter, some ladies outside with other persons and they ask me............

**EXHIBIT**

tabbies®

1.

Pages 8-15 labeled by Juana Hilda Gonzalez Lomeli

Until 8 February of 2006 first in the morning at about 1000 hours they sent me to a cubicle where they did processes, there came an Public Ministry from the SIEDO joined by 2 persons of the feminine sex, where they told me that I had to take 2 pictures that they needed and in that occasion my lawyer was there either, to which I asked if it was mandatory for them to take them, and they responded to me that yes and they again asked for my general data and they were recording me, to which I opposed no resistance and accepted, after that, they sent me to put my fingerprints on some pieces of carton like the first time and later they told me to wait, they take me back up to my stay and at approximately 1330 hours they take me back down again and they tell me I have processes and I go down and they tell me that I have to go with them, the ones from the SIEDO and I asked them, "For what, why?" They said because I had a hearing, and I told them that I had them always in those cubicles and they were unoccupied, only one was occupied, there they had my boyfriend Cesar, and they answered me that it couldn't be done there because my lawyer could not go to that place, that she was going to be where we where going to go, that they were going to take me out of the detention place and take me to the SIEDO and since I didn't know and obeying, I respected what they indicated paying them attention. I arrived at the offices of the SIEDO and as soon as I get there, that pass me to a room with two tables, and a man comes in to interview me and I begin talking with him, and when reiterating the precisely didn't know anything of what they had previously asked me, what I mean in the first interview that he did on 11 January 2006, to add that it was him who made the interview the first time, well then that was the second time that I saw him again and to tell him the same that I did not know what he was talking about, I remember it from this time since I arrived, very kindly he offered me something to drink and he was taking little bottles of water that were finished and very amiable he would exchange them for another full one, about half an hour later an attorney arrived, I believe she was from the Public Ministry from there and was participating with her, later she retired and he passed me to a room that was very small and from one second to the other he change his voice and the way he was treating me, he grabbed my arm real hard and with high-sounding words he began to tell me that he was tired of fighting with me and me that I was so stupid that I could not notice that in all that time that my boyfriend was a kidnapper and I so stupid living with him and in addition they had all the information, and since I was shocked I responded that I didn't know anything, that I in truth ignored everything that he told me, but I was real scared already and he grabs me by the hair and he puts my head on the floor with the gun on my head and he says, " What do you think, if I return your brother to jail, do you think you can cooperate? Or better yet listen." And then he dials the phone of my daughter and puts the receiver on my ear and I take it way from him and tell him to leave my daughter in peace. "What do you want me to do? And he was making fun of me and would say: "Ah, you're going to cooperate?" Well I began to tremble and cry, with much fear, never has this happened to me and that day before I had talked to my daughter, her father had told me that there were weird people in the corner of your house, like if they were spying and I had told him no to worry about it, that it was part of the investigation, but that there was no problem, that they were simply checking that nothing illicit would happen. In the end, in that moment

was real sick and later he would tell me, the one from the SIEDO that I couldn't do anything, that everything was against me and that with one call he could do whatever he wanted and to see that they could not take me out of the detention center but that they could do whatever they wanted, and that they knew I had nothing to do with this but my boyfriend did, that because my lover had already said everything, that she was the one that would talk on the telephone with Hugo Alberto Wallace, and the only thing I said was that I did not know of any of that. To which he responded, "Well you have no option, to decide, that when I would leave there, there were police from the District already there and that they were not going to have any compassion for me, nor that they were going to believe I was innocent and they were going to hit me down, that at that moment I did not understand that phrase, and he told me again, "So are you going to cooperate? Or do I dial again?" And I couldn't stop crying due to the impotence and obviously I was scared and he grabbed me and covered my mouth and began to touch my breasts and told me, "Ah, look how pretty, maybe you don't feel good? I ask you because shortly when they take you the other police, its going to be around 10 the ones that are going to touch you like that all good", and I couldn't take any more and I said what did they want? To leave in peace, and he would say nothing, you are only going to accept everything that I say you did and very clear, you are going to sign, but in front of your lawyer you are not going to be able to ask nor say anything about this, so that you can see that this is serious, shortly you are going to notice that there are other persons detained and so that you can see that it is serious and everything I say is done, and since I didn't know why, or who they had detained, for a moment I thought it was my brother; I answered what did they want me to do, and he responded again, to accept and I said, as long as they leave my family in peace and that they would not touch me anymore, I would do it, and then he returned to the table. The Public Ministry opens the door and comes in and he tells the Public Ministry that everything is about to start, that I already was saying everything and he begins to dictate what I supposedly had said, and my attorney arrived at 1600 hours and they tell her that I had already said everything and the guy that did everything to me, next to me, looking at me, and the lawyer asked me that if I am okay, that why did I look bad, and I answered that I am well, and she says, if you don't want don't sign because I do not see you well and in addition I was not here when you supposedly said everything, well I with all my fear of everything, I said no that I did want to sign, inclusive the man fought with my lawyer, because she saw that I was so bad that she did not want me to sign. But since I was so scared, I said yes for us to sign, because I felt that if I didn't do it, they were going to kill me, or my family and the truth, I preferred that they do whatever to me, but not to touch my family, and in total, nothing mattered to me anymore at that moment. 1900 hours arrived, and the lawyer had to retire and she asked me how I felt, I told her bad, but that I couldn't do anything, since they did not permit me to talk with her, and the lawyer, angry, answered since when are lawyers here for adornment, but to not put myself in any more problems, I told them that nothing was going on, and they gave me the papers and I signed, but in those moments I don't remember with accuracy, why I began to get dizzy and my vision got cloudy, and the only thing I told the lawyer before she left, I asked, "That if they were not going to take me to the police men outside" Because in that condition I had signed, to which the lawyer answered me, "What police men are you talking about? And I told her that guy told me about them, and she was very upset and said, look, I don't know who told you that, but I have to hurry but tomorrow

morning I am going to see you at the detention center, and if they threatened or did something to you, you tell me, because I don't know why they took you out, if they did not have permission to do it. But you explain everything tomorrow and it doesn't matter that you have signed, that because I was not there, I put in a demand against all of this, and she told me in front of them and she retired, that was at 1900hours, and they do the dissimulation like they were going to take me, when the same guy came back again and begins to say that if I really did not think that they could hit me down there, not only me but all my family, that why did I say all of that to the lawyer, that she had already told me that with no one should I talk to, not even the AFIS, with nobody, and he sat me and begins, and I don't know to tell me so many things, that I already felt even more dizzy and I begin to listen but far away, and I begin to get real sleepy, and I don't remember anything, until almost 0500 hours approximately, the ascend me to an SUV and I don't know the destination.......

**Translation of the last page of the Annex to Juana Hilda Gonzalez Lomeli's declaration:**

Page 23

Miranda passes after the 8 of February 2006 since the 12 of July that she was talking with me and even her chauffer saw me and recognized that it wasn't me. Why does she now say it was me? Why did she not detain me from that moment, or why does she not prove the expert reports of the fingerprints on the SUV, since I supposedly went to the theater with her son in the SUV, in resolution why those and other things so illogical that are said about all of this and that nothing is seen clearly, and for this and for this type of situation I would like to invite the people really interested, so that they could realize the truth, the truth that is in these records that are full of thoughts, it seems, they say, I listened and more stupidities that would not finish. The only situation is that it is unjust that they end more than a profession, a life, a life that I will never be able to live again with that liberty, of innocence that I used to live, because this place is full of evil, of revenge, of anger and vengeance , that I ask GOD soon to recuperate my life, my family, and my liberty...

Translated by:

Fernando Lopez

Notary Public
John E. Band
Notary expires 1-24-2010

# Frente Mexicano Pro Derechos Humanos
## del Distrito Federal Asociación Civil
### "Paz, Justicia y Libertad"
Registro Notarial 54270

No. De Folio _____

MÉXICO, D.F, A _16_ DE _ABRIL_ DE _2007_

C. PRESIDENTE DEL CONSEJO
EJECUTIVO DEL DISTRITO FEDERAL, A.C.
P R E S E N T E

LA O EL QUE SUSCRIBE C. _Juana Hilda Gaciñez Joseph_
EDAD _31_ SEXO _FEMENINO_ NACIONALIDAD _MEXICANA_
CON DOMICILIO EN _Fenchicis   91 CASA 5-C_
COLONIA O RANCHERIA _COMPA_
DELEGACION, MUNICIPIO O DEPARTAMENTO _ISTAPALAPA_
_____ C.P. _____
TELEFONO _55/9/7-7-8_ PAIS _MEXICO_
HACE SABER DE ILICITOS DE LA PERSONA CON AUTORIDAD MORAL
O PUBLICA, QUIEN RESPONDE AL NOMBRE DE _JUZGADO_
_DÉCIMO   SEXTO   DE DISTRITO DE PROCESOS PENALES FEDERALES_
CON PARENTESCO O CARGO DE _P.G.R_

QUE SE UBICA EN _____
HECHOS: TODO INICIA 12 Julio (2005) ALREDEDOR DE LAS 5:00 PM
BATÉ POR UN PEDIDO DE SUSHI YO ME ENCONTRABA EN EL
DOMICILIO PERUGINO #6 DEP 4, COL. EXTREMADURA INSURGENTES,
DE SUSHI POR TELEFONO YO HABIA SOLICITADO EL PEDIDO
DE MI EDIFICIO, ME PERCATO CUANDO BAJO A ABRO LA PUERTA
PERSONAS CIVILES Y ENTRE OTROS Q ENTRAN MUCHOS POLICIAS Y
CON UNAS PERSONAS Y ME PREGUNTAN O UNAS SEÑORAS AFUERA

Q DUNDE ESTABA EL DEL HIJA
Q EN UN MOMENTO LOS ATENDIA YA Q ESTABA PAGA
MI PEDIDO, SE PASAN AL EDIFICIO Y EN ESO ABRE LA
TA MI VECINA VANESA B LA DEL DEP. DE PLANTA BAJA
ME DICE PASA AMIGA TE ESTABA ESPERANDO PARA COMER
Q YO HABIA QUEDADO DE COMER AHI, CUANDO ME PASO YO A
UNA DE SUS RECAMARAS CON SU HIJO, Y DE PRONTO K
HABIAN Y ME EMPIEZAN A INTERROGAR Q SI YO SOY
LA DEL DEP. Y A LO CUAL LES CONTESTO Q SI, Y ES Q
YA LA SEÑORA MIRANDA MIENTRAS YO ESTABA PAGANDO EL P
DIDO ELLA YA ME HABIA INTERROGADO Y ME EMPEZARON A
PREGUNTAR Q QUE HABIA HECHO UN DIA ANTES EN LA NOCHE
LO CUÁL LES COMENTÉ Q HABIA IDO AL CINE CON UNA AM
GA Y ME PREGUNTAN Q SI CONOCIA O ERA NOVIA I
HUGO ALBERTO WALLACE, A LO Q LES RESPONDI Q NO LO
CONOCIA YA LE HABIA DICHO MOMENTOS ANTES A LA SEÑ
Q SE ENCONTRABA AFUERA DEL DOMICILIO, Y Q EFECTIVAM
TE YO TENIA NOVIO PERO Q VIVIA EN CUERNAVACA Y
TENIA 2 AÑOS CON ÉL, Y ME PREGUNTABAN Q EN Q TRA
BAJABA YO, Q POR Q ANDABAN BUSCANDO A UNA MUJER, R
DIA, NALGONA CON QUDIS GRANDES Y Q TRABAJABA EN EL FUND
TORI, PERO Q SE PROSTITUIA A LO CUÁL MUY MOLESTA LES
DIJE, PUES Q ESTABAN EQUIVOCADOS YA Q YO NO ME PROST
TUIA Y PUES TAMPOCO ERA RUBIA NI OJOS VERDES, Y LE
DIJE Q POR Q CONMIGO? Y ME RESPONDIERÓN Q PUES LI
CAMIONETA DE ESTE MUCHACHO ESTABA A TRES CUADRAS Y
Q PUES POR VECINOS, PREGUNTANDO LAS CARACTERISTICAS D
LA MUJER Q ELLOS BUSCABAN LES DIJERON EL NUM. DEL
EDIFICIO Y Q AHI HABIA VARIAS GÜERITAS; PERO Q SI Y
NO ERA Q SI PODIAN EN ESE MOMENTO HABLARLE AL CH
FER DEL MUCHACHO PARA Q ÉL ME VIERA, YA Q ÉL SI CO
CIA A LA MUCHACHA Q SALIA CON HUGO ALBERTO WALLACE,
A LO CUÁL LE CONTESTÉ Q SI, EN ESE MOMENTO LE HABIAN
AL CHOFER ES UN MUCHACHO CHAPARRITO MORENO DELGAD
Y ME PONEN ENFRENTE DE ÉL, YO ESTABA AHI EN EL D
DE VANESA EN LA PUERTA DE SU DEP, ELLA ESTABA PRES
TE EN TODO ESTO Q SUCEDIA, Y LE PREGUNTAN LAS POLICI
AL CHOFER ¿ES ELLA LA MUJER? Y SE ME QUEDA VIEND
EL MUCHACHO DE ARRIBA ABAJO, Y CONTESTA ¡NO! Y TO
DAVIA ELLOS LE DICEN SEGURO Q NO ES ELLA, POR Q ELL
ES LA DEL DEP Y Y LE VUELVEN A DECIR Y EL RESPO
DE ¡NO! LA MUCHACHA Q YO CONOZCO ES MAS ALTA,

JUANA HILDA GONZALEZ Ismael

2- Y ELLOS ME DICEN DISCULPE SEÑORITA PERO ESTE
ES NUESTRO TRABAJO ALO CUÁL LES CONTESTO YO ¡
¡NO HAY PRODLEMA! / Y SE RETIRAN DE AHÍ Y
SE SALEN DEL EDIFICIO Y SE ESTAN EN LA CALE
EN LA BANQUETA Y EN ESOS MOMENTOS HABIA
YA MÁS FAMILIARES DE ESE MUCHACHO WALLACE,
Y A TODAS LAS PERSONAS Q IBAN LLEGANDO AL
EDIFICIO LES PREGUNTABAN LO MISMO, PERO
LLEGABAN MUY AGRESIVOS Y DESESPERADOS Q HAS-
TA LOS ASUSTABAN, YO ME PERCATÉ CUÁNDO LLE-
GÓ UNA COMPAÑERA DEL EDIFICIO CON SU NOVIO Y
LOS PARARON EN LA PUERTA DEL EDIFICIO , Y LO
MISMO LE PREGUNTARON, ELLA ESTABA CON SU NOVIO,
Y LO MISMO FUE CON LA VECINA # 3 PUES
ES Q ELLAS TAMBIÉN ERAN GÜERITAS, AL PO-
CO RATO ME RETIRO YO DEL LUGAR, ALO CUÁL.
ME ACOMPAÑA VANESA C/ LOS BEBES PARA TOMAR
UN TAXI Y NO IRME SOLA Y A Q ERA YA
UN POCO TARDE! APROX 9:00 PM TOMO EL
TAXI Y REGRESO A MI DOMICILIO PARA DE-
JAR A VANESA C/ SUS BEBES AHI EN PERUGINO
YO ME VOY, AL DIA SIGUIENTE TEMPRANO,
REGRESO POR UNA MALETA C/ ROPA Y ME
RETIRO NO VI NADA FUERA DE LO NORMAL,
PASAN 16 DIAS APROX, CUANDO REGRESO A MI
DEP. Y ME PERCATO Q MI PUERTA ESTABA A-
BIERTA Y COMO YA ME HACIAN ROBADO ⟶

3- Juana Hilda Gonzalez Juarez

EN 2 OCASIONES, PUES LUEGO, LUEGO, PRESENTI
ALGO, CUANDO ENTRO Y VEO Q MIS COSAS ES-
TABAN MEDIAS MOVIDAS PERO MUY DISCRETO,
EN CUANTO VEO ML ALAJERO NO TENIA YA
MIS ALAJAS DE ORO NI MIS LENTES ERAN COMO
10 PARES DE MARCA Y 2 TELEFONOS CEL, Y EN
ESO ME COMENTA MI VECINA AL SALIR YO DEL
EDIFICIO Q DIAS ANTES OSEA COMO EL 15 O
16 DE JULIO DEL 2005 VIO A UNAS PERSO-
NAS ADENTRO DE MI DEP #4 TOMANDO FOTOS,
YA Q COMENTABAN Q AHI TENIA YO A ALGU-
EN SECUESTRADO, YA Q HABIA DEJADO LA
TELE PRENDIDA, SIENDO Q SIEMPRE LA DE-
JABA PRENDIDA Y CUANDO NO ERA LA TELE ERA
EL RADIO, PERO PUES NADIE SABIA ESO Y YO LO
DEJABA PUES CON EL FIN DE Q PENSARAN Q
YO ESTABA AHI, PARA EVITAR PRECISAMENTE Q
SE METIERAN A ROBAR, EN FIN LE PREGUNTE
A MI VECINA Q SI ELLA SABIA ¿QUIEN HABIA
ENTRADO? Y LO UNICO Q ME DIJO Q ERA
LA MISMA SEÑORA Q ME HABIA INTERROGADO
LA VEZ DEL DIA 12 DE JULIO, Y PUES YO
IGNORABA Q TODAVIA SEGUIA ESE PROBLEMA YA
Q PARA MI HABIA QUEDADO CLARO DESDE ESE DIA,
ME RETIRE DEL LUGAR Y LO UNICO Q
VI PRUDENTE FUE HABLARLE A LA CASERA DEL
EDIFICIO Y PREGUNTARLE SI ELLA SABIA ——>

Tema  Hilda  Gonzalez  Jonell
4.-

Q ESTABA PASANDO AHI YA Q ELLA ERA
LA ENCARGADA DEL EDIFICIO Y PUES LO ÚNICO
Q ME DIJO ES Q DESCONOCIA, Y LE COMEN-
TÉ Q SE HABIAN METIDO A MI DEP, A VER
SI ELLA SABIA ALGO, Y ME DIJO Q ¡NO! A
LO CUAL YO LE DIJE Q ME HABIAN ROBADO
Y Q YA ERA LA 3ra VEZ QUE ME PASA-
BA ESO, Y LA VERDAD YO NO ME IBA
A EXPONER A MAS, A LO CUAL LE COMEN
TÉ Q YA LE IBA A ENTREGAR EL DEP,
Y Q APARTE ME IBA IR A MIAMI A
GRABAR UNOS VIDEOS Y Q DE UNA VEZ SE
LO IBA A ENTREGAR YA Q ESTABA MUY MOLES-
TA Y ASUSTADA POR TODO LO Q ESTABA PA-
SANDO, YA Q LE DIJE Q YA ME IBA A TRA-
ER A MI HIJA A VIVIR CONMIGO PERO ASI
NO PODIA HACER NADA, LO CUAL ME ENTENDIÓ
YA Q YO NUNCA LE HABIA DADO PROBLEMAS,
DE NINGÚN TIPO.
                    ( TENORIOS 91 CASA 5-C )
DESPUÉS DE UNA GIRA Y GRABACIONES DE
VIDEOS Y PELICULA, EN LOS ANGELES, MIAMI,
Y MÉXICO, REGRESO EN NOVIEMBRE 2005 A
MÉXICO Y ME VOY A VIVIR A LA CASA DE
MI NOVIO YA Q EL DEP. DE PERUGINO SIEMPRE
VIVI YO SOLA NUNCA VIVIÓ MI NOVIO CONMIGO,
ENTONCES LLEGO Y VIVO CON EL EN NOVIEMBRE.

5.- Juana Hnda Gonzalez Donald
(2006)

Diciembre y el 11 de enero me detienen en la entrada del domicilio Tenorios 91 casa 5-C col Villa Coapa, me detienen sin ninguna orden solo me preguntan mi nombre y me suben a una camioneta rota, a lo cual no puse resistencia y me llevaron a las oficinas de siedo, cuando llego a esas oficinas me percato q ahi tenian a mi hermano, osea q momentos antes ya lo habian detenido, y en cuanto llegué me empezaron a entrevistarme y a rendir declaracion, preguntandome desde q yo vine a radicar a México y asi estuve acompañada de una defensora de oficio, despues de toda la declaracion me permanecieron haciendome entrevistas del dia 11 de Jullo del 2005, a lo cual les comente, todo lo sucedido o relatado anteriormente, y asi estuve sin dormir hasta el dia siguiente despues del cateo q hicieron en el domicilio Tenorios 91 casa 5-C en lo cual me dijeron q encontraron unas armas a lo cual les dije q yo desconocia q estuvieran ahi y un Jic de ahi de siedo me dijo en tono amenazante pues q tenia q decir q eran de mi novio, o de lo contrario se las iban a poner a mi hermano y pues de esa manera lo ——>

6- Juan Hilda Garraez Ismael

PODRIAN DETENER DE NUEVO, YA Q A MI HER-
MANO UN DIA ANTERIOR LO HABIAN DEJADO LIBRE
PUES YA Q VIERON Q EL TAMBIEN DESCONOCIA DE TODO
ESTO, Y DE ESE MODO POR Q NO VOLVIERAN A
AGARRAR A MI HERMANO DIJE PUES Q EXACTAMEN-
TE LAS ARMAS ERAN DE MI NOVIO, YA Q EN
VERDAD NI YO LAS HABIA VISTO, PUESTO Q YO
APENAS TENIA 3 MESES VIVIENDO CON EL, E INCLU-
SO HASTA ESA FECHA TODAVIA NI SIQUIERA ELLOS
TENIAN EL NOMBRE DE MI NOVIO COSA Q YO POR
COOPERAR CON ELLOS YO FUI QUIEN SE LOS DI, POR
Q SE SUPONIA Q ALA Q ANDABAN BUSCANDO Y
Q TRAIA AVERIGUACIÓN ERA YO POR SER GÜERITA
Y YA Q EN EL CATEO ENCONTRARON FOTOS
DE NOSOTROS Y DE SU AMIGO JACOBO Y ELLOS
ME DECIAN QUIEN TENIA Q VER EN ESTO ERA
JACOBO, EN FIN NO ME RESISTI A NADA Y
SIMPLEMENTE TRATÉ DE COOPERAR EN TODO LO
Q SE ME PREGUNTABA Y EXPLICANDOLES TODO
CONFORME ME LO PREGUNTABAN, AHI PERMANECI
HASTA Q ME TRASLADARON A LA CASA DE ARRAI-
GO DE DOCTORES Q FUE APROX 14 DE ENERO
2006), LLEGO AL ARRAIGO Y PASA APROX: 4
DIAS CUANDO ME BAJAN AL AREA DE DILIGENCIAS Y
AL CUBICULO DONDE LLEGO ESTABAN 6 PERSONAS DEL
SEXO MASCULINO A LO CUÁL ME EXTRAÑÓ MUCHO
YA Q SE SENTIA PESADO EL AMBIENTE Y JE →

7- Isidra Hilda Gonzalez Jamai!

Pregunto a un ministerio público Q estaba ahi, ¿Q Porq tantos hombres si para Q me estaban citando? Y me contesta Q para Ampliar mi declaración ya Q no había quedado bien la anterior y pues como en realidad no conocia mis Derechos, Pues yo para cooperar con ellos les vuelvo a dar mi declaración y aparte aportarles datos de mi novio, ya Q me decian Q ya sabian Q yo no tenia nada Q ver, Pero Q él con su Amante si lo había hecho, y yo les dije Q si era verdad lo Q ellos decian, Pues Q yo no les podia afirmar nada ya Q yo desconocia de todo lo Q se me señalaba, y Pues Q lo buscaran ya Q yo no iba a encubrir algo asi, y asi fue como les dije lo único Q yo sabia, Donde lo podran localizar y los domicilios de sus negocios y sus telefonos y direcciones y nombre completo ya Q ellos no tenian nada de eso, y efectivamente a unos dias logran detenerlo y justo con una amante, y agregando Q en esa diligencia me dieron a firmar toda la declaración y Q si me la leyeron y desconosco si exista, ya Q en esa diligencia no estuvo mi abogada incluso desconosco quién les dió axceso a esas personas y quienes eran ——>

8- Izama Huda Gonzalez Joncin

Por q en realidad nunca se identificaron conmigo y duré 6 horas en esa diligencia lo recuerdo perfectamente ya q yo fui la q les dije q ya estaba muy cansada ya q no habia comido, per q de no decirles yo eso, ellos me hubieran tenido mas tiempo y es q me dolia mucho la cabeza por q todos preguntaban al mismo tiempo varias cosas y tratando de q me confundiera con lo q estaba diciendo y asi les dije q ya me sentia mal y fue del modo q me dejaron retirar;

Despues de esa ocasión ya no me molestaron.

Hasta el 8 de Febrero 2006 primero por la mañana como alas 10:00 AM me pasaron a un cubiculo donde se hacian las diligencias venia un M.P. de siedo junto con 2 personas más del seko femenino, donde me dijeron q tenian q tomarme 2 fotos q necesitaban y en esa ocasión tampoco estaba mi abogada, a lo cual les pregunté q si era obligatorio q me las tomaran y me respondieron q si y me volvieron a pedir mis datos generales y me estaban grabando, a lo cual no opuse resistencia y acedi, despues de eso me pasaron a q pusiera mis huellas ——>

a- Icana Hilda Gonzalez Jamell

EN UNOS PEDAZOS DE CARTONCITOS COMO LA 1ra vez
Y DESPUES ME DIJERON Q ME ESPERARA,
ME SUBEN A MI ESTANCIA Y APROXIMADAMENTE
ALA 1:30 PM ME BAJAN Y ME DICEN Q
TENGO DILIGENCIA Y VUELVO A BAJAR Y
ME DICEN Q TENGO Q IR CON ELLOS LOS
DE SIEDO. Y LES DIJE ¿Q PARA? Q PORQ
TENIA UNA AUDENCIA Y LES DIJE Q PUES SIEM-
PRE ME LA HACIAN EN ESOS CUBICULOS Y
ESTABAN DESOCUPADOS, SOLO UNO ESTABA OCU-
PADO AHI TENIAN A CESAR MI NOVIO, Y
ME CONTESTARON Q AHI NO PODIA SER POR Q
MI ABOGADA NO PODIA IR A ESE LUGAR Q ELLA
IBA A ESTAR DONDE IBAMOS Q ME IBAN A
SACAR DE AHI DEL ARRAIGO Y LLEVARME A
SIEDO Y PUES YO SIN SABER Y OBEDE-
CIENDO ACATÉ LO Q ME INDICABAN HACIENDO-
LES CASO, LLEGUÉ A LAS OFICINAS DE SIEDO Y
EN CUANTO LLEGO ME PASAN A UN CUARTO CON
DOS ESCRITORIOS Y SE PASA UN TIPO A EN-
TREVISTARME Y YO COMIENZO A PLATICAR CON
ÉL, Y PUES AL REITERARLE Q EFECTIVAMENTE
NO SABIA NADA DE LO Q YA ANTERIORMENTE
ME HABIA PREGUNTADO OSEA EN LA PRIMER ENTRE-
VISTA Q ME HIZO EL DIA 11 DE ENERO /2006
INCLUSO FUE ÉL, EL Q ME HIZO LA ENTREVISTA
PRIMERA TAMBIÉN, ENTONCES PUES YA ERA

Juana Hilda Gonzalez Jewell

10-

La segunda vez q lo volvia a ver y a decirle lo mismo q desconocia de lo q me hablaba, lo q recuerdo de esta vez es q desde q llegué muy amablemente me ofreció algo de tomar y estuvo tomando botellitas de agua q se terminaba y amable me las cambiaba por otra llena, como a la media hora llegó una lic, creo q era M.P. de ahi y él estaba platicando con ella, después ella se retiró y él me pasó a un cuartito q era muy pequeño y de un segundo a otro cambió su tono de voz y su trato hacia a mi, me estrujó muy fuerte del brazo y con palabras altizonantes me empezó a decir q ya estaba harto de estar liriando conmigo y yo q estaba tan pendeja como para no haberme dado cuenta en tanto tiempo q mi novio era un secuestrador y yo tan estupida, viviendo con él y q ademas ya tenia toda la información, y pues yo ya muy mal le respondo q yo no se nada q de verdad ignoro todo lo q me decia pero yo ya con mucho miedo y me toma del cabello y pone en el piso con la pistola en la cabeza y me dice ¿q crees q si refundo a tu hermano a la carcel, crees q puedas cooperar? o mejor escucha→

-11-

Juana Hilda Gonzalez Israel

Y EN ESO MARCA AL TEL DE MI HIJA Y
PONE LA BOCINA EN MI OIDO Y YO SE LO
QUITO Y LE PEDO Q DEJE A MI HIJA
EN PAZ, Q QUIERE Q HAGA? Y EL BUR-
LANDOSE ME DECIA A YA VAS A COOPERAR,
Y YO PUES EMPECE A TEMBLAR /A LLORAR,
Y CON MUCHO TEMOR /JAMAS ME HABIA PASADO
ESO Y ES Q DIAS ANTES Q YO HABIA HABLA-
DO CON MI HIJA SU PAPA ME HABIA DICHO Q
HABIA GENTE RARA EN LA ESQUINA DE SU CASA, COMO
SI ESTUVIERAN ESPIANDONOS, Y YO LE HABIA DI-
CHO Q NO SE PREOCUPARA Q ERA PARTE DE LA
INVESTIGACION, PERO Q NO HABIA PROBLEMA Q
SIMPLEMENTE ESTABAN CHECANDO Q NO HICIERA NA-
DA ILICITO, EN FIN EN ESE MOMENTO YA ESTA-
BA MUY MAL Y LUEGO EL ME DECIA, EL DE
DEDO Q PUES YO NO PODIA HACER NADA Q
TODO ESTABA EN MI CONTRA Y Q PUES EL CON
UNA LLAMADA HACIA LO Q QUERIA Y PUES Q VIERA
Q SE SUPONIA Q NO ME PODIAN SACAR DEL ARRAI-
GO PERO Q ELLOS PODIAN HACER LO Q QUISIERA,
Y Q PUES YA SABIA Q YO NO TENIA NADA
Q VER PERO MI PAREJA SI, Q POR Q SU
ADELANTE YA HABIA DICHO TODO YA Q ELLA
ERA LA Q LE HABLABA POR TELEFONO A HUGO
ALBERTO WALLACE, Y PUES YO LO UNICO Q LE
DIJE ES Q DESCONOCIA DE TODO ESTO ———> .

12- Juana Hilda Gonzalez Jovell

A LO CUAL ME RESPONDIÓ, PUES Q NO TENÍA
OPCIÓN, Q DECIDIERA YA Q AL SALIR DE AHÍ,
DE TODOS MODOS YA ESTABAN ESPERÁNDOME POLI-
CIAS DEL DISTRITO Y Q ELLOS NO ME IBAN A
TENER COMPASIÓN NI ME IBAN CREER Q ERA INO-
CENTE Y ELLOS SI ME IBAN A DAR PARA ABAJO,
Q EN EN EL MOMENTO YO NO ENTENDI ESA FRASE
Y ME VOLVIÓ A DECIR ¿Q ENTONCES YA VAS
A COOPERAR? O MANO DE NUEVO, Y YO NO PA-
RABA DE LLORAR DE IMPOTENCIA Y CLARO MIEDO
Y ME AGARRA Y ME TAPA LA BOCA Y ME
EMPIEZA A TOCAR EL BUSTO Y ME DICE AH
MIRA Q BONITO, A POCO NO SIENTES RICO, TE
PREGUNTO PORQ AHORITA Q TE LLEVEN LOS OTROS
POLICIAS VAN A SER COMO (10) LOS Q TE VAN
A TOCAR ASÍ DE RICO, Y YA NO AGUANTÉ Y LE
DIJE Q ¿QUE QUERIA? Q ME DEJARÁ EN PAZ,
Y ME DICE NADA, SOLAMENTE VAS ACEPTAR TODO
LO Q YO DIGA Q DIJISTE Y CLARO VAS
A FIRMAR, PERO DELANTE DE TU ABOGADA NO
PUEDES PREGUNTARME NI DECIR NADA DE ESTO,
PER Q PARA Q VEAS Q ESTO ES EN SERIO AHO-
RITA TE VAS A DAR CUENTA DE Q YA ESTÁN
DETENIDAS OTRAS PERSONAS Y PUES PARA Q
VEAS Q SI ES SERIO Y SE CUMPLE TODO.
YO Q TE DIGO, Y PUES YO NO SA-
BIENDO POR Q, O A QUIÉN HABÍAN ——→

13- Juana Helga Gonzalez Jamil

DETENIDO, POR UN MOMENTO llegué A PENSAR Q ERA MI HERMANO; ya LE CONTESTE Q QUERIA Q HICIERA, y ME RESPONDIÓ DE NUEVO Q ACOR-TES y LE DIJE CON TAL DE Q DEJE A MI FAMILIA EN PAZ y ya NO ME TOCARA LO IBA HACER, EN ESO REGRESO AL ESCRITORIO ABRE LA PUERTA y PASA LA M.P y LE DIJE Q ya VA EMPEZAR, Q YO YA LE ESTABA DICIENDO TODO y LE EMPEZA A DIC-TAR EL LO Q SUPUESTAMENTE YO LE HABIA DICHO, y MI ABOGADA llegó A LA 4:00 PM y LE DICEN Q YO YA HABIA DICHO TODO y EL TIPO Q ME HIZO TODO A LADO MIO ; MIRANDOME y LA ABOGADA ME PREGUNTA Q SI ESTOY BIEN Q POR Q ME VE MAL, y yo LE CONTES-TO Q ESTOY BIEN, y ME DICE SI QUIERES NO FIRMAMOS POR Q yo TE VEO MAL y ADEMAS YO NO ESTUVE AQUI CUANDO SUPUESTAMENTE DI-JISTE TODO y yo PUES CON EL TEMOR DE TODO y LE DIGO Q NO, Q SI DIJE y Q SI QUIE-RO FIRMAR, INCLUSO EL TIPO HASTA SE PE-LEÓ CON MI ABOGADA POR Q ELLA ME VIÓ TAN MAL Q NO QUERIA FIRMAR ; PERO YO COMO TE-NIA TANTO MIEDO LE DIJE Q SI FIRMABAMOS POR Q yo SENTIA Q SI NO LO HACIA ME IBAN A MATAR , O A MI FAMILIA y LA VERDAD YO PREFERIA Q A MI ME ⟶

14.- Juan    Hilda   Gonzalez   Someri

Hicieran lo Q quisieran, pero Q no toca-
ran a mi familia || total Q no me im-
portaba ya nada en ese momento, llegó las
7:00 pm || la abogada se tenia Q reti-
rar || pues me pregontó Q cómo me sentia
le dije Q mal, pero Q no podia hacer nada
ya Q no me permitieron hablar con ella,
a lo cuál hasta la abogada molesta les
contestó Q de cuándo acá los abogados no-
más estaban de adorno, pero yo para ya
no meterme en más problemas le dije Q no
pasaba nada || me dieron los papeles
|| firmé pero yo en esos momentos ya
no recoerdo con exactitud Q pasaba por
Q empezé a marearme || la vista nubrada,
y lo único Q le dije a la abogada an-
tes de Q se fuera le pregonté ¿ Q si ya
no me iban a llevar los policias de
afuera? por Q con esa condición habia
yo firmado, a lo cuál me contesta la
abogada ¿de Q policias me hablas? || le
dije Q el tipo ese me dijo de ellos,
y ella muy molesta dijo, mira no se
quién te haya dicho eso pero ahorita
llevo mucha prisa pero mañana voy a
verte al arraigo || si te amenazaron o te
hicieron algo me lo dices, por Q incluso—➔

15— ___ Hija Garaze Josil

YO NO SÉ NI PORQ TE SACARÓN, SI NO TENIAN NI EL PERMISO, PARA HACELLO PERO ME EXPLICAS TODO MAÑANA Y NO IMPORTA Q YA HAYAMOS FIRMADO PERO COMO YO NO ESTABA METO UNA DEMANDA DE TODO ESTO," Y ESO ME LO DIJO DELANTE DE TODOS ELLOS Y SE RETIRÓ, ESO FUE A LAS 7:00 PM EN ESO YA HACEN LA FINTA COMO DE Q YA ME VAN A LLE-VAR CUANDO ME REGRESA EL MISMO TIPO Y ME EMPIEZA A DECIR Q SI DE VERDAD NO CREIA Q ME PODIAN DAR PARA ABAJO Y NO SOLO A MI SINO A TODA MI FAMILIA, Q PARA Q LE DECIA ESO A MI ABOGADA Q YA ME HABIA DI-CHO Q CON NADIE DEBERIA DE PLATICAR NI CON LOS REES, CON NADIE, Y ME SIENTA Y EMPIEZA NO SÉ A DECIRME TANTAS COSAS Q YO YA ME SENTIA MAS MAREADA Y EMPIEZO A ESCUCHARLO PERO LEJOS Y EMPIEZO CON MUCHO SUEÑO Y A NO RECUERDO NADA, HASTA COMO A LAS 5:00 P.M. APROX, ME SUBEN A UNA CAMIONETA DESCO-NOSCO EL DESTINO SOLO RECUERDO Q SEÑALARON UN BUM DEL PAPÁ DE UNA AMIGA Y LES DI-JE Q SI ERA ESE, Y UNAS CUADRAS ADELANTE, DE ESA DIRECCIÓN DE CUATENOC Y MORENA ADELAN-TE SIENTO UN GOLPE MUY FUERTE PERO EN CAMARA LENTA, SÓLO SENTÍ, Q SE ME FUÉ LA RESPIRACIÓN, LO ÚNICO Q ME PERCATÉ —>

23- Juana Hnda. Gonzalez Jauw

MIRANDA PASA DESPUÉS DEL 8 DE FEBRERO
(2006) Y NO DESDE EL 12 DE JULIO Q
ELLA ESTUVO HASTA CONVERSANDO CONMIGO Y
SU CHOFER HASTA ME VIÓ Y RECONOCIÓ Q
NO ERA YO, ¿PORQ SI AHORA DICE Q SOY
YO? ¿POR Q NO ME DETUVO DESDE ESE
MOMENTO, O POR Q MAS AÚN NO MUESTRA
LOS PERITAJES DE LAS HUELLAS DE LA CAMIONE-
TA YA Q SUPUESTAMENTE FUI AL CINE CON
SU HIJO EN ESA CAMIONETA, EN FIN COMO ESAS
Y OTRAS COSAS TAN PERO TAN ILÓGICAS
Q SE DICEN DE TODO ESTO Y Q NO SE
VE NADA CLARO Y POR ESTE TIPO
DE SITUACIÓN YO QUISIERA INVITAR A
LA GENTE DE VERDAD INTERESADA PARA
Q SE DIERAN CUENTA DE LA VERDAD LA
VERDAD Q ESTÁ EN ESOS EXPEDIENTES Q ESTÁN
LLENOS DE CREO, PARECE, DICEN, ESCUCHÓ Y
MAS ESTUPIDECES Q NO TERMINARÍA, LA
ÚNICA SITUACIÓN ES Q ES INJUSTO Q TRON-
QUEN MÁS Q UNA CARRERA, UNA VIDA, UNA
VIDA LA Q NUNCA SE VOLVERÁ A VIVIR
CON ESA LIBERTAD, DE INOCENTE Q ANTES
YO VIVÍA, POR Q ESTE LUGAR ESTÁ LLENO
DE MALDAD, DE RENCOR, DE CORAJE, DE VENGANZA
Q YO LE PIDO A DIOS PRONTO RECUPE-
RAR MI VIDA, MI FAMILIA, Y MI LIBERTAD..

# AFFIDAVIT

I, Ambar Trevino Perez, being first duly sworn depose and states as follows:

1.  I am the attorney for Juana Hilda Gonzalez Lomeli, who is accused of being involved with Brenda Quevedo in the crime of murder and kidnapping of Hugo Alberto Wallace.

2.  I am familiar with all the circumstances surrounding these accusations.

3.  I first met Juana Hilda Gonzalez on February 4, 2006 at the jail in Mexico City when I accompanied another individual accused of the crime involving Hugo Alberto Wallace and Cesar Freyre's mother in the jail in Mexico City at the SIDEO office of detention by the Federal police. At the time of the meeting, present was Cesar Freyre, who was in custody, Rosa Morales (mother of Cesar) Juana Hilda Gonzalez and Julette Morales (sister of Cesar). At that time when I first observed Juana Hilda Gonzalez she had no marks or bruises on her face or body. However, at that time, I did not represent her as she had a public lawyer representing her.

4.  The next time I saw Juana Hilda Gonzalez was on February 11, 2006, in jail, when I was retained as her lawyer. At that time, I observed bruises on her neck and face. She had a cast on her right arm and scars on her left arm. At that time she told me that she was questioned and drugged to obtain a statement regarding the kidnapping and alleged murder of Hugo Wallace. At that time she had been charged but did not recall or knowingly make any confession. This is probable because at the time of the initial questioning she believed that she was drugged. All she remembered was signing a confession which was already prepared by the Federal prosecutor. She did not know what it contained and she did not read or write it. She also told me while she was in jail, the police were molesting her by fondling her breast and other parts of her body. She stated that she was afraid of being raped. On that day, I

EXHIBIT

tabbies'

2.

spent two hours with her and discussed her case with her. At all times she maintained her innocence and at no time did she ever state that she confessed.

5. After February 11, 2006, I saw her almost twice a week I found out about the confession of Juana Hilda Gonzalez approximately February 20, 2006. At that time I told her about the confession. She stated that she never gave any information to the chief of Federal prosecutors, Fermin Ubaldo and Braulio Robles, or any other Federal Agents or any other Federal prosecutors. She told me that she never read the confession, never gave any information and only signed because the police and the prosecutor threatened her family. She was told by these individuals that her mother and six year old daughter were held in custody and would be held in custody until she signed the confession implicating all the parties implicating Brenda Quevedo.

6. In early March 2006, the two brothers Tony and Albert Castillo, who were also implicated by Juana Hilda Gonzalez's confession, advised their mother, Helena Bustamente, that the police wanted 200,000 peso in order to stop beating Alberto. When he as arrested a bag was placed over his head to terrorize him. When I first met Alberto in jail in March, 2006, he was bruised in the face and right eye. Cesar Freyre told me that the police beat Alberto prior to our meeting. These beatings continued for an extensive period of time.

7. While in custody since 2006, Cesar Freyre has been tortured. He has been beaten by the police. He had electrodes placed on his thorax and they set electricity currents through the electrodes causing him great pain and to faint. This happened at least twice because they wanted him to confess and he has refused to do so. Because of the torture, he has had continuing medical problems while in jail. He is receiving minimal medical care. (See attached statement of Cesar Freyre Morales)

8. On February 10, 2006, a Motion was filed to withdraw the confession (see attached). This Motion has been ignored by the Federal Police, the prosecutor and the Court. Even though it

has been more than two years and the police have continued to be guilty of torture to solve the case. No action has been taken to find the real parties guilty or release accused from custody. This renounced confession has been used to substantiate the warrant of extradition.

9. I believe that if Brenda Quevedo is returned to Mexico, she will suffer the same fate as Juana Hilda Gonzalez. She will face beatings, sexual molesting and possible rape if she does not execute a confession identical to that of Juana Hilda Gonzelez.

10. There is no guarantee of a fair trial.

11. Torture is an accepted form of interrogation by the Mexican police and even a confession induced by torture is accepted by the Mexican Courts. All forms of abuse are acceptable with the exception of death.

Further Affiant Sayeth Not.

Ambar Trevino Perez
Attorney At Law
Attorney for Juana Hilda Gonzlez

Subscribed and Sworn to
Before me this *12th* day of
March, 2008

Notary Public

**U.S. Department of Justice**
Executive Office for Immigration Review
United States Immigration Court


Matter of                                    File A 88 513 956



                                   )
                                   )
BRENDA QUEVEDO-CRUZ                 )    In REMOVAL Proceedings
                                   )
                                   )
                Respondent         )         Transcript of Hearing



Before ROBERT D. VINIKOOR, Immigration Judge



Date:  February 15, 2008              Place:  Chicago, Illinois



Transcribed by FREE STATE REPORTING, INC., at Annapolis, Maryland



Official Interpreter:  Herman Real


Language:  Spanish


Appearances:

     For the Department of
     Homeland Security:              For the Respondent:

     Seth B. Fitter                  Stanley Horn
                                     Omar Amazir


**EXHIBIT**

**3.**

1    JUDGE FOR THE RECORD

2         For the record, this is a continued removal hearing being

3    held on February 15th, 2008, before Immigration Judge Robert D.

4    Vinikoor at the Immigration Court sitting at Chicago.  This

5    hearing relates to Brenda Quevedo, File A 88 513 956.  This

6    respondent is in court by televideo from the McHenry County

7    Jail.  Present also in Chicago is the respondent's attorney,

8    Stanley Horn, and Omar Amazir.  The Government attorney is Seth

9    Fitter, and we have the Spanish interpreter, Herman Real

10   (phonetic sp.).

11   JUDGE TO MR. REAL

12        Mr. Interpreter, would you raise your right hand.  Do you

13   solemnly swear that you will interpret to the best of your

14   ability from English into Spanish and Spanish into English?

15   MR. REAL TO JUDGE

16        I do, Your Honor.

17   JUDGE TO MR. REAL

18        Thank you.

19   JUDGE TO MR. HORN

20        And, Mr. Horn, would you identify yourself again.

21   MR. HORN TO JUDGE

22        Stanley Horn, 2 North LaSalle Street, Chicago.

23   JUDGE TO MR. AMAZIR

24        And, Mr. Amazir?

25   MR. AMAZIR TO JUDGE

1        Omar Amazir on behalf of the respondent.

2    JUDGE TO MR. FITTER

3        And, Mr. Fitter?

4    MR. FITTER TO JUDGE

5        Seth B. Fitter for the Government.

6    JUDGE TO MS. QUEVEDO-CRUZ

7        Q.    Ms. Quevedo, will you state your name, please.

8        A.    Brenda Quevedo-Cruz.

9        Q.    Do you speak and understand English?

10        A.    Yeah.

11        Q.    We're going to have you testify in English, but if you

12    don't understand a question, raise your hand and we'll repeat

13    that question for you through the interpreter.

14        A.    Okay.

15    JUDGE TO MS. QUEVEDO-CRUZ

16        Okay.

17    JUDGE TO MR. HORN

18        Now, Mr. Horn, are you going to be speaking for the

19    respondent today or is Mr. Amazir?

20    MR. HORN TO JUDGE

21        Both of us, Judge.

22    JUDGE TO MR. HORN

23        Okay.

24    MR. AMAZIR TO JUDGE

25        He's going to be lead, Judge, and then --

1    JUDGE TO MR. AMAZIR

2        Okay.

3    JUDGE TO MR. HORN AND MR. FITTER

4        I want to first explain to the respondent her situation.

5    JUDGE TO MS. QUEVEDO-CRUZ

6        Q.   Ma'am, we had a prior hearing in your case, I believe

7    in January of this year.  At that time your attorney admitted

8    that you were not a citizen of the United States, that you're a

9    native and citizen of Mexico.  He admitted that you crossed the

10   border illegally without inspection and that you could be

11   deported from the United States for entering illegally.  He

12   asked that you not be deported but you be considered for asylum

13   in the United States.  A person is eligible for asylum if they

14   could how that they were persecuted in the past or have a well-

15   founded fear of future persecution on account of their race,

16   religion, nationality, membership in a particular social group

17   or political opinion, and so your attorney has filed with the

18   court a request for asylum.  Do you understand that?

19       A.   Yes, I do.

20       Q.   A request for asylum is also considered a request for

21   withholding of removal, which is a similar form of relief that

22   would allow someone not to be deported to a specific country.

23   So Mr. Horn has also asked that you not be deported to Mexico.

24   There is also a similar form of relief but different called

25   withholding of removal under the United Nations Torture

A 88 513 956                    24              February 15, 2008

1    Convention.  If you do not qualify for asylum or withholding of

2    removal, you can still make an application for withholding of

3    removal under the Torture Convention.  That application does not

4    have the same requirements as an asylum application.  Asylum --

5    even though you have a fear of harm, you cannot qualify for

6    asylum unless the fear of harm is based on your race, religion,

7    nationality, membership in a particular social group or

8    political opinion, but in an asylum -- in a Convention against

9    Torture case, you would only have to show that it's more likely

10    than not that you would be tortured not on account of those

11    specific other reasons.

12    JUDGE TO MR. HORN

13        So, Mr. Horn, you're seeking asylum, withholding and

14    Torture Convention protection; is that correct?

15    MR. HORN TO JUDGE

16        That's correct, Judge.

17    JUDGE TO MR. HORN

18        Okay.

19    JUDGE TO MR. HORN AND MR. FITTER

20        Now I see that Judge Katsivalis marked the application in

21    the record as Exhibit No. 2.

22    JUDGE TO MS. QUEVEDO-CRUZ

23        Q.   Ma'am, would you just raise your right hand.  Do you

24    solemnly swear that the information in your request for asylum

25    is true and that you've signed your application in your true

1    name?

2         A.    Yes, I do.

3         Q.    Thank you.    Do you also -- just raise your hand one

4    more time -- do you also swear that any testimony you give today

5    will be the truth, the whole truth and nothing but the truth so

6    help you God?

7         A.    Yes, I do.

8         Q.    Okay, put down -- put down your hand. Now it looks

9    like the Department of Homeland Security has also filed evidence

10   in your case, ma'am.    I'm not sure if Judge Katsivalis marked

11   that separately or not.

12   MR. HORN TO JUDGE

13        He did not, Judge.

14   JUDGE TO MR. HORN

15        Okay.   Did you get a copy of that?

16   MR. HORN TO JUDGE

17        I got it yesterday or the day before yesterday; I'm not

18   sure.

19   JUDGE TO MR. HORN

20        Okay.

21   JUDGE TO MR. HORN AND MR. FITTER

22        Now what this appears to be, this is received February 5th.

23   It's stamped in court February 5th, so it must have been served

24   in court before Judge Katsivalis February 5th.

25   MR. HORN TO JUDGE

```
 1          Just part of it.

 2     MR. AMAZIR TO JUDGE

 3          I mailed it out.

 4     MR. HORN TO JUDGE

 5          He mailed it out, Judge.

 6     JUDGE TO MR. HORN

 7          So how did this stamp get on there?  Was there a hearing on

 8     February --

 9     MR. AMAZIR TO JUDGE

10          I walked it down and it was --

11     JUDGE TO MR. HORN

12          Okay.  So there was no hearing on February 5th?

13     MR. HORN TO JUDGE

14          No.

15     MR. AMAZIR TO JUDGE

16          No.

17     JUDGE TO MR. HORN

18          Okay.  Well, this evidence by the Government attorney

19     appears to be a certified arrest warrant relating to Brenda

20     Quevedo-Cruz and a sworn statement from another person.  Now,

21     Mr. Horn, have you had a chance to go over this with your client

22     or --

23     MR. HORN TO JUDGE

24          I have not, Judge.  I have not.  I just got it served the

25     day before yesterday.  He was in custody.  I was out at
```

1    Woodstock, and when I was out at Woodstock, I did not have it.

2    JUDGE TO MR. HORN

3        Okay.  So do you want more time to go over this with your

4    client?

5    MR. HORN TO JUDGE

6        Well, I would like to get -- yes, I would like to go over

7    it with her, but there's witnesses here who flew in from Mexico,

8    so I'd like to go ahead with the witnesses, and if you want to

9    mark this for identification, I have no problem with that, but

10   as far as getting it admitted into evidence, I do have an

11   objection to that.

12   JUDGE TO MR. HORN

13       Okay, that, that's fine.  That's fine  So I'll mark it for

14   identification purposes only today.

15   MR. HORN TO JUDGE

16       So, I mean, we'll have another date on this, so

17   (indiscernible).

18   JUDGE TO MR. HORN

19       Yeah.  I'm --

20   JUDGE TO MS. QUEVEDO-CRUZ

21       Q.    Ma'am, I'm not going to be able to complete your case

22   today.  Do you understand that?

23       A.    Yeah.

24       Q.    But I am going to start your hearing today and take

25   evidence today, and then I'll have to continue it for more

A 88 513 956                    28              February 15, 2008

1    evidence at a later date, but your attorney has indicated that

2    he does have some witnesses and he would like to present those

3    witnesses today if at all possible.

4    JUDGE TO MR. FITTER

5        Not, Mr. Fitter, I mean, do you have witnesses available to

6    testify today or not?

7    MR. FITTER TO JUDGE

8        No, I have no witnesses now, and I'm surprised that if I

9    mailed it out February 5th -- I mailed it to Mr. Amazir's office

10   because -- well, I'm not going to discuss why I didn't mail it

11   to Stanley Hall because I'm not quite sure where his office is

12   at the present time, so I mailed it to Omar Amazir on

13   February 5th.  So I'm not quite sure why --

14   JUDGE TO MR. FITTER

15       Okay, well, I'm not sure -- I'm not, I'm not sure why this

16   case has to be continued, but in any event, I, I note Mr. Horn's

17   objection to it being admitted into the record at the present

18   time.  So I'll grant Mr. Horn's request for more time.

19   JUDGE TO MR. HORN

20       Now it looks like you did put together and file with the

21   Court some supporting evidence; is that right. Mr. Horn?

22   MR. HORN TO JUDGE

23       I did, that's correct, Judge.

24   JUDGE TO MR. FITTER

25       Did you get that, Mr. Fitter?

1   MR. FITTER TO JUDGE

2        No.   When was that done, Judge?

3   JUDGE TO MR. FITTER

4        It was stamped in February 4th.   It's the 2007 World Report

5   and Amnesty International article.

6   MR. HORN TO JUDGE

7        And I served that personally on the -- on your office.

8   JUDGE TO MR. HORN

9        You mean at 55 East Monroe?

10  MR. HORN TO JUDGE

11       55 East Monroe.

12  JUDGE TO MR. HORN

13       Okay.

14  JUDGE TO MR. HORN AND MR. FITTER

15       So I'm going to mark that supporting evidence as Exhibit

16  No. 4 for purpose of the record.

17  MR. HORN TO JUDGE

18       And that's for identification, too, Judge?

19  MR. FITTER TO MR. HORN

20       Yes.

21  JUDGE TO MR. HORN AND MR. FITTER

22       Okay, so I'll mark that for identification purposes as

23  well.   Now, Mr. Fitter, I've already made a finding of

24  removability in this case, so it's now the respondent's burden

25  to go forward with the evidence to show that she's eligible for

1    asylum, withholding of removal or Torture Convention protection.

2    So I'm going to allow Mr. Horn to proceed with his case in

3    chief.  Now before we do that, Mr. Horn, I see some issues right

4    at the, at the outset.  In order to be eligible for asylum or

5    withholding of removal, you have to show that the fear of harm

6    is on account of one of those five grounds.  Who does the

7    respondent fear in this case because on her application the only

8    thing that is checked off is membership in a particular social

9    group or Torture Convention.  So are you claiming that she fears

10   harm as a member of a particular social group?

11   MR. HORN TO JUDGE

12       As, as a woman she fears harm and more important and the

13   primary relief would be Torture Convention relief, Judge.

14   JUDGE TO MR. HORN

15       Okay.  Well, I mean, we can get into the case in chief with

16   regard to Torture Convention protection, but there's two issues

17   in dealing with asylum.  First, whether or not there are serious

18   reasons to believe the respondent has, has committed a, a -- if

19   there are reasons to believe that she's committed a serious non-

20   political offense outside the United States.  The Seventh

21   Circuit Court of Appeals has said that the standard for that

22   determination is probable cause, and if in fact there are

23   reasons to believe she's committed such an offense, then she

24   would not be eligible for asylum or withholding of removal.

25   Secondly, even if, even if there are not reasons to believe

1    she's committed a crime outside the United States that's a

2    serious non-political offense, she would still have to meet

3    statutory requirements for asylum.

4    MR. HORN TO JUDGE

5         I agree with that, right.

6    JUDGE TO MR. HORN

7         So I'm not sure if your witnesses are here today to address

8    that first issue whether it's likely she committed a serious

9    non-political offense outside the United States or, or what

10   because I, I'd like to try and see if we could even identify a

11   particular social group that she's a member of because if you

12   can't identify a cognizable social group, then we could just

13   move right into the Torture Convention claim.

14   MR. HORN TO JUDGE

15        I think we should move right into the Torture Convention

16   claim, Judge.

17   JUDGE TO MR. HORN

18        Okay.  So you're -- at this point you're not really seeking

19   asylum or withholding?

20   MR. HORN TO JUDGE

21        No, we're really seeking Torture Convention relief.

22   JUDGE TO MR. HORN

23        Okay.  So I'll, I'll note for the record that you're not

24   going to argue that she's a member of a particular social group

25   and --

1    MR. HORN TO JUDGE

2        No, not, not at this time, no.

3    JUDGE TO MR. HORN

4        Okay.  So I'll, I'll note for the record that you're not

5    going to argue that she's a member of a particular social group

6    and --

7    MR. HORN TO JUDGE

8        No, not, not at this time, no.

9    JUDGE TO MR. HORN

10       Okay.  So now let's -- and then I don't really need to

11   address whether or not there are reasons to believe she's

12   committed a serious non-political offense and make a decision on

13   probable cause because that only is an issue for asylum and

14   withholding.

15   MR. HORN TO JUDGE

16       Right.  At this point that's correct.

17   JUDGE TO MR. HORN

18       Okay.  So then we're just going to limit this case to a

19   withholding of removal application under the Torture Convention.

20   MR. HORN TO JUDGE

21       Right.

22   JUDGE TO MR. HORN

23       Okay.  So now we -- we're square on that. I don't know why

24   then you would object to the Warrant of Arrest.

25   MR. HORN TO JUDGE

1        I don't object to the Warrant of Arrest.   What I object to

2    is the attachment to it, which is a statement which is full of

3    inconsistencies which was done under the influence of drug and

4    torture to the witness who made that statement.

5    JUDGE TO MR. HORN

6        Okay, but, but that's not really an issue before the Court.

7    MR. HORN TO JUDGE

8        Well, that's part of their exhibit, Judge.   Part of their

9    exhibit is that -- where is it -- part of their exhibit is not

10   only -- well, part of their exhibit is, one, is the warrant from

11   the Department of the (indiscernible) through a Federal court

12   because we're going to contest the extradition part of it, but

13   they also attested -- attached here a statement from a witness,

14   and that's what I object to.   It's full of inconsistencies.   It

15   was done --

16   JUDGE TO MR. HORN AND MR. FITTER

17       Well, let me ask Mr. Fitter this.   Mr. Fitter, it was my

18   understanding that before an arrest warrant could be issued in

19   Mexico there normally is an investigation, and then there are

20   fact witnesses that present testimony to the police and to a

21   court before the arrest warrant is issued.

22   MR. FITTER TO JUDGE

23       That's correct, Judge.

24   JUDGE TO MR. FITTER

25       Now which court issued this arrest warrant?   Can you point

A 88 513 956                    34              February 15, 2008

1    that out to me?

2    MR. FITTER TO JUDGE

3       Well, let me just say it was the, it was the trial court,

4    the criminal court.

5    JUDGE TO MR. FITTER

6       Okay.  So I can't tell where it is.  Is this Mexico City?

7    MR. FITTER TO JUDGE

8       It's Mexico City, correct.

9    MR. HORN TO JUDGE

10      It doesn't say that.

11   JUDGE TO MR. FITTER

12      So the City of Mexico, Federal District --

13   MR. FITTER TO JUDGE

14      Right.

15   JUDGE TO MR. FITTER

16      -- on December 31st.  What's the name of the court there?

17   Can you tell from this?  I mean, what page of your exhibit shows

18   the court?  And then you're submitting the affidavit just to

19   show what evidence the court heard before issuing the arrest

20   warrant?

21   MR. FITTER TO JUDGE

22      I think, I think this statement was made after the arrest

23   warrant was issue, but let me, let me check the dates.  Hold on.

24   This was done on February 8, 2006, and the arrest warrant was

25   issued on --

A 88 513 956                     35              February 15, 2008

1    JUDGE TO MR. FITTER

2        I mean, was this arrest warrant issued by the police or by

3    the -- by a court?

4    MR. FITTER TO JUDGE

5        By the court.

6    MR. HORN TO JUDGE

7        Where -- I don't see that, Judge.

8    JUDGE TO MR. HORN AND MR. FITTER

9        Well, I'm just trying to clarify it.  It does -- well,

10   let's go off the record while you look for that.

11   MR. FITTER TO JUDGE

12       Okay.

13   JUDGE TO MR. FITTER

14       And the, the affidavit that Mr. Horn is objecting to, was

15   that an affidavit that was made to the court or an affidavit

16   given to the police or, or what?

17   MR. FITTER TO JUDGE

18       Let me take a look.

19   JUDGE TO MR. FITTER

20       Let's go off the record while you look that up.

21                          (OFF THE RECORD)

22                          (ON THE RECORD)

23   JUDGE FOR THE RECORD

24       We're back on the record.

25   JUDGE TO MR. FITTER

A 88 513 956                    36              February 15, 2008

1     Mr. Fitter, I can't tell who issued this warrant, whether

2    it came from a court, whether it was from the prosecutor's

3    office. It looks like it was authenticated by the prosecutor's

4    -- public prosecutor for the Federal District in December of

5    2007, but it appears on page 20 of the affidavit that Mr. Horn

6    had referred to was an affidavit that was, was taken before the

7    public, federal public defender's office, February 8th, 2006. So

8    I don't know if you need to get someone to testify

9    telephonically from the federal public defender's office as to

10   how this was put together, who issued the warrant or you can get

11   someone from the Mexican Consulate in Washington as a liaison to

12   explain it to me.

13   MR. FITTER TO JUDGE

14     Okay.

15   JUDGE TO MR. FITTER

16     Because what Mr. Horn seems to be arguing is that this came

17   from the prosecutor's office and not from a court.

18   JUDGE TO MR. HORN

19     Now in any event we'll pass over that issue, and we'll go

20   to your first witness. Would that be the respondent or someone

21   else?

22   MR. HORN TO JUDGE

23     I'm going to bring -- call the respondent in first, Judge,

24   and then we've got one, two, three witnesses at a minimum; maybe

25   four.

1    JUDGE TO MR. HORN

2        Okay.  So those witnesses are going to have to have a seat

3    outside.

4                              (OFF THE RECORD)

5                              (ON THE RECORD)

6    JUDGE FOR THE RECORD

7        We're back on the record.

8    JUDGE TO MR. HORN

9        Mr. Horn, you've indicated that due to the lateness of the

10   hour, you would want to call your out-of-town witnesses first;

11   is that right?

12   MR. HORN TO JUDGE

13       I do, Judge.

14   JUDGE TO MR. HORN

15       Okay.  So who will your first witness be?

16   MR. HORN TO CRUZ-GOMEZ

17       Q.    Would you state your name, please.

18       A.    Pasiana Enriqueta Cruz-Gomez.

19   JUDGE TO MR. REAL

20       Okay, will you try and spell the first name for me, Mr.

21   Interpreter.

22   MR. REAL TO JUDGE

23       Pasiana?

24   JUDGE TO MR. REAL

25       Yes.

```
1    MR. REAL TO JUDGE

2         P A S I A N A.

3    MR. HORN TO MS. QUEVEDO-CRUZ

4         Q.    Brenda, can you hear all of this?

5         A.    Yes.

6         Q.    And can you see your mother?

7         A.    No.

8    MR. HORN TO MS. CRUZ-GOMEZ

9         Okay.  Pull your chair --

10   JUDGE TO MR. HORN

11        I'll just move the televideo screen, Mr. Horn.

12   MR. AMAZIR TO JUDGE

13        I'll, I'll spell it out.  I'll spell it out for the record,

14   if you require it.

15   JUDGE TO MR. AMAZIR

16        Okay, so will you repeat -- spell it, Mr. Amazir.

17   MR. AMAZIR TO JUDGE

18        Okay.  First name is P A S I A N A.  Middle name,

19   E N R I Q U E T A.  Last name Cruz-Gomez.

20   JUDGE TO MR. AMAZIR

21        Thank you very much.

22   JUDGE TO MR. HORN

23        Okay, go ahead, Mr. Horn.

24   MR. HORN TO JUDGE

25        Okay.
```

1    MR. HORN TO MS. CRUZ-GOMEZ

2         Q.    And where do you live?

3         A.    In Mexico, Federal District.

4         Q.    Okay.  And are you a citizen and resident of Mexico?

5         A.    Yes.

6         Q.    And are you related to the respondent here?

7    JUDGE TO MR. HORN

8         You can ask her if she's the mother of Brenda.

9    MR. HORN TO JUDGE

10        Okay.

11   MR. HORN TO MS. CRUZ-GOMEZ

12        Q.    Are you the mother of Brenda Cruz?

13        A.    Yes.

14        Q.    Okay.  And now are you aware of -- and up to the time

15   that Brenda left Mexico, were you --

16   JUDGE TO MR. HORN

17        We don't even have that in the record yet, Mr. Horn.

18   There's no foundation for that, so why don't we start a little

19   more basic.

20   JUDGE TO MS. CRUZ-GOMEZ

21        Q.    Did Brenda live with you until what age, ma'am, or how

22   old --

23        A.    Twenty-five.  Twenty-five years.

24        Q.    And what's Brenda's date of birth?  What's Brenda's

25   date of birth, ma'am?

1        A.    It's August 24th of 1980.

2        Q.    And do you know when she left Mexico and came to the

3    United States?

4        A.    Approximately --

5        Q.    Do you know what year?

6        A.    June, July of 2006.

7        Q.    And, and --

8        A.    Pardon me.   August.

9        Q.    Okay.   And have you seen her since she came to the

10   United States?

11       A.    No.

12       Q.    Have you communicated with her?

13       A.    Only if family member would tell me that she was doing

14   fine.

15       Q.    And did you know that she was going to leave Mexico

16   and come to the United States?

17       A.    No.   I found out afterwards.

18       Q.    Was she living with you when she left or was she

19   living separate from you?

20       A.    No, since before, but the situation that we were

21   living, she was outside of the house.

22       Q.    Okay.   Do you know who she was living with?

23       A.    With a family member.

24       Q.    Who was it?

25       A.    With some family members.   Towards the end, with her

1    father's family.

2         Q.    Okay.   Who is Brenda's father?

3         A.    Roberto Quevedo Pereda.

4    JUDGE TO MR. REAL

5         Spell that, Mr. Interpreter.

6    MR. REAL TO JUDGE

7         Roberto is R O B E R T O, first name, Quevedo,

8    Q U E V E D O, Pereda, P E R E D A.

9    JUDGE TO MS. CRUZ-GOMEZ

10        Q.    And was Brenda living with her father or someone else?

11        A.    There where father lives her grandmother lives also.

12   JUDGE TO MR. HORN

13        Okay, go ahead, Mr. Horn.

14   MR. HORN TO JUDGE

15        Okay.

16   MR. HORN TO MS. CRUZ-GOMEZ

17        Q.    Prior to the time of August 8th, '06, and prior to the

18   time that Brenda lived with you, did she live with someone else

19   for a period of time?

20        A.    Yes.   She was in London in the year 2003-2004.

21        Q.    And what was she doing in London?

22        A.    She went there to work and to study language, English.

23        Q.    Okay.   And how long was she in London?

24        A.    One year, almost a year and a half.

25        Q.    And when did -- what year did she come back to -- I'm

1    sorry -- what year did she come back to Mexico?

2         A.   2004.

3         Q.   And when she came back to Mexico, did she live with

4    somebody?

5         A.   She lived a little bit with me.  Then afterwards she

6    went to live with a friend, with a female friend.  That's when

7    she knew -- that's when she met Jacobo Table Dobin.

8         Q.   Do you know when that was?

9    JUDGE TO MS. CRUZ-GOMEZ

10        Q.   Is that, is that Jacobo, J A C O B O, Table,

11   T A B L E, Dobin, D O B I N?

12        A.   Yeah.

13        Q.   Okay, and who is Jacobo?

14        A.   That was her boyfriend.

15        Q.   And so she --

16        A.   Brenda's boyfriend.

17        Q.   So she lived with him after returning from London?

18        A.   Yes, a month afterwards.  Toward the end, the end of

19   December '04.  She met him toward the end of 2004.

20        Q.   Now do you know how long your daughter lived with

21   Jacobo?

22   MR. HORN TO MR. AMAZIR

23        He's going to ask the questions.

24   MR. REAL TO JUDGE

25        I'm sorry, Your Honor.  Would you repeat that question.

1    JUDGE TO MR. HORN

2        Go ahead.

3    JUDGE TO MS. CRUZ-GOMEZ

4        Q.   Do you, do you know long your daughter lived with

5    Jacobo?

6        A.   I only remember a few months.

7    MR. HORN TO MS. CRUZ-GOMEZ

8        Q.   Okay, and what did he --

9        A.   Very few.  Very few.

10       Q.   And then what -- do you know what he did for a living?

11       A.   I knew that he sold and bought all of appliances for

12   the home and cars.

13       Q.   Okay.  And after they broke -- after Brenda quit

14   living with him, what did she do?

15       A.   I imagine that she was very scared because she left

16   then.  I haven't spoken with her very well, but, but she

17   realized or she noticed this situation because he, because he

18   wouldn't tell her that he was, that he was changing, he was

19   changing addresses because he had sold a car that might have

20   been stolen.

21       Q.   Okay.  So did she ever go back to live with him?

22       A.   No.  When this came out in all the newspapers, Jacobo

23   Table, that's when she notice all the situation.

24   JUDGE TO MS. CRUZ-GOMEZ

25       Q.   Well, what came out in the newspapers, ma'am?

A 88 513 956                        44                   February 15, 2008

1        A.    It came out that he was a killer, a kidnapper, and

2    that he was responsible for the kidnapping of -- he was blamed

3    for the kidnap of Hugo Alberto Wallase.

4    JUDGE FOR THE RECORD

5        That's H U G O   A L B E R T O   Wallace --

6    MR. HORN TO JUDGE

7        W A L L A S E.

8    JUDGE FOR THE RECORD

9        W A L L A C E.

10   JUDGE TO MS. CRUZ-GOMEZ

11       Q.    Is that Miranda, Wallace Miranda?

12       A.    Isabel Miranda Wallace, his mom.

13       Q.    Okay, well -- so was -- when did this come out about

14   Jacobo in the papers?  You know the time?

15       A.    More or less February of 2006.

16   MR. HORN TO MS. CRUZ-GOMEZ

17       Q.    Have you -- did you ever meet Wallace?

18       A.    No.

19       Q.    Okay.

20   JUDGE TO MS. CRUZ-GOMEZ

21       Q.    Do you know if Mr. Wallace has been arrested by the

22   police in Mexico?

23   MR. HORN TO JUDGE

24       At any time.

25   MS. CRUZ-GOMEZ TO JUDGE

1          In one newspaper it came out -- the newspaper came out that

2     he had a file, he had criminal for drugs and contraband.  One of

3     his ex-girlfriends that he had, it came out in the newspapers,

4     she mentioned that, that the easy life that called his life -- I

5     mean called her attention that he had and the big amounts of

6     money that he had and that he had commented to him that he had

7     been out of the country on one occasion fleeing --

8     MR. HORN TO MS. CRUZ-GOMEZ

9          Q.   I didn't hear.  What was the word?

10         A.   For dealing drugs.

11         Q.   Okay.  Now do you know if your daughter ever met Hugo

12    Alberto?

13         A.   I know that she did not meet him.  She never met him.

14         Q.   How do you know that?

15         A.   Because she told me when I was able to speak to her an

16    occasion when, when she was with her father.  She was really

17    scared, and she mentioned, she mentioned to me crying and she

18    swore by me and before God that she never met him.

19         Q.   Do you why she was scared?

20         A.   Because of all the things that were being mentioned

21    about her, that she was a kidnapper, a prostitute, killer.

22         Q.   Okay.  Now were there other people involved or in --

23    strike that.  Do you know what happened to Alberto Wallace?

24         A.   I know because of what I've been informed, that PGR

25    called me, first the chief offer me to turn my daughter as a

1      protected witness and to tell him as to where -- the whereabouts

2      of her, one thing that I denied because I did not know her

3      whereabouts.  Since I did not want to tell them that I did not

4      know, they started torturing me mentally.

5           Q.   Okay.  Let's go back a little bit.  Okay.  Okay.  Now

6      after your daughter left the house, when was the first time you

7      had contact with either the federal or local police?

8           A.   When she --

9           Q.   No, no, the date.  The date.

10          A.   It was February 26th of 2006.

11          Q.   Was that the first time the police ever contacted you?

12          A.   No.

13          Q.   When was the first time they contacted you?

14          A.   They had not, not looked for me for anything; they

15     just had a search warrant when I came back.  I'm sorry?

16          Q.   When was the first time they contacted you -- by

17     telephone, personally, just the first time?

18          A.   The first time that was in person with a search

19     warrant at my house.

20          Q.   And what happened when the police came to the house?

21          A.   It was really harsh.  I came and they were, they were

22     inside already, approximately 40 people.  Four of them were

23     higher, high level; the rest of them were police with big guns.

24     JUDGE TO MS. CRUZ-GOMEZ

25          Q.   Well, did they have a warrant to search your house or

1    were they looking for your daughter?

2         A.    They show me an order that they had, and then I knew

3    that they were looking for her for the kidnapping of Alberto

4    Wallace.

5    MR. HORN TO MS. CRUZ-GOMEZ

6         Q.    And what did the police do to you that first time?

7         A.    My house was thrown all over, they said to me that

8    they had to take me.  I try to call a family member.  I was in a

9    hallway, 2 by 2, in a very small area.  They threw me against

10   the wall or the phone.  They pointed me with the guns and they

11   were -- they loaded one of the chambers screaming for me to shut

12   up because surely -- because my house might have been where

13   Alberto Wallace was kidnapped to.  My son that was also with me,

14   he was also scared, very scared.  He try to intervene, and he

15   was also pushed to the side.  It was brutally (indiscernible).

16        Q.    When they push you against the wall, did they point a

17   gun at you?

18        A.    I, I heard that a gun loaded, and they pointed it

19   towards me, and they said to calm down.

20        Q.    How far away did -- were you from the gun when they

21   pointed it at you?

22        A.    Approximately about a meter.

23        Q.    Okay.

24        A.    Approximately.

25        Q.    Did they, did they point the gun at you?

1       A.    Yes.

2    JUDGE TO MS. CRUZ-GOMEZ

3       Q.    Ma'am, ma'am, you said something that the police said

4    that they thought that Wallace may have been held at your house,

5    that's why they were searching it?

6       A.    No.    They were looking for documents.    They were

7    looking for my daughter and all of my daughter's documents.

8    They took everything of hers, my computer, my deed to the house.

9    They violated all my stuff.

10   MR. HORN TO MS. CRUZ-GOMEZ

11      Okay.

12   JUDGE TO MS. CRUZ-GOMEZ

13      Q.    Let me ask you a general question, ma'am.    This search

14   of your home occurred in February of 2006, you believe?

15      A.    I am sure.    It was February 26th.

16      Q.    It's now two years later.    Do you know, do you know if

17   Jacobo Table is in federal custody in Mexico or state custody?

18   Has he been arrested?

19      A.    No, I know he's still on the loose.

20   MR. HORN TO MS. CRUZ-GOMEZ

21      Q.    Okay.    Were there -- besides your daughter, were they

22   looking for other people and were other people arrested?

23      A.    Yes.

24      Q.    How many other people?

25      A.    They had two brothers, which are the brothers,

```
 1    Castillo Cruz, and another person which name is Cesar Freyre.

 2    Yes.

 3         Q.    And were there any women arrested?

 4    JUDGE FOR THE RECORD

 5         So that's -- let me spell that.  Cesar, C E S A R,

 6    Freyre, F R E Y R E.

 7    JUDGE TO MR. REAL

 8         And what was the other -- what was the other name, Mr.

 9    Interpreter?

10    MR. REAL TO JUDGE

11         And the first one, the main one is Juana Hilda Gonzalez.

12    MR. HORN TO MS. CRUZ-GOMEZ

13         Q.    Is that a woman?

14         A.    It's a woman.

15    JUDGE FOR THE RECORD

16         Okay, let me, let me see if I can get that spelling.

17    MR. HORN TO JUDGE

18         It's in the statement, Judge, page -- I can spell it for

19    you.  It's -- her name is --

20    JUDGE TO MR. HORN

21         Okay, Juana, J U A N A, Hilda, H I L D A, Gonzales,

22    G O N Z A L E S.  Is that right?

23    MR. HORN TO JUDGE

24         Gonzales-Lomeli.

25    JUDGE TO MS. CRUZ-GOMEZ
```

1        Q.    Lomeli, L O M E L I.  Is that right, ma'am?  Juana

2    Hilda Gonzales-Lomeli?

3        A.    Lomeli, yes.

4        Q.    So you think that she's been arrested and Cesar has

5    been arrested?

6        A.    Yes, because of the news.  This lady, she has been in

7    charge of putting the big show on for all of them.

8    MR. HORN TO MS. CRUZ-GOMEZ

9        Q.    Was her --

10       A.    And so she ran first in January.

11   MR. HORN TO MS. CRUZ-GOMEZ

12       Q.    Okay, and were there -- besides these two people, you

13   said two brothers were arrested?

14       A.    Yes, they are two brothers, which are -- last name is

15   Castillo Cruz.

16   JUDGE TO MR. REAL

17       How do you spell Castillo?  C A S --

18   MR. REAL TO JUDGE

19       C A S T I L L O  Cruz, C R U Z.

20   MR. HORN TO MS. CRUZ-GOMEZ

21       Okay.

22   JUDGE TO MR. REAL

23       And did she give the other brother's name?

24   MR. REAL TO JUDGE

25       Judge, she just gave the both last names, Your Honor.  She

1    did not give an individual --

2    MR. HORN TO MS. CRUZ-GOMEZ

3         Q.    What were the first names of the two brothers, if you

4    know?

5         A.    Alberto is one, A L B E R O.   And the other one I do

6    not remember.

7    MR. HORN TO MS. CRUZ-GOMEZ

8         Okay.

9    MR. HORN TO MS. CRUZ-GOMEZ

10        Q.    So you think about four people have been arrested?

11        A.    Yes.   There is another one that -- yes, and there is

12   another person that was also linked to this, which is last name

13   Uscanga, U S C A N G A.

14        Q.    And who arrested them, the federal police or the local

15   police?

16        A.    Federal police, and that was with a C --

17   U Z C A N G A.

18        Q.    Okay.   Now I want to get back to when the police came

19   to your house the first time.   Okay.   After they pointed the gun

20   at you and threatened you, what happened?

21        A.    I felt like I was dying among those days because of my

22   son and my daughter, the date that she was going -- they were

23   going to kill her.   After that, they took me with them, myself

24   and my son, like criminals, showing us, showing us off on the

25   streets like criminals.

1       Q.    Were you handcuffed?

2       A.    No.

3       Q.    And where did they -- where, where did they put you

4    when they took you from the house?  Did you go in your own

5    vehicle?

6       A.    No.   Until I came out of the building, I noticed that

7    the whole building, the whole building was surrounded by black

8    trucks with the letters A F I, AFI.

9       Q.    What does that mean?

10      A.    Which is -- I do not know.  They stand for PGR or the

11   -- Delinquency, Organized Delinquency.

12      Q.    Okay.  And where did they take you when they took you

13   from the house?

14      A.    To the ciedo offices.

15      Q.    What's ciedo?

16      A.    It's something, an agency specialize in kidnappings.

17   Ciedo.  That is C I E D O.

18      Q.    And how long were you --

19   JUDGE TO MR. REAL

20      How do you spell that, Mr. Interpreter, again?

21   MR. REAL TO JUDGE

22      Yes, Your Honor.  C  I E D O.

23   MS. CRUZ-GOMEZ TO MR. HORN

24      Six hours approximately.

25   MR. HORN TO MS. CRUZ-GOMEZ

1      Q.    And were you alone or with your son?

2      A.    Each one of us separately in a room.

3      Q.    How old are your son at that time?

4      A.    Nineteen years old.

5      Q.    Okay.  And during the time you were at the

6    interrogation, how were you treated?

7      A.    They were very sarcastic.  They were making fun of me.

8      Q.    And?

9      A.    Asking, asking me or psychologically torturing me and

10   asking me repeatedly if I knew who Wallace was, and I would --

11   you know, as I was telling them, I was giving my whole

12   testimony.

13     Q.    Okay.  And what did you tell them?

14     A.    Well, what I know, everything I knew from Jacobo

15   because I never treated him and only from far away I will see

16   how he will pick up my daughter in one occasion, that I never

17   knew Hugo Alberto Wallace nor Juana Hilda nor the brothers nor

18   Cesar Freyre.  They asked me the my daughter's whole history

19   since, you know, what she was doing, you know, what she was

20   doing since her schooldays up to that date.

21     Q.    Did your daughter ever deal in drugs, if you know?

22     A.    I'm sure no.

23     Q.    Okay.  Now after these six hours, what happened?  Did

24   you go home?

25     A.    They send us in a taxi, my son and I, in 1:00 in the

A 88 513 956                    54                  February 15, 2008

1   morning.

2      Q.   Okay.  And then when's the next time you had -- strike

3   that.  Did you have occasion to deal with the police a second

4   time, either you, your son or both?

5      A.   Yes.

6      Q.   When?

7      A.   The second time there was something in writing sent

8   that my son was falsifying the testimony.  You know, for that he

9   had to go and testify.

10     Q.   Where?

11     A.   This is not the federal police; it was the other one,

12  the PGJ.

13     Q.   Is that the local police?

14     A.   Local, yes.

15     Q.   Were you called as well?

16  MR. REAL TO MR. HORN

17     Pardon me, counsel?  I didn't hear.

18  MR. HORN TO MS. CRUZ-GOMEZ

19     Q.   Was she called as well.  No, her.  Was she called, not

20  her.

21  MR. REAL TO MR. HORN

22     Yeah, her.

23  MS. CRUZ-GOMEZ TO MR. HORN

24     No, but at this time I had a lawyer, and the lawyer advised

25  me that this time it was important for me to go, too.

1    JUDGE TO MS. CRUZ-GOMEZ

2        Q.    Okay.  Now was that time that your, your son was

3    called to the local police related to the kidnapping or Wallace

4    or related to some other incident?

5        A.    It's the same thing, like a witness.

6        Q.    Did you go with him?

7        A.    Yes.

8    JUDGE TO MR. HORN

9        Okay.

10   MR. HORN TO MS. CRUZ-GOMEZ

11       Q.    And what happened at that time?  Well, strike that.

12   When was that?  What was the date of that?

13       A.    April.

14       Q.    What year?

15       A.    April, more or less, of 2006.  2006.

16       Q.    Can you tell us what happened when you went to the

17   police that time?

18   MR. REAL TO MR. HORN

19       I'm sorry, counsel, but I didn't --

20   MR. HORN TO MS. CRUZ-GOMEZ

21       Q.    Can you tell us what happened to you and/or your son

22   when you went to the police at that time.

23       A.    There, you know, they call my attention because it was

24   a different way of treating us, different.  They were only

25   receiving orders from the federal police to verify, to verify

1    the false statement that was given.

2        Q.    What false statement?

3        A.    They did not tell us.  They had just told us that they

4    had just called us -- my daughter told me that they just wanted

5    to influence fear in us.  They told me that, that all of this

6    was already set up.

7        Q.    What do you mean by set up?

8        A.    Previously that it was planned.  He said:  Lady, don't

9    believe all this because this is all made up, and that's what we

10   thought, and possibly they commented that probably Hugo Alberto

11   Wallace is alive.

12       Q.    Who made it up?

13       A.    This would be the city hall who made it up.

14       Q.    Why, if you know?

15       A.    When the newspaper came out on June 2006, that Juana

16   Hilda Gonzales, that she was tortured, drugged, psychologically

17   and physically harmed for her to sign a blank sheet of paper by

18   the federal police, and out of that form they took out -- they

19   took out -- asked her how it is right now on the scene as how

20   they killed Alberto Wallace.

21       Q.    In other words, the statement that --

22   JUDGE TO MR. HORN

23       I have to change the tape, Mr. Horn.

24   (TAPE 2)

25   JUDGE FOR THE RECORD

```
 1          Tape number 2.

 2     JUDGE TO MS. CRUZ-GOMEZ

 3          Q.   Ma'am, are you saying that the local police told you

 4     that Mr. Wallace was --

 5     MR. HORN TO JUDGE

 6          Ms.   It's Ms.   Oh, I'm sorry.

 7     JUDGE TO MS. CRUZ-GOMEZ

 8          Q.   -- that Mr. Wallace was still alive and it was all

 9     made up?

10          A.   They were taking our statements again, and between

11     that statement they made those comments that they were, that

12     they had, they were not taking the case, but what they had seen,

13     that's what they perceived.

14     MR. HORN TO MS. CRUZ-GOMEZ

15          Q.   Did -- and did they tell you that the statement that

16     Juana Hilda Gonzales-Lomeli, the statement taken February 2006

17     was not her true statement?

18     JUDGE TO MR. HORN

19          Mr. Horn, I'm going to strike the question. First of all,

20     you're putting words in the witness's mouth.  Secondly, now

21     you're supplying a date, and I, I highly doubt that the police

22     are going to admit that they tortured somebody --

23     MR. HORN TO JUDGE

24          Well, okay.

25     JUDGE TO MR. HORN
```

1        -- and so --

2    MR. HORN TO JUDGE

3        I didn't ask that.

4    JUDGE TO MR. HORN

5        -- let's try it -- let's try and take this carefully,

6    slowly.

7    JUDGE TO MS. CRUZ-GOMEZ

8        Q.    Ma'am, you said that there was a newspaper article

9    about Juana Hilda Gonzales; is that right?

10        A.    Yes.

11        Q.    And was she one of the individuals that had been

12    arrested by the federal police?

13        A.    Yes.

14        Q.    And what did this newspaper article say?

15        A.    It said that, that she -- in first place, that she had

16    never met Alberto Hugo Wallace and that it was all a lie what

17    Ms. Wallace said in relation, in relation to her and that she

18    had been totally drugged and tortured mentally and physically

19    and that they were going to involve, I mean, her mom and her

20    little girl --

21        Q.    Okay.

22        A.    -- that was out of the building.

23        Q.    Now does that mean that Juana Hilda Gonzales was

24    released by the police and then gave a statement to the press?

25        A.    No, she's still in jail.

1       Q.   Okay.  So how did the newspapers get her statement

2    that she had been drugged or abused?

3    MR. HORN TO MS. CRUZ-GOMEZ

4       If you know.

5    MS. CRUZ-GOMEZ TO JUDGE

6       I do not know.  I do not know how.

7    JUDGE TO MS. CRUZ-GOMEZ

8       Q.   And do you -- this newspaper article about Juana Hilda

9    Gonzales came out in June of 2006?

10      A.   July, June, more or less.

11      Q.   Okay.  And did this newspaper article come out before

12   you were taken to the local police station or after you appeared

13   for the second time?

14      A.   The second time.

15      Q.   No, what I'm saying is this article about Juana

16   Gonzales, when did you find out about it?

17      A.   I do not remember exactly, but it was between June and

18   July of 2006 more or less.

19      Q.   And --

20      A.   They took it to me in the newspaper, Reforma.

21      Q.   Do you have a copy of that newspaper article?

22      A.   Yes.

23      Q.   Did you bring it to court today?

24      A.   Where is it?

25   JUDGE TO MR. HORN

A 88 513 956                          60                    February 15, 2008

1      Okay, Mr. Horn, do you have the newspaper articles?

2  MR. HORN TO JUDGE

3      I don't have the article, Judge, but I'll bring it with --

4  I got -- as long as I -- we'll continue it, I'll get the article

5  and submit it.

6  JUDGE TO MR. HORN

7      Okay.

8  JUDGE TO MS. CRUZ-GOMEZ

9      Q.   Now, ma'am, the question is, When you talked to the

10  local police and gave a second statement, did Juana Gonzales

11  come up at all or not?

12      A.   No, they did not comment anything.  I mean, they were

13  just amazed by the way that it was set up.

14      Q.   Okay.  Have you talked to Juana Gonzales yourself?

15      A.   No.

16      Q.   So do you know whether or not her statement was --

17  whether, whether or not she was drugged and tortured or you only

18  know what's in the newspaper?

19      A.   Yes, recently a month ago I confirmed it because I

20  asked to speak to her female lawyer, the lawyer or the

21  representative, Ambar Trevino.

22  JUDGE TO MR. REAL

23      I need that spelled

24  MR. REAL TO JUDGE

25      A M B A R, first name.

```
1    JUDGE TO MR. REAL

2       A M --

3    MR. REAL TO JUDGE

4       B as in boy, A R and Trevino, T as in Tom R E V as in

5    Victor I N O.

6    JUDGE TO MS. CRUZ-GOMEZ

7       Q.   Okay.  So you asked to speak to Ambar Trevino?

8       A.   Yes.  She gave an appointment to my sister and I

9    because I wanted, I wanted to find out how the case of Cesar

10   Freyre and Juana Hilda was because she is the lawyer of both of

11   them.

12   MR. HORN TO JUDGE

13      I'm going to get into that, Judge, in a minute.

14   JUDGE TO MR. HORN

15      Okay.

16   JUDGE TO MS. CRUZ-GOMEZ

17      Q.   So what did Ambar Trevino tell you?

18      A.   That Juana Hilda Gonzales, that Juana Hilda Gonzales,

19   when she was detained, they started telling her to sign that she

20   had been part of the kidnapping.  They started messing with her

21   brain because her mom was out of the building with her daughter,

22   and they started to offer her a cup of water every minute, and

23   they started offering her a glass of water every minute, and she

24   started feeling -- you know, this is why she started feeling

25   really dizzy.  She remembers also that she was touched,
```

1    tortured.

2        Q.    Okay, so, so what's the -- did, did Ambar Trevino tell

3    you whether Juana Gonzales is going to be released or what or

4    what's the status of her case?

5        A.    She's the one who told me that all of this was set up,

6    that they made her sign a blank sheet of paper while she was

7    drugged, and after all this, after this, they set up Juana

8    Hilda's declaration.  That's when her declaration came out, and

9    the federal police.

10   MR. HORN TO MS. CRUZ-GOMEZ

11       Q.    You said she was touched.  What do you mean by that?

12       A.    She was touched on her private parts sexually.

13   JUDGE TO MR. HORN

14       Okay.  Well, Mr. Horn, do you have a statement from the

15   attorney for -- I mean, this is really hearsay, hearsay, so

16   the --

17   MR. HORN TO JUDGE

18       Yeah.

19   JUDGE TO MR. HORN

20       -- the -- Hilda Gonzales talked to her attorney who then

21   apparently spoke to this witness.  So we're, we're getting

22   double hearsay here, so --

23   MR. HORN TO JUDGE

24       We'll get it translated.  We have a statement, and we'll

25   get it translated.  There's a problem with that, Judge, and let

1   me explain it to you.  I'm going to do this on the record.  We

2   have the lawyer here for Brenda in Mexico here in the courtroom,

3   and we have -- but the problem is he cannot testify because

4   under Mexican law, as he tells me this, if he acts as a witness

5   -- he represents both Brenda in Mexico and the two boys in

6   Mexico, which the mother is going to testify to in a little bit,

7   and I have medical statements which I'll -- you know, about,

8   about Brenda being beaten up, but if he testifies either in this

9   court or in any other court, then he's disqualified from

10  representing the parties here or in Mexico.  So, unfortunately,

11  he cannot testify in court.

12  JUDGE TO MR. HORN

13      That's fine.  I'm not asking him to testify, but --

14  MR. HORN TO JUDGE

15      Now whether I can get the --

16  JUDGE TO MR. HORN

17      -- what I'm saying is this witness is saying that she

18  talked to an attorney, Ambar Trevino, and Ambar Trevino said

19  that she talked to her client and her client told her some

20  things.  So do you have a statement from the attorney, Ambar

21  Trevino?

22  MR. HORN TO JUDGE

23      Yeah, we have a medical record which we got showing that

24  Brenda -- that Juana was beaten up, and I've got to get it

25  translated; I just got it.  I got to get it translated, which I

```
 1    will submit at the next hearing.  Okay.

 2    JUDGE TO MR. HORN

 3         But you don't have -- so then, in answer to my question,

 4    you don't have a statement from her attorney --

 5    MR. HORN TO JUDGE

 6         Can give it to me.

 7    JUDGE TO MR. HORN

 8         -- so you're only offering a hearsay statement --

 9    MR. HORN TO JUDGE

10         Yeah.  He can't -- he -- she can't -- as I say to you,

11    Judge, the lawyer cannot even give me an affidavit.

12    JUDGE TO MR. HORN

13         I thought you said the respondent's attorney couldn't

14    testify.

15    MR. HORN TO JUDGE

16         No lawyer in Mexico who represents clients can either give

17    a -- act as a witness or --

18    JUDGE TO MR. HORN

19         Well, they talk to the press; why couldn't they give you a

20    statement?  That's not testifying; that's a -- what I, what I'm

21    saying is respondent is saying that a lawyer told her something,

22    and I, I, I don't see why the lawyer for, for --

23    MR. HORN TO JUDGE

24         I can, I can have the lawyer here.  He can tell you what

25    the rules are for Mexican lawyers.
```

1    JUDGE TO MR. HORN

2         Is this the respondent's lawyer in Mexico or is this the

3    lawyer --

4    MR. HORN TO JUDGE

5         No, the respondent's lawyer is here in this courtroom, and

6    he can tell you what the rules are --

7    JUDGE TO MR. HORN

8         Okay, so we'll go to him next --

9    MR. HORN TO JUDGE

10        Okay.

11   JUDGE TO MR. HORN

12        -- as to the rules.

13   MR. HORN TO JUDGE

14        Okay, that's fine.  Okay.  All right.

15   MR. HORN TO MS. CRUZ-GOMEZ

16        Q.   Okay, now the lawyer that represented Juana, does she

17   also represent the boys?

18        A.   Yes.

19        Q.   What did she tell you happened to the two boys, the

20   two brothers?

21        A.   In jail they were also tortured inside of the jail

22   asking them 200,000 pesos not hit them when their mom --

23        Q.   Strike that.  Well, hold up.  Who asked, who told --

24   who talked about 200,000 pesos?

25        A.   The brothers.  They called their mom.  Then they were

A 88 513 956                    66              February 15, 2008

1    asking for 200,000 pesos for them not to be tortured or to be

2    hit, to be hit by -- hit on.

3        Q.    Okay.  Did you talk to the mother of the two boys?

4        A.    Yes.

5        Q.    When did you talk to them?

6        A.    After speaking to the representative, Ambar.  A month

7    ago, more or less.

8        Q.    And, and who was with you?

9        A.    My sister.

10        Q.    And why did you go to talk to the mother of the two

11    boys?

12        A.    Because of that representative Ambar had spoken to me

13    about, about the kids also being tortured, and I'm interested

14    in, I'm interested in, you know, something that I -- that is

15    important to me as to why they all have them as a group.

16        Q.    Let me ask this, and I'm going to get back to

17    something else in a minute, but as long as you're talking about

18    -- have the boys, the boys been arrested?  When were they

19    arrested and, and Juana?

20        A.    The same day.

21        Q.    But when?  What day?  Have they been charged?  Have

22    they been brought to trial yet?

23        A.    Yes.  They still haven't received a sentence.  There

24    still hasn't been a sentenced for Juana, the brothers or Cesar

25    Freyre, no.

1      Q.   Okay.  All right.  Let's go back.  After you -- the

2    second time you were at the police and you left, were you ever

3    called back a third time?

4      A.   Yes, the federal police, where they treated me really

5    bad.  They asked me, they asked me to show up with my lawyer,

6    but when I got there, they told my lawyer to stay because,

7    because the chief, because the chief of the ciedo wanted to

8    speak with me.  He let me through alone, and the chief, like I

9    repeated (indiscernible).  He started offering me to turn over

10    my daughter as a protected witness, and since no, he started

11    asking me a lot of questions as to where the, the whereabouts of

12    my daughter, and finally he hit the table saying textually what

13    a fuck; you know where your daughter's at and I know when

14    somebody's lying, and, and he sent for DNA, for DNA to be done.

15    He, you know, had blood drawn from my finger and he had a hair

16    taken off my head.  When I asked, you know, what was the reason

17    for this, they told me that this was, you know, when they found

18    my daughter dead, so that I will be able to recognize her

19    through the DNA, and that for me not to do a lot of questioning,

20    some questions, because they were going to put me in jail the

21    same way as Cesar Freyre's mother.  All of this, you know, very

22    awkward, you know, making fun of.  When my lawyer heard that I

23    was crying, he came in, and they told me -- I told him and they

24    told him that they offered me again, you know, to turn over my

25    daughter as a protected witness, to take her, and he told them a

1    protected witness?  Like the one that was found dead three

2    months ago down here from your office, downstairs in the

3    basement.  That was all.  I came out really bad.

4        Q.   All right.  Was that the same lawyer that's here in

5    the courtroom today?

6        A.   Yes.

7        Q.   Okay.  Did you have another lawyer prior to that?

8        A.   Excuse me.  The lawyer that accompany me, that lawyer

9    I do not have him no more because they saw him, they saw him

10   with Ms. Wallace eating, and I cannot attest to this, but they

11   said that possibly he sold out.

12       Q.   Okay.  You were worried about -- did Alberto's mother

13   try to bribe, if you know, anybody?

14       A.   Yes.  I know that she also wanted to buy off my

15   lawyer.  She offer him money.

16       Q.   Which lawyer?  The first lawyer or the second lawyer?

17       A.   The second.

18       Q.   That's the one that's here in the courtroom, right?

19       A.   Yes.  Yes.

20       Q.   All there.   There was a third time that you were with

21   the police.  Okay, then what happened -- did you ever talk to

22   the police again?

23       A.   No.  I got summoned to the courtroom the 16th,

24   courthouse.

25       Q.   Sixteenth of what month?

1       A.    No, they summoned myself and my son again, but I went

2   with my new lawyer.

3       Q.    Okay.  And was that in the police or in court?

4       A.    The courthouse.

5       Q.    Okay.  And what year was that?

6       A.    2006, June of 2006.

7       Q.    And what happened at that time?

8       A.    The judge's clerk asked me many questions in relation

9   to the case, showing, showing the brothers behind bars and Juana

10  Hilda Gonzales, asking me if I knew them.

11      Q.    And?

12      A.    I did not know them.  And so then I knew them, I met

13  them.  Ms. Wallace was present there with her lawyer

14  representative, Ambar Trevino, and Ambar Trevino, because of the

15  kids of Juana Hilda, is the lawyer of the kids and the brothers

16  Cruz.

17      Q.    Now when you went to the lawyer and then you went to

18  the mother of the two boys, what -- when did that meeting take

19  place?

20      A.    Excuse me.  When I met, when I met the children's

21  mother about a month ago.

22      Q.    And where did this meeting take place?

23      A.    At a café.

24      Q.    In Mexico City?

25      A.    Yes.

1        Q.    And about how long did this meeting take?

2        A.    Two hours.

3        Q.    And you were with your sister?

4        A.    Yes.

5        Q.    Okay.  And what did she, what did you say to her and

6    what did she say to you?

7    JUDGE TO MR. HORN

8        Who was she with, Mr. Horn?

9    MR. HORN TO JUDGE

10        Her sister, who is here and who will verify that.

11    MR. HORN TO MS. CRUZ-GOMEZ

12        Q.    And what did she say to you and what did you say to

13    her?

14        A.    She's a very religious person.  She believes in God.

15    That caught my attention and, like me, and the two of us started

16    speaking, you know, saying that God is with us and that this,

17    our experience, you know, was good among us, and after that she

18    started speaking to me as to how much, how much the children or

19    the kids had suffered since they got caught and in jail when

20    they asked for the 200,000 pesos.  She does not have money.

21    JUDGE TO MR. HORN

22        Mr. Horn, Mr. Horn, I, I'm -- I hate to interrupt, but

23    we're not really making any progress here, and I, I don't -- it

24    sounds like she was talking to the mother of the brothers or

25    talking to her own sister?

```
 1   MR. HORN TO JUDGE

 2       The mother of the two brothers.

 3   JUDGE TO MR. HORN

 4       Okay, and you said her sister.

 5   MR. AMAZIR TO JUDGE

 6       Her sister was present also.

 7   MR. HORN TO JUDGE

 8       Her sister was present also, her sister.

 9   JUDGE TO MR. HORN

10       Okay.  But I -- okay, but the conversation was not with her

11   sister; the conversation --

12   MR. HORN TO JUDGE

13       Was with the mother of the two boys.

14   JUDGE TO MR. HORN

15       -- was with the mother of the two boys.  Okay.  So this is

16   another, another conversation that she's recounting.

17   MR. HORN TO JUDGE

18       Right.

19   JUDGE TO MR. HORN

20       And so what's the point in time?  I mean --

21   MR. HORN TO JUDGE

22       To show how -- what -- the mother of the two boys will tell

23   about the 200,000 peso bribe to avoid getting beaten and what

24   happened to them in jail.

25   JUDGE TO MS. CRUZ-GOMEZ
```

1        Q.    Okay.  So when did you speak to the mother of the two

2   boys?  When was that conversation?

3        A.    Approximately about a month, a month and a half ago.

4        Q.    And are the boys still in jail?

5        A.    Yes.

6        Q.    And she was not able to give her sons the money?

7        A.    No, because she was told by the chief in jail they did

8   not have the money to convince them to sign the paper that they

9   were part of the kidnapping.

10  MR. HORN TO MS. CRUZ-GOMEZ

11       Q.    And --

12  JUDGE TO MS. CRUZ-GOMEZ

13       Q.    Okay.  I'm not sure I understand what you just said,

14  ma'am. Did, did the boys sign a statement saying they were part

15  of the kidnapping or not?

16       A.    No, they have not signed, but they have been tortured.

17       Q.    And who told you that?

18       A.    The boys' mom.

19       Q.    Okay.  And why did you speak to the mother of these

20  boys last month?

21       A.    After speaking to their representative, Ambar Trevino,

22  telling me of the torture that they had done to them, I asked

23  for the lady's phone number because I wanted to know the

24  situation because it's very similar to my son's because they're

25  in a group.  They're in a group that all of them kill -- because

A 88 513 956                      73                  February 15, 2008

1    all of them, all of them are saying that they kill Alberto Hugo,

2    Alberto Wallace.

3    MR. HORN TO MS. CRUZ-GOMEZ

4         Q.    Who's they?

5         A.    The Cruz brothers, Juana Hilda Gonzales, Cesar Freyre.

6         Q.    Said that they killed Wallace?

7         A.    No.   No.   It's in relation to Juana Hilda's statement.

8         Q.    Do the boys, the two brothers and all the people deny

9    having anything to do with the disappearance, killing of

10   Wallace?

11        A.    Yes.

12        Q.    And is that the reason that you believe they were

13   tortured?

14   MR. FITTER TO JUDGE

15        Objection.   Leading.

16   JUDGE TO MR. HORN

17        I'll sustain the objection.

18   MR. HORN TO JUDGE

19        Okay.

20   JUDGE TO MR. HORN

21        Mr. Horn?

22   MR. HORN TO JUDGE

23        Yeah?

24   JUDGE TO MR. HORN

25        Let's more to something else.

1    MR. HORN TO JUDGE

2       Okay.

3    JUDGE TO MR. HORN

4       I mean, you have about one hour more this morning, so one

5    or one and a half hours to go, so budget your time accordingly.

6    MR. HORN TO JUDGE

7       Okay.  Just a couple more questions.

8    MR. HORN TO MS. CRUZ-GOMEZ

9       Q.   What do you think would happen to your daughter if she

10   went back to Mexico?

11      A.   Torture, the same as Juana Hilda, to get the same way

12   her signature that she did take part in the kidnapping.

13      Q.   And Wallace's mother has been -- what has Wallace's

14   mother done to publicize the alleged disappearance?

15      A.   The lady, the lady started saying that she did not

16   have any money or family members and that family members lend

17   her money to show off pictures of the whole gang of the

18   brothers, Juana Hilda, Brenda, Jacobo and Cesar Freyre.

19      Q.   Wallace's mother put up billboards; is that what

20   you're saying?

21      A.   Spectaculars, very, very big, very big spectaculars

22   that are very, very big.  They cost a lot of money.  Now I know

23   because Juana Hilda and their brother -- I mean, the brothers'

24   lawyers told me that she is the owner, that she is the owner of

25   the biggest publishing company in Mexico.

1    MR. HORN TO JUDGE

2        Okay.  I have no further questions.

3    JUDGE TO MR. FITTER

4        Mr. Fitter.

5    MR. FITTER TO MS. CRUZ-GOMEZ

6        Q.    Ma'am, how did you enter the United States?  Did you

7    come in today or yesterday?

8        A.    Yesterday, the day before yesterday, since Wednesday.

9        Q.    Okay.  You came in as a visitor; is that correct?

10       A.    Yes.  They gave me a special visa.

11       Q.    Who gave you a special visa?

12       A.    The Mexican Embassy.

13       Q.    Okay.  And are you -- this is the same people who you

14   claim were torturing these people, is that it?  The Mexican

15   Government is torturing these people at the same time they're

16   allowing you to come in --

17   JUDGE TO MR. FITTER

18       Mr. Fitter, it's too vague a question.

19   MR. FITTER TO JUDGE

20       Okay.

21   JUDGE TO MR. FITTER

22       I don't know who she got -- Mexico could not give her a

23   visa to come to the United States, so I didn't even understand

24   that answer.

25   JUDGE TO MS. CRUZ-GOMEZ

1      Q.   Did you go to the American Embassy, ma'am?  Do you

2   have your passport with you today?

3      A.   Yes.

4      Q.   Could I see it, please.

5      A.   Yes, of course.

6      Q.   It looks like you got a visitor visa, ma'am.

7      A.   Yes.

8   JUDGE TO MR. FITTER

9      Okay, go ahead, Mr. Fitter.

10  MR. FITTER TO MS. CRUZ-GOMEZ

11     Q.   But you said someone else had given you special

12  permission.  Who was that?

13  MR. REAL TO MR. FITTER

14     I'm sorry, Mr. Fitter?

15  MR. FITTER TO MS. CRUZ-GOMEZ

16     Q.   You said someone else --

17  MR. HORN TO JUDGE

18     I'm going to object.  We've got a valid visa here. There's

19  no reason to go into --

20  JUDGE TO MR. HORN

21     I'm allowing Mr. Fitter some questions.  He's asking her to

22  clarify her answer; that's all.

23  MR. FITTER TO MS. CRUZ-GOMEZ

24     Q.   You said something about you received special

25  permission.

1      A.   Well, they asked -- I mean, we asked for it as an

2   emergency, and we let them know as to the motive that we were

3   coming here as witnesses to the Consul and they gave me the visa

4   for that time.

5      Q.   Now I want to ask you a couple of questions about -- I

6   think something that the Judge touched up about addresses.  You

7   said that your daughter, Brenda, she was living with your

8   husband; is that right?  Your ex-husband?

9      A.   Ex-husband?

10  JUDGE TO MS. CRUZ-GOMEZ

11      Roberto Quevedo.

12  MR. FITTER TO MS. CRUZ-GOMEZ

13      Q.   Who is that?

14      A.   Her father.

15      Q.   Okay.  Her father, okay.  And you knew the address, is

16  that right, of this person?

17      A.   Yes.

18      Q.   Okay.  And when the police first came to your house

19  with a search warrant in February 2006, did you inform the

20  police about that?

21      A.   No.  I did not know.

22      Q.   I thought you said you did know.  When did you know

23  that she was living with her father?

24      A.   Until very -- I mean, a long time after.

25      Q.   Well, when did you find out, ma'am?  Last year?  Two

A 88 513 956                        78              February 15, 2008

1    years ago?

2         A.    No, in 2006 before, before she came to the United

3    States.

4         Q.    Okay, when in 2006?

5         A.    May, June, when she was wanted.

6         Q.    Okay.

7    JUDGE TO MS. CRUZ-GOMEZ

8         Q.    Do you know if Brenda's father has been questioned by

9    the police?

10        A.    She -- the police has, you know, kept a watch on his

11   house, outside his house, and on the phone line they found a box

12   that intervenes with the calls.

13        Q.    Okay.  Do you -- why do you think they searched your

14   house and not Robert Quevedo's house if your daughter was living

15   with him?

16        A.    Because Brenda always lived at the house.

17        Q.    No, I'm saying why didn't they search the house that

18   she was living in rather than your house.

19        A.    I do not know.

20   JUDGE TO MR. FITTER

21        Go ahead, Mr. Fitter.

22   MR. FITTER TO MS. CRUZ-GOMEZ

23        Q.    Did you tell, did you tell the police and they -- when

24   you -- as they were executing the search warrant in February

25   2006 about, about her father?

1    A.    No.  I was really scared.  No, but at that time Brenda

2    -- that was towards the end -- she was still with Jacobo.

3    Q.    But did you, did you offer any information to the

4    police at all?

5    MR. HORN TO JUDGE

6        Objection, Judge.  Let's find out if the police asked them

7    before we find out if she offered anything.

8    JUDGE TO MR. FITTER

9        Mr. Fitter, I'm not -- offered any information?  She was

10    interviewed three times and gave her life story to the police,

11    so what do you mean offered any information?

12    MR. FITTER TO JUDGE

13        About where Brenda might be.

14    JUDGE TO MR. FITTER

15        Okay.

16    JUDGE TO MS. CRUZ-GOMEZ

17    Q.    Did you ever tell the police that Brenda was living

18    with her father?

19    A.    No, because I was very scared of her life, for her

20    life.

21    Q.    So you were trying to --

22    A.    They were going to kill her.

23    Q.    So you were trying to protect Brenda?

24    A.    Well, when I found out, yes, like a mother.  Yes, I

25    try to cover her, but I did not speak anything with her; I only

1    knew.

2    JUDGE TO MR. FITTER

3        Mr. Fitter.

4    MR. FITTER TO MS. CRUZ-GOMEZ

5        Q.   Well, how was Brenda discovered in the United States?

6    It wasn't from you.

7        A.   No.

8        Q.   How was she found?

9        A.   I do not know.  I do not know, but, I mean, this lady

10   has put a lot of information on the internet and photographs.

11   She has a lot of relations in publicity.

12       Q.   Which lady are you talking about?

13       A.   Ms. Wallace.  She has looked for them in all the -- I

14   mean, through all -- always.

15       Q.   You talked about some photographs; is that right?

16       A.   Yes.

17       Q.   I'm going to show you a couple of exhibits or a couple

18   of photographs.  Now this is a document that's ID Exhibit No. 3,

19   page 60.

20   MR. HORN TO JUDGE

21       I'm going to object to that, Judge.  That's not in

22   evidence.

23   JUDGE TO MR. HORN

24       I'm allowing -- what do you want?  To have her come back,

25   Mr. Horn?

1   MR. HORN TO JUDGE

2       No, but we don't have anything in evidence, you know.

3   JUDGE TO MR. HORN

4       I'm allowing Mr. Fitter to question her about the

5   photographs.

6   MR. FITTER TO MS. CRUZ-GOMEZ

7       Q.   Do you know the people --

8   MR. HORN TO MR. FITTER

9       What page are you looking?  Page 60?

10  MS. CRUZ-GOMEZ TO MR. FITTER

11      By photographs, and when we were on trial -- yes, by

12  pictures only.  I do not know if this one is Juana Hilda.

13  MR. REAL TO MR. FITTER

14      The respondent is pointing to the baby in the middle

15  picture.

16  MS. CRUZ-GOMEZ TO MR. FITTER

17      This is Cesar Freyre, the gentleman with the glasses

18  (indiscernible) on the picture.

19  MR. HORN TO JUDGE

20      Your Honor, I'm going to object because they marked them so

21  that she can identify them.  Because there's a -- wait, wait,

22  wait, hold it.  Let's go -- they've marked the pictures on here

23  so they, so they can be identified.  So she may -- the question

24  is she should ignore the bottom part and she should -- see if

25  she can identify them.  These are already identified.

1    MR. FITTER TO MS. CRUZ-GOMEZ

2        Just look at the photographs.

3    JUDGE TO MR. HORN

4        This is not crucial, Mr. Horn.  I don't know what we're

5    having a problem with this about.

6    JUDGE TO MS. CRUZ-GOMEZ

7        Q.   Ma'am, there's a photograph there that the Government

8    has.  Is your daughter in that photograph?

9        A.   I do not -- it's just that I do not know.  I think, I

10   think that it's her, but it does not --

11       Q.   And you're pointing to which person?

12   JUDGE TO MR. FITTER

13       Could I see it, Mr. Fitter?  Okay, that's the first row on

14   the right.

15   JUDGE TO MS. CRUZ-GOMEZ

16       Q.   Okay.  Is her -- is your daughter's boyfriend, ex-

17   boyfriend, Jacobo, in that photograph, do you know?

18       A.   Because of the pictures that I have seen on the

19   newspaper, that's him.

20   MR. REAL TO JUDGE

21       The respondent is pointing to the gentleman sitting --

22   JUDGE TO MR. REAL

23       In the middle lower -- okay.

24   JUDGE TO MS. CRUZ-GOMEZ

25       Q.   Do you know if Cesar Freyre is in this photograph?

1      A.    Also because of the newspaper that I have seen, I

2  believe this one.

3  MR. REAL TO JUDGE

4      The respondent is pointing to the gentleman, the one

5  sitting on the left.

6  JUDGE TO MS. CRUZ-GOMEZ

7      Q.    And do you know if Mr. Wallace is in this picture?

8      A.    Because of the pictures, no, no.

9  JUDGE TO MR. FITTER

10      Okay, go ahead, Mr. Fitter.

11  MR. FITTER TO MS. CRUZ-GOMEZ

12      Q.    Next, page 61.  Who are these two people?

13  MR. REAL TO MR. FITTER

14      The respondent is pointing to the lady on the left.

15  MS. CRUZ-GOMEZ TO MR. FITTER

16      Juana Hilda.  Because of the glasses, I do not know if it

17  could be Jacobo.

18  JUDGE TO MR. FITTER

19      What page are you on, Mr. Fitter?

20  MR. FITTER TO JUDGE

21      Sixty-one.

22  JUDGE TO MR. FITTER

23      I only have one photograph on page 61 of my exhibit.

24  MR. HORN TO JUDGE

25      Yeah, there's only one photograph, Judge.  Oh, you have a

1    different one, Judge.

2    MR. REAL TO MR. FITTER

3        The respondent is pointing to the lady on the right and

4    she's saying that it might be Brenda; it does not seem like her.

5    MR. HORN TO MR. FITTER

6        (Indiscernible) page -- the other one, the other one, the

7    other one.

8    MR. FITTER TO JUDGE

9        Sixty-one.

10   MR. HORN TO JUDGE

11       Right, Judge, that's it.

12   JUDGE TO MR. HORN

13       It looks like there's two page 61s.  Okay.

14   JUDGE TO MS. CRUZ-GOMEZ

15       Q.   So who do you think these people are, ma'am?

16       A.   From the left side is Juana Hilda.

17   MR. REAL TO JUDGE

18       The respondent is pointing to the gentleman in the middle

19   MS. CRUZ-GOMEZ TO JUDGE

20       Because of the glasses, I do not know if it's Jacobo, and

21   to the right I am not sure because it does not look like her; it

22   could be Brenda; I am not sure.

23   JUDGE TO MS. CRUZ-GOMEZ

24       Okay, thank you.

25   JUDGE TO MR. FITTER

1        Mr. Fitter.

2    MR. FITTER TO MS. CRUZ-GOMEZ

3        Q.    Does, does -- did Brenda ever tell you that she knows

4    Juana Hilda?

5        A.    No.   No.

6        Q.    Have you talked to Brenda recently or not?

7        A.    Yes, because of the jail, yes, we have been able to

8    speak.

9    MR. FITTER TO JUDGE

10       I have no more questions.

11   MR. HORN TO JUDGE

12       I have just one question.

13   JUDGE TO MR. HORN

14       Yes.

15   MR. HORN TO MS. CRUZ-GOMEZ

16       Q.    You said you were worried about Brenda's life and

17   that's why you didn't tell her about the -- that she was living

18   -- strike that.  You said you were worried about Brenda's life

19   when the police questioned you when they came to the house.

20   Could you tell us why you were worried about Brenda's life.

21       A.    Because they treated me really bad.  Psychologically

22   is a torture.  Thinking that, you know, I being her mom, they

23   did that to me, what was I to expect that they would do to my

24   daughter to get the truth, you know, for them to get what they

25   wanted to know.

1    MR. HORN TO JUDGE

2        I have no further questions.

3    JUDGE TO MS. CRUZ-GOMEZ

4        Okay, ma'am, this completes your testimony.  Thank you for

5    testifying.

6    JUDGE TO MR. HORN AND MR. FITTER

7        Now let me go off the record a moment.

8                            (OFF THE RECORD)

9                            (ON THE RECORD)

10   JUDGE FOR THE RECORD

11       We're back on the record.

12   JUDGE TO MR. HORN

13       Mr. Horn, we've taken a short recess.  You, you've

14   indicated that you do have the lawyer for your client, Brenda

15   Quevedo here, but he cannot testify concerning anything that's

16   pending in the court in Mexico because that would disqualify him

17   from being her attorney there; is that right?

18   MR. HORN TO JUDGE

19       That, that's correct, Judge.

20   JUDGE TO MR. HORN

21       So I just want to ask him one or two preliminary questions

22   just for the record.

23   JUDGE TO MR. DURAN-LARA

24       Q.   Sir, will you state your name again, please.

25       A.   Juan Carlos Duran-Lara.

1      Q.    Is that D U R A N   L A R A?

2      A.    Yes, Your Honor.

3      Q.    And are the lawyer for Brenda Quevedo in Mexico?

4      A.    Until this date, I have not taken the case because it

5   is necessary for Brenda Quevedo to be in Mexico so she can

6   authorize the charge that her -- the actual time that she could

7   be given to me or to whichever lawyer she chooses.

8      Q.    You are familiar with the lawyers representing Cesar

9   Freyre and Juana Hilda Gonzales; is that right?

10      A.    I did not understand correctly.  If I know them

11      Q.    Yes.  Do you know the -- are you representing anybody

12   else in these cases in Mexico?

13      A.    In the trial -- in trial against Cesar Freyre, the

14   gentleman, Castillo, and (indiscernible).  I have not been

15   appointed the defendant lawyer, defense lawyer, but even though

16   (indiscernible) then it's authorized to me for me to read,

17   receive the notices, and in their case notify the lawyers which

18   document that could be involved in the process.

19      Q.    You indicated that you don't -- you cannot testify

20   because you would be disqualified from representing these people

21   or Brenda in Mexico; is that right?

22      A.    That is correct.

23      Q.    Could I ask you some general questions about the law

24   of Mexico?

25      A.    Yes, if it's in relation, if it's in relation to

1   something legal and if I understand, gladly I will respond. I

2   just have a question for Your Honor, if this is, this is an

3   informal interrogation or you just want to know of --

4        Q.   Just some general information about the criminal

5   justice system.

6        A.   That is correct, but I let you know, Your Honor, that

7   this (indiscernible) -- this could be consulted through the

8   internet.  With all due respect that Your Honor deserves, this

9   could also be found through the internet.

10       Q.   That, that's fine.  That's fine.  The Government has

11  presented a certified arrest warrant for Brenda Quevedo.  Is

12  that from a court or can the prosecutor's office issue that?

13       A.   Whoever -- I mean, the only person that could issue

14  search -- pardon me -- an order of arrest, you know, as much as

15  (indiscernible) legislation as federally is just a judge.

16       Q.   And is there an investigation done before an arrest

17  warrant is issue?

18       A.   A lot of the times it does take an investigation, but

19  sometimes, but sometimes the state's attorney or the public

20  ministry do not reach to elaborate an investigation, and even

21  though they request the justice from the judge, the penal judge,

22  that the judge give their order of arrest, issue this order of

23  arrest presuming a felony.

24       Q.   Is a person charged with a crime in Mexico entitled to

25  post a bond for their release?

1        A.    Felonies are considered aggravated.  Article 19

2    (indiscernible) of the penal code, local penal code, you know,

3    the legislation of federal, you know, that would not allow, that

4    would not allow that this cannot be obtained in their case

5    provisional as much, as much as when he goes to trial.

6        Q.    Okay, sir, I'm not going to have you testify any

7    further.

8        A.    I thank you, Your Honor, very much.

9    JUDGE TO MR. HORN

10       Okay.  Mr. Horn, I just wanted to have some brief testimony

11   reflecting respondent does have a lawyer in, in Mexico who's

12   willing to represent her should she be returned to Mexico.

13   MR. HORN TO JUDGE

14       Okay, that's fine.

15   JUDGE TO MR. HORN

16       Was there any other reason to present him?

17   MR. HORN TO JUDGE

18       Well, well, he knows a lot, but he won't -- he can't

19   testify, so I'm not going to --

20   JUDGE TO MR. HORN

21       Okay.  So who is your next witness?

22   MR. HORN TO JUDGE

23       We're going to have the sister testify.

24   JUDGE TO MR. HORN

25       Okay.  Would you have her come in.

1              (OFF THE RECORD)

2              (ON THE RECORD)

3    JUDGE FOR THE RECORD

4        Let the record reflect the next witness has entered the

5    courtroom.

6    JUDGE TO MS. RANGEL-GOMEZ

7        Ma'am, would you have a seat, please.

8        A.    Thank you.

9        Q.    Do you speak English or do you want to use the

10   interpreter?

11       A.    I want to use.

12       Q.    Okay.   Would you state your name, please, in Spanish,

13   please.

14       A.    Braulia Guadalupe Rangel Gomez.

15   JUDGE TO MR. REAL

16       And could you spell your -- can you spell the name, Mr.

17   Interpreter.

18   MR. REAL TO JUDGE

19       First name is B as in boy, R A U L I A, Guadalupe,

20   G U A D A L U P E, Rangel, R A N G E L, Gomez, G O M E Z.

21   JUDGE TO MR. REAL

22       Okay.

23   JUDGE TO MS. RANGEL-GOMEZ

24       Q.    And would you raise your right hand, ma'am.  Do you

25   solemnly swear that any testimony you give today will be the

1    truth, the whole truth and nothing but the truth so help you

2    God?

3         A.   Yes, I do.  Yes.

4         Q.   Okay.  Are you the sister of Brenda Quevedo?

5         A.   No, I am her aunt.

6         Q.   Okay.  So you are the sister of her mother or her

7    father?

8         A.   The sister of her mother.

9         Q.   And are you aware of the criminal case against Brenda

10   in Mexico?

11        A.   Yes.

12        Q.   And were you ever interviewed yourself by the police

13   about her case?

14        A.   Never.

15        Q.   But your, but your sister has been interviewed?

16        A.   Lots of times.

17        Q.   And what has your sister told you about the case in

18   Mexico?

19        A.   She has told me that she has -- that she is very

20   impressed because of all the lies, that she is very afraid that

21   something will happen to her daughter, that something will

22   happen to her or her son or one of us.

23        Q.   Now your sister testified before you did, and she said

24   that you were with her when you talked to various people.

25        A.   Yes.

1      Q.    And that you, you actually talked to the mother of one

2    of the individuals who's being detained.

3      A.    Yes.

4      Q.    Who, whose other was that?

5      A.    The mother of the Castillo brothers.

6      Q.    And when did you meet with this person?

7      A.    The first time, it was when I went to request help

8    from the television stations.  That's where I met the lady when

9    she was also asking or requesting to be heard.

10     Q.    Well, why would you want help from the television

11   station, ma'am?  I don't understand that.

12     A.    Because Ms. Wallace, she had gone, she had gone a lot

13   of times to the television stations and to the radio stations,

14   and she was saying that Brenda was a killer, a prostitute, that

15   she would kill the man and she would cut off their heads.

16     Q.    So Mrs. Wallace has been interviewed by the television

17   station concerning her son's disappearance?

18     A.    A lot of times.  A lot of times.

19     Q.    And she's identified Brenda as someone who was

20   involved?

21     A.    Yes.

22     Q.    And so why would you go to the TV station?  I don't

23   understand why you would go to the station.

24     A.    To take my niece's documents to show them that she is

25   a representative, she has a bachelor's in political sciences,

1    and that all her life she has had stable jobs, that she would

2    always be able to show where she has worked, the dates.  She

3    also went to England and she had a job in England, and all of

4    this was perfectly documented.

5        Q.    Okay.  So did you -- were you ever interviewed by the

6    television station or not?

7        A.    Never. Never.  They promised they were going to

8    interview me, but they never did it.

9        Q.    Okay.  So the met the mother of the Castillo brothers?

10       A.    Yes.

11       Q.    And did you meet with her recently or is this a long

12   time ago?

13       A.    The first time, the first time it was a year ago, but

14   there was a second time approximately about a month and a half

15   ago, and at this time I was accompanied by my sister, Enriqueta.

16       Q.    Okay.  So you were accompanied by your sister and who

17   else?

18       A.    My husband.

19       Q.    And what was the purpose for meeting with the mother

20   of the Castillo brothers?

21       A.    When the first time that I met the lady, she let me

22   know about the injustice that had been done to her sons, that

23   they had been harmed, that she had had a lot of problems because

24   they had asked or requested money from her, and I commented this

25   to my sister, and now the second time that we saw her, I told, I

1    told her to tell or comment everything that was happening to my,

2    to my sister.

3    MR. REAL TO JUDGE

4        Sorry.  My sister.

5    JUDGE TO MS. RANGEL-GOMEZ

6        Q.   Well, what did the -- I'm more interested in your last

7    meeting with this lady.  What was her name?

8    MR. HORN TO JUDGE

9        What, what person, Judge?

10   JUDGE TO MR. HORN

11       The mother of the Castillo brothers.  Do you know, Mr.

12   Horn?

13   MS. RANGEL-GOMEZ TO JUDGE

14       I am not very sure, but I think it's Maria -- first name is

15   Maria and last name or the second name is Luisa, L U I S A.

16   JUDGE TO MS. RANGEL-GOMEZ

17       Q.   Well, what did Maria Luisa tell you about her son's

18   situation?

19       A.   That they were treated very bad in jail.  At one time

20   when they wanted them to sign a statement stating that they had

21   taken part in the killing, they did not do this or comply with

22   this because they said that they surely had not participated in

23   this.  They asked them, for them to give them 200,000 pesos, and

24   then Maria Luisa, their mother, found -- when she found out

25   this, they called their mom and told her we need 200,000 pesos,

1    their mom asked them for what and they told them we do not know.

2    Maria Luisa goes to jail and speaks -- I do not know how you say

3    it -- the police and tells them what do you want with 200,000

4    pesos, and they told her in return for your sons to conserve

5    their life.  I'm not very sure of what she told me that they

6    were being harmed for or they could lose their lives.  I'm not

7    pretty sure what she told me, but it was something similar, very

8    similar.

9        Q.   Okay, ma'am, do you and your sister come from a middle

10   class family, an upper class family or poor family?

11       A.   We come from a working family, always, always working,

12   always working.  We have always tried, we have always tried to

13   have a tranquil life without any debts, but that's all we do:

14   We work so we can have our family well, tranquil.

15       Q.   Do you think you or your sister's family would be able

16   to protect Brenda if she was sent to Mexico to stand trial in

17   this criminal case?

18       A.   I do not understand very good, very well the question.

19   I can protect her because I love her, but I cannot --

20       Q.   Okay, listen to the question again.  If Brenda is

21   innocent, why can't she go to Mexico and, and prove that?

22       A.   Because it's not possible in Mexico.  I am sure --

23   MR. REAL TO JUDGE

24       The respondent is pointing to herself.

25   MS. RANGEL-GOMEZ TO JUDGE

1        I am sure that if Brenda gets to Mexico, Ms. Wallace is not

2    going to allow that Brenda could be free.  She wants, she wants

3    through all -- I mean every which way that Brenda -- I mean, for

4    Brenda to be in jail, saying all the lies.

5    JUDGE TO MS. RANGEL-GOMEZ

6        Q.    Well, why does Ms. Wallace think Brenda's involved?

7        A.    Really I do not know why Brenda -- why she thinks

8    Brenda's involved.

9    JUDGE TO MR. HORN

10       Okay.  Mr. Horn, I asked those preliminary questions --

11   MR. HORN TO JUDGE

12       Okay.

13   JUDGE TO MR. HORN

14       -- just so we could move things along here.

15   MR. HORN TO JUDGE

16       I'm aware of that.

17   MR. HORN TO MS. RANGEL-GOMEZ

18       Q.    You said the boy --

19   JUDGE TO MR. HORN

20       But what's the purpose of this witness?

21   MR. HORN TO JUDGE

22       I'm just going to go very briefly, Judge.

23   MR. HORN TO MS. RANGEL-GOMEZ

24       Q.    You, you said when you talked to the mother of the

25   boys the second time, you said they were treated badly in jail.

A 88 513 956                    97              February 15, 2008

1    What does that mean?

2          A.    Yes, that there was a reason to punish --

3    (indiscernible) to the punish jail and they would just give them

4    bread and water without any explication; only, only said that

5    Ms. Wallace -- and that Ms. Wallace knew this and that Ms.

6    Wallace sent, sent people to tell them as to what to do to them.

7    MR. HORN TO JUDGE

8          I want to get through.

9    MR. HORN TO MS. RANGEL-GOMEZ

10         Q.    You said the boys were given bread and water?

11         A.    Yes.

12         Q.    That's what the mother said?

13         A.    Yes.

14         Q.    How many times -- were they given regular meals?

15         A.    I do not know.  I am not -- I do not know.

16         Q.    What did the mother say about that?

17   MR. FITTER TO JUDGE

18         About what?

19   MR. HORN TO MR. FITTER

20         About giving them regular meals.

21   MR. FITTER TO MR. HORN

22         But she doesn't know.

23   MR. HORN TO MR. FITTER

24         I was just going to ask her.  I want to get it clarified.

25   MR. FITTER TO MR. HORN

1        Clarified about what?  She said she doesn't know.

2    MR. HORN TO MR. FITTER

3        Do you have an objection?

4    MR. HORN TO MS. RANGEL-GOMEZ

5        Q.    Okay.  Did the mother of the Castillo boys say

6    anything else about their treatment?

7        A.    That she was horrified, that she did not understand

8    why this was happening to her sons.

9        Q.    Okay.  Now you also met with your sister, you met the

10   boys' lawyer; is that correct?

11       A.    That is correct.

12       Q.    And when did this meeting occur?

13       A.    Exactly around the month.

14       Q.    Around what month?

15       A.    The lawyers, the boys' lawyers met her a month, month

16   and a half, more or less.

17       Q.    From now?

18       A.    Now, yes.

19       Q.    Okay, and what did -- and did you have a -- and who

20   was present?

21       A.    I arrive with my sister and my husband.

22       Q.    Okay.  Were they -- was your sister and your husband

23   present during the conversation?

24       A.    No.

25       Q.    Who was present?

1         A.    My sister.

2         Q.    And what did the lawyer say to you and what did you

3    say to your -- to the lawyer?

4         A.    We wanted, we wanted to know as to what was going on

5    with the Castillo brothers with the case and with their case to

6    see, to see how it was because I had -- I mean, that I met their

7    mom and that their mom -- and we wanted to know how, how the

8    case was going.

9         Q.    What did she say to you?

10        A.    That it was the same, that they were really afraid and

11   they were scared because Ms. Wallace continued to say so many

12   lies.

13        Q.    I didn't understand.  What did you -- Ms. Wallace

14   what?

15        A.    Continued to say so may lies.

16        Q.    Oh, say so many lies.  Okay.  Did she tell you what

17   the condition -- did the lawyer tell you what the condition of

18   the boys were while they were in jail?

19        A.    He said that at the beginning it was very, very

20   difficult, that right now they were trying to prove, they were

21   trying to prove that they were innocent and they did not have

22   any part in anything of thing or they were not part of the case.

23        Q.    What was their physical condition, if you know?  Did

24   she describe -- strike that.  Did she describe their physical

25   condition?

```
 1   JUDGE TO MR. HORN

 2       I thought you said that you're now on the lawyer of the

 3   boys.

 4   MR. HORN TO JUDGE

 5       I said the lawyer, did the lawyer describe the physical

 6   condition of the boys.

 7   JUDGE TO MR. HORN

 8       I thought you said she --

 9   MR. HORN TO JUDGE

10       She no.

11   JUDGE TO MR. HORN

12       -- did she describe.

13   MR. HORN TO JUDGE

14       A woman.  It's a woman lawyer.  I don't know.

15   JUDGE TO MS. RANGEL-GOMEZ

16       Q.   Is it a woman lawyer or I thought -- I thought it was

17   a man that was representing the boys?

18       A.   No, it's a woman.

19       Q.   Was that Ambar, A M B A R, Trevino?

20       A.   Yes.

21   MR. HORN TO MS. RANGEL-GOMEZ

22       Q.   And did she describe --

23   JUDGE TO MS. RANGEL-GOMEZ

24       Q.   Did she tell you anything else about the treatment of

25   the boys?
```

1        A.    That I can remember at this time, no.

2    MR. HORN TO MS. RANGEL-GOMEZ

3        Q.    What do you think would happen to Brenda if she went

4    back to Mexico?

5        A.    I feel that Ms. Wallace could harm her.

6        Q.    In what way?

7        A.    I do not know.  Sending somebody to rape her, sending

8    somebody to confess, to hit her or selling her something that

9    she could be (indiscernible) or advise her to sign a document or

10   a paper that is not the truth.

11       Q.    Do you know the relationship between Mrs. Wallace and

12   the police?  Strike that.  Do you know if Mrs. Wallace has any

13   relationship with the police?

14       A.    I know that Ms. Wallace enters and leaves the

15   courthouse like she was, like it was her house.

16       Q.    Do you know if she's paid the police any money?

17       A.    No, I have not seen.

18       Q.    Okay. Do you know if she's been in contact with the

19   police?

20       A.    She says that she's in contact at all times with them.

21   She says that.

22       Q.    Ms. Wallace says that?

23       A.    Yes.

24   MR. HORN TO JUDGE

25       I have no further questions.

A 88 513 956                    102              February 15, 2008

1    JUDGE TO MR. FITTER

2        Mr. Fitter?

3    MR. FITTER TO JUDGE

4        Just a few questions.

5    MR. FITTER TO MS. RANGEL-GOMEZ

6        Q.   Ma'am, do you, do you know an individual by the name

7    of Hilda -- can't think of the name -- Juana Hilda Gonzales-

8    Lomeli has given a statement to the police?  Did you know that?

9        A.   Yes, I do know.

10       Q.   Have you ever seen that statement, ma'am?

11       A.   I saw it in the newspaper.

12       Q.   Okay.  And do you know that that implicates your

13   niece, Brenda Quevedo?  Do you know that?

14       A.   Yes.

15       Q.   Okay.  So if there's a statement written by one of

16   these people who is allegedly involved in this kidnapping, why

17   would the police need to ask your niece any questions at all?

18       A.   I'm sorry; I did not understand.

19       Q.   You, your -- one of your last statements was you're

20   afraid of Ms. Quevedo going back to Mexico because you think she

21   might be harmed by the police or asked to sign a confession

22   which is false or something to that effect; is that correct?

23       A.   Yes.  Yes.  I fear that something might happen to her

24   because this woman, Hilda, she submitted a document where it

25   says that she was -- she signed a document under pressure and

1   that she was drugged.

2      Q.   Okay. My question to you, ma'am, is --

3   JUDGE TO MR. FITTER

4      It's somewhat of a rhetorical question and it's difficult

5   to understand, Mr. Fitter.

6   JUDGE TO MS. RANGEL-GOMEZ

7      Q.   But, ma'am, do you know if the police would question

8   Brenda if she would get -- go back to Mexico or do you think

9   they don't even need to question her; they already have the

10  evidence?

11     A.   I think they do not have any -- no evidence.

12     Q.   So you think they would have to question her?

13     A.   I would hope that they would question her, but I'm

14  sure that they would not question her because, because Ms.

15  Wallace has a lot of power, and whatever Ms. Wallace says is

16  just what goes.  I'm very convinced of that.

17     Q.   So you think that Ms. Wallace would just fabricate

18  evidence against Brenda?

19     A.   I am definitely convinced.

20     Q.   Well, why do you think Ms. Wallace thinks that

21  Brenda's involved?

22     A.   Because she saw her on a picture.

23     Q.   And that's all?

24     A.   That's all.

25  JUDGE TO MR. FITTER

1          Anything else, Mr. Fitter?

2     MR. FITTER TO JUDGE

3          No, Judge.

4     JUDGE TO MR. HORN

5          Mr. Horn, anything else?

6     MR. HORN TO JUDGE

7          No, not at this time.

8     JUDGE TO MS. RANGEL-GOMEZ

9          Okay, ma'am, this completes your testimony.  Thank you for

10    testifying.  Thank you for coming to court.

11    JUDGE TO MR. HORN

12         Mr. Horn, who else did you have from out of town?

13    MR. HORN TO JUDGE

14         We have -- well, see, if we're going to adjourn now, Judge,

15    then I'm going to get some documents translated and submit it.

16    Then I don't need a witness.  Otherwise, I would --

17    JUDGE TO MS. QUEVEDO-CRUZ

18         Q.   Ms. Quevedo, you've been listening to the testimony;

19    is that correct?

20         A.   Yeah, that's correct.

21    JUDGE TO MS. QUEVEDO-CRUZ

22         We still have to take your testimony, and apparently your

23    attorney needs time to go over the Government's documents with

24    you and prepare some other evidence.  So I'm going to have to

25    continue your case for about two or three weeks, and then I'll

```
1    come back and we'll hear more testimony at that time.

2    JUDGE TO MR. HORN

3        Now it looks like I have an afternoon open on March 12th

4    at, say, approximately 1:00.  What does your -- it's a Wednesday

5    afternoon.

6    MR. HORN TO JUDGE

7        Yeah, March 12th is okay.

8    JUDGE TO MR. HORN

9        Now the only difficulty would be, Mr. Horn, is if there are

10   two judges here in Chicago on that day doing the two detained

11   courtrooms, I wouldn't have a courtroom available to me.

12   MR. FITTER TO JUDGE

13       Do you want me to check right now?

14   JUDGE TO MR. HORN

15       So I'm going to tentatively give you that date, March 12th,

16   and then if there's a conflict in the use of the courtrooms,

17   then I might have to change the date.

18   MR. AMAZIR TO JUDGE

19       You can't do it (indiscernible) --

20   MR. HORN TO JUDGE

21       Judge, the March -- I have a case on March 11th, and there

22   may be a conflict in the (indiscernible) California.  So March

23   12th may be a conflict, but I'll let the Court know.

24   JUDGE TO MR. HORN

25       Okay, that's fine and, you know, if in fact there's a
```

1    problem with that date, I can, I can move the date, but I'm

2    trying to schedule it sooner than later.

3    MR. HORN TO JUDGE

4         Okay.

5    JUDGE TO MR. FITTER

6         Is that agreeable, Mr. Fitter?

7    MR. FITTER TO JUDGE

8         That's fine, Judge.

9    JUDGE TO MS. QUEVEDO-CRUZ

10         Okay, ma'am, I'm going to have you come back on March 12th,

11   and then that's when we'll take your testimony.

12   JUDGE TO MR. HORN AND MR. FITTER

13        This hearing stands adjourned on the conditions stated.

14                         HEARING CONTINUED

15

16

17

18

19

20

21

22

23

24

25

Lic. Alejandro Caballero Castellum

Notario 150 del Estado de México

ESC. 1171

========= INSTRUMENTO NÚMERO =========================
========= MIL CIENTO SETENTA Y UNO ===================
========= VOLUMEN CUADRAGÉSIMO CUARTO ================

=== A los VEINTIÚN días del mes de ENERO de dos mil OCHO. ========

=== ALEJANDRO CABALLERO CASTELLUM, Notario adscrito a la Notaría número Ciento cincuenta del estado de México como Provisional, con residencia en Lerma, hago constar: ==============================

=== EL RECONOCIMIENTO DE FIRMAS que otorga la señora PASIANA ENRIQUETA CRUZ GÓMEZ. ===========================================

=== La compareciente me exhibe un documento en idioma inglés denominado "TO WHOM IT MAY CONCERN", que consta de cinco fojas escritas por un solo lado, del cual agrego un ejemplar al apéndice de este protocolo con el número de este instrumento y letra "A". ===

=== La compareciente reconoce en todas sus partes el contenido de dicho documento y reconoce como suya la firma que lo calza por ser de su puño y letra y ser la misma que acostumbra usar en todos sus asuntos y que conoce el idioma inglés en el contenido y alcance del documento. =================================================

=== Al apéndice de este protocolo con el número de este instrumento y letra "A", agrego un ejemplar del documento que se ratifica, en copia fotostática compulsada por mí con su original. ==============

=== GENERALES. ====================================================

=== La compareciente declara ser: ================================

=== Originaria de Cuernavaca, Morelos, que nació el nueve de marzo de mil novecientos cincuenta y cuatro, mexicana por nacimiento, hija de padres mexicanos, soltera, empleada, con domicilio en avenida Popocatepetl número ciento noventa y seis, interior uno, colonia General Anaya, código postal tres mil trescientos cuarenta, delegación Benito Juárez, México, distrito Federal, y de paso por esta Ciudad. Se identifica con credencial para votar con número de folio cero cero cero cero cero doce millones trescientos cincuenta mil ciento cuarenta y siete. ==========================================

=== YO, EL NOTARIO, DOY FE Y CERTIFICO: ==========================

=== a) Que la compareciente se identificó con el documento ya relacionado, quien a mi juicio tiene capacidad legal por no constarme nada en contrario. =============================

=== b) Que a la compareciente le fue leído íntegramente el presente instrumento habiéndole informado del derecho que tiene de leerlo por sí misma. ======================================================

=== c) Que a la compareciente le ilustré sobre el valor y las consecuencias legales del contenido de este instrumento, le informé

1

EXHIBIT

4.

de las penas en que incurren quienes declaran con falsedad ante Notario y le hice saber que todas sus declaraciones se consideran hechas bajo protesta de decir verdad. ===========================

=== d) Que lo relacionado e inserto concuerda con sus originales a que me remito y tuve a la vista. ===========================

=== e) Que la compareciente manifestó al suscrito Notario su conformidad con este instrumento, y su comprensión plena, para constancia de lo cual la firma el día veintiuno de enero de dos mil ocho. ===========================

=== FASIANA ENRIQUETA CRUZ GÓMEZ. (Firmado). ===========================

=== ANTE MÍ. Alejandro Caballero Gastélum. Firmado. ===========================

=== Un sello: Lic. ALEJANDRO CABALLERO GASTÉLUM, Notaría 150 Lerma, Estado de México. Estados Unidos Mexicanos. ===========================

=== Autorizo definitivamente en Lerma, Estado de México, el veintiuno de enero de dos mil ocho. Alejandro Caballero Gastélum. Firmado. ===========================

=== Un sello: Lic. ALEJANDRO CABALLERO GASTÉLUM, Notaría 150 Lerma, Estado de México. Estados Unidos Mexicanos. ===========================

2

TO WHOM IT MAY CONCERN.

February 26, 2006. Police forced themselves in my apartment located at Popocatepetl (name of the street), #372 – Building Alfa, Apartment #401. It was horrible for my and my son, Omar of 19 years of age, that day was Sunday, and we had gone to the super market, and when we came back, it caught our attention how many black trucks(SUVs) were out side the house. We climbed to the 4th floor were we live and it was a surprise to see so many people in our house. From before the entrance there was police, inside and allover the apartment, close to 40 police personnel with machine guns and within them, like 4 civilian personnel. When I entered, what I remembered is that I screamed, "What were they doing in my house?" It was torn upside down; all of the drawers of my furniture were empty, mattresses on the floor, clothes all over the floor, etc.

The way they treated me was very rough, I believe they indicated they were looking for Brenda because of the kidnapping of Mr. Hugo Wallace and that they were also going to take me in. In my desperateness, the first thing I did was to try to talk on my telephone with my family but they threw me and hitting me against the wall. They pointed their weapons, about six police men yelling at me to calm down, while pointing their weapons at me. When that happened one of the civilians personnel, a short woman, screamed at me yelling "to shut up because surely this apartment was something that Brenda and I obtained by kidnapping a person". My son, who was in the living room, at hearing my screams and theirs, wanted to help me, but they too, threw him against the wall. They kept taking things, while been very sarcastic in what they asked my such as: "you wouldn't happen to have an electric chainsaw?".

They went downstairs to take a lot of things such as: a computer (CPU), all of my papers (Legal house papers, insurances, birth certificates, pictures, cell phones, etc). At the end, they ordered so much, that my son and I begged them not to take my son, but they screamed at us and we had to go whit them. When we went down stairs, it was incredible, there where about 5 black trucks (SUVs), whit big letters "Agency Federal of Investigation", around the building and we were taken away like criminals.

They took us to the "SIEDO", an organization of the PGR (Mexican Police), where we arrived around of 17:00 hours, to take our affidavits, which was very hard on us, that they left me and my son alone, each of one of us in a separate closed room. And me, like a mother I was very worried about my son, because I saw that he was not doing well, he was very pale. In the end, they returned only one small suitcase whit some of my papers for the apartment in a bag with CDs. They indicated to us that they would continue to call us to testify, leaving at around 01:00 hours the next day.

March 27, 2006. The news came out in all the types of communication media (television, radio, newspaper, but most of all television was given the most coverage), were Ms. Isabel Miranda de Wallace placed a huge billboard located in "Paseo de la Reforma", where my daughter's (Brenda's), picture appears



next to the pictures of Jacobo Tagle Dobin, exhibiting them like "kidnappers and murderers" and offering a reward for turning them in ($5, 000 US dollars for Brenda and $25, 000 US dollars for Jacobo). I can't express what I was feeling and going thought; I wanted to run and never stop. Every one was talking to me in the office where I work; my mother became very ill of health when she saw the news, worried about my son, dear God, How much pain! My left arm hurt so much, but I couldn't waste time to go see the doctor, I only asked God to help me.

From that moment on, my daughter would come out on the news daily, in different stations, newspapers, etc. Where Ms. Isabel Miranda de Wallace assured that my daughter was a prostitute, because with lies she would take clients so that they would kidnap and murder them. In addition to those comments made by her, she also stated that my house was the "den" where every one would meet to make their plans, since the University Plaza was close, the place where the kidnapping was presumed , giving in details my name and home address in complete detail.

Early April 2006. I arrived at my domicile and there was an official citation, in part from the "Procuraduria de Justicia del Distrito Federal" (Mexico City Justice Department)", indicating that my son had to present himself, for "falsifying declarations" in his interrogation in February 2006. It was terrible for me; I became very ill, thinking that they would incarcerate my son. That's when I hired the services of the Attorney Armando Gonzales. He scared me when he indicated that "false declarations" is a form to pressure of to tell them where my daughter was and that my son would be placed in jail while they investigated him. The contact I had with the authorities also indicated for me to present my self also. During that interview, they once again took our statements and coincide whit the statements we made in February 2006. They made some comments that they were not in agreement whit the way in witch the PGR acted, that this seemed previously fabricated. That there were commentaries that Mr. Hugo Alberto Wallace was alive, that he knew where Brenda was, that it was a very delicate case, etc.

During the same week, in April 2006. When I went to the grocery store, walking down "Cuauhtémoc Avenue", all of a sudden, when crossing the street I raised my eyesight and I was absorbed with what I saw, there was a huge, huge billboard on "Paseo de la Reforma" that showed the same image of Brenda and Jacobo. They had placed in three blocks from my apartment, and five blocks from my son's school, and believe what I tell you, it was no sufficient to say that we suffered, a billboard placed on the path to school for my soon and on my way to work. Derived from the previous, my son suffered comments, mockery, etc. from fellow school mates, until one day, he couldn't deal anymore, and when I found him in his room whit the lights off, he told me all of this, they would call him the "brother of the kidnaper!"

End of April 2006. I received another citation the PGR-SIEDO (Police organization), from the same place where they had taken us after they forced themselves in my apartment. Only for me, and to get an attorney, to see matter of kidnapping of Mr. Hugo Alberto Wallace. I acquired my attorney Mr.



Armando Gonzales, but when I arrived and turned in my identification, they told me that I couldn't go in with my lawyer, to go in alone, because the chief of the department wanted to talk to me. Obviously I resisted, indicating that the document said to present myself whit my attorney. My attorney told me to go in, that he would reach me whatever happens. In the same office where they had taken my affidavit after their forced themselves in my apartment, the same official was waiting and his boss followed immediately. The began asking me to tell them where Brenda was, that they offered me like a "protected witness", that they recommended to turn her in and to better have her in a jail cell and see her, then have her a fugitive. In the end, little by little they become more violent, specially the chief, when he saw that he wouldn't able to get any information, he began to hit in the table and waiting to hit me while yelling, "like hell, I see her very tranquil, and I know when someone is laying, you know where your daughter is, and you know what? Don't keep asking questions about Wallace case, because just like you are seated there, Cesar Freire's mother was seated here too, and we placed her in jail. "What do you think?" All while mocking me, just like that, he gave instructions to take hair and blood samples. I asked him, what that was for? And he responded that it was for when they would find my dead daughter, to be able to recognize her. In that moment I couldn't stand it any more and I have a crisis, and broke down crying. From what, I remember he told me, to shup up, while they took my samples. At that same moment my attorney came in and asked them why they had made me cry. That they had only asked for a few minutes, until they returned to offer us to present them with "Brenda" and that they would take her as a "protected witness".

My attorney asked them, protected witness? And what happened recently, to one of your protected witness that was found dead in the rooms located under his offices. I only remember that we left, that I was very ill, thinking solely, that if I am her mother, I had been mistreated psychologically, physically, and morally, what could I expect when they would get my daughter in their hands.

May 2006. Mr. Alfredo, the porter in the building where I used to live, he had been visited by Ms. Isabel Miranda de Wallace and told him that she wanted him to give her some of Brenda's data such as: where she parked her car, she wanted to take pictures, but he told her that it was not allowed, then she screamed and threatened him. Also in the days follow, we took notice that we were being followed. There were people in dark automobiles, day and night, always spying on us. It was a terrible thing, because I already feared that they would do something to my son.

Middle of June 2006. I changed attorneys, after we realized that the previous lawyer has asked for so much money, he had taken advantage of this whole ordeal that was so difficult, that I was informed that he was seen Ms. Isabel Miranda de Wallace. Nevertheless, he insisted in continuing on wanting to stay on the case.

23 June 2006. They returned with another citation from the Sixteenth Judge of the District of Criminal Trials (Juzgado Decimo sexto del Distrito de Procesos Penales), for me and my son to appear as witnesses before that jurisdiction,

fortunately we had already gone with our attorney, Mr. Juan Carlos Duran, but he was not able to enter where they were going to do the interrogation. That day was a series of questions from the Secretary of the Judge, but it was very long and hard; it almost took four hours, and Ms. Isabel Miranda de Wallace was there. I noticed that she would come in and out with the judge as if she was in her house and everyone obeyed all her commands. Thanks to God, during all of these occurrences, Attorney Ambar Trevino, the lawyer of Mr. Cesar Freyre and Juana Hilda Gonzalez Lomeli, defended me from the questions that were so illogical that Ms. Isabel Miranda de Wallace had manifested, for the secretary to ask me.

September 2006. I sold my apartment where I lived for 12 years, because I had too many bills that where very expensive so that we would have a lawyer to represent us and whit the help of God, I was able to purchase a small apartment, five blocks from where we lived and we changed the following month. Immediately we sent our new official ID's and I informed our new lawyer of the changes.

23 December 2006. In part from the PGR, a campaign was initiated to capture the 19 most wanted kidnappers of highest danger, where Brenda Quevedo Cruz, my daughter and Jacobo Tagle Dobin, where they also offer a reward for whoever turns them in. This page was placed on all the windows of all the police patrols of Mexico City, and in all of the grocery stores, etc. A part from that, people gave me flyers, offering rewards that they had received on the street, but only with the pictures of Brenda and Jacobo.

Beginning of January 2007. The director at my son's school talked to me, Professor Varela, informing me, and certainly very worried, that personnel from the PGR had gone to his school, and wanted to know my address, and thankfully he did not give them any information, until he talked to me. I got my attorney, Mr. Juan Carlos Duran to talk with Professor Varela, and I listened how he gave him directions to not give anything, only a letter to the PGR indicating and asking what they wanted. It turns out that this turned out to be a great danger to my son, that Professor Varela literally said, "Your son collapsed, he is very ill, with his lips pale, but he is already being attended in the nurses office and been treated psychologically." That day we went for him, because Professor Varela had told us that this gentleman had waited very long in a black car with unmarked plates. Then next day, Professor Varela, informed us that the same personnel took him a letter, with what had happened to give them the solicited information.

The next day after they were informed of my new domicile, there were the same dark vehicles close to my house, without plates and people inside them. During the next few days, personnel from TELMEX knocked on my door, indicating that they had to check my telephone outlets because there was a problem, even though we told them we were not experiencing any problems. But they insisted in coming into my apartment while they were carrying out diverse maneuvers on the roof. There were like six people. When they left, one



of my neighbors commented that she was worried because she had talked to TELMEX, who told her that they had not sent anyone to check the building and that there was no report of a problem.

Also, my children's father, who lives in the city of Toluca, has experienced the same thing where dark vehicles with unmarked plates are watching his house. In the same manner, about two months ago, they had a problem with his telephone line, and when they sent the technician from TELMEX, he asked if they had a big problem, since he had found a telephone box in the telephone lines on the street to listen to the conversations of his house.

It has been a tremendous psychological torture in part by the authorities and from Ms. Isabel Miranda de Wallace, that I really have no idea how we have supported this, but the only thing that maintains me on my feet is to be able to be heard. That although I don't have the wealth and financial possibilities that Ms. Isabel Miranda de Wallace has, I have great faith in God, so that the competent authorities are able to analyze this case that is so mysterious, and that we can make light of this truth so that my daughter can come out of this proud of her, because she has nothing to do with this matter.

Pasiana Enriqueta Cruz Gómez.
Av. Popocatepetl No. 196-Depto. 1
Col. General Anaya, C.P. 3340, México, D.F.



*Lic. Alejandro Caballero Gastélum*

*Notaría 150 del Estado de México*

ESC. 1171

ES PRIMER TESTIMONIO QUE SE EXPIDE EN FAVOR DE LA SEÑORA

PASIANA ENRIQUETA CRUZ GÓMEZ, A FIN DE QUE LE SIRVA DE CONSTANCIA.

DOY FE. ============================================================

=== VA EN TRECE PÁGINAS CORREGIDAS. DOY FE. =========================

=== LERMA, ESTADO DE MÉXICO, A VEINTIUNO DE ENERO DE DOS MIL OCHO. =









[Embargoed for: 7 February 2007]                                    **Public**

# amnesty international

## Mexico
## Laws without justice: Human rights violations and impunity in the public security and criminal justice system

**Summary**                                          **AI Index: AMR 41/002/2007**

Amnesty International is calling on the new government of Mexico to reform the public security and criminal justice system in order to end widespread human rights violations. It is also vital that federal and state authorities take all necessary steps to ensure that state law and practice are consistent with international human rights standards and that longstanding impunity for human rights abuses ends.

This report examines in detail some of the serious failings of the public security and criminal justice system, which often result in abuses, and the arbitrary and unfair application of the law. Amnesty International makes recommendations to the government in five key areas: international human rights standards; public security and the criminal justice system; accountability; human rights defenders and the rights of victims.

Mexico has signed and ratified most remaining international and regional human rights instruments and has often invited international and regional human rights bodies and non-governmental human rights organizations to scrutinise the human rights situation. Despite this apparent openness to improving respect for human rights, widespread abuses committed in the context of the public security and criminal justice system remain one of the central obstacles to major advances in the protection of human rights and access to justice, particularly at state and municipal level.

As the cases highlighted in this report show, there is a wide gap between legal principle and the reality of those who come into contact with the law and need its protection, particularly in Mexico's 31 states and the Federal District of Mexico City. The criminal justice system is sometimes misused to detain and prosecute political activists and human rights defenders, some of whom have the threat of arrest hanging over them for years because warrants are issued but not acted on. Cases in this report also show how individuals are sometimes detained on the basis of obviously flawed or spurious evidence, frequently well beyond the



legal limits allowed for pre-trial detention. Others are denied access to adequate legal advice and representation at precisely the point when they are most at risk of torture or other ill-treatment to extract confessions. Reports of torture are routinely dismissed or ignored by judges, reinforcing impunity for these human rights violations.

Victims of these violations disproportionately come from the poorest and most marginalized sectors of society - members of indigenous communities, peasant farmers, women, children, migrants and socially excluded urban communities.

In researching this report Amnesty International interviewed and corresponded with representatives of federal and various state governments, prosecutors, defence lawyers, members of the judiciary, several governmental human rights commissions (*Comisión Nacional de Derechos Humanos*, CNDH, and *Comisiónes Estatales de Derechos Humanos*, CEDH), members of non-governmental human rights organizations, as well as victims of human rights abuses and their families. The organization's findings illustrate how law enforcement police, judicial police, prosecutors, judges and lawyers often fail to consistently uphold international fair trial standards. These include the right not to be deprived of liberty arbitrarily, the right to physical integrity, the right to effective defence, the right to be presumed innocent until proven guilty and the right to effective legal recourse. In particular, Amnesty International's research highlights the lack of impartiality among some police, prosecutors and judges, and the abuses that arise from the significant discretional powers granted to the Public Prosecutor's Office in criminal proceedings.

Many state officials interviewed for this report recognized deep failings with the present system, both in the legal framework and in the application of the law. Nevertheless, progress in securing change has been glacial. In 2004, the President Vicente Fox's government proposed a number of important legislative reforms to the Federal Congress. Amnesty International wrote to members of Congress the same year urging the approval of some key elements of the reforms to improve the protection of human rights.[1] However, after nearly three years of discussion in Congress, legislators have failed to approve major reforms and the pattern of abuses continues.

Improving public security and combating high crime rates are major political and social concerns in Mexico. However, all too often debate about how to tackle these issues has ignored or placed the protection of human rights in opposition to increased public security. In fact, the protection of human rights is not an obstacle to combating crime, but a fundamental means of ensuring safe convictions, fair trial standards and the independence and impartiality of the justice system. All these are indispensable in order to improve its effectiveness and generate public confidence in the criminal justice system. It is time for politicians and opinion formers to recognize that public security cannot be guaranteed for all, unless the human rights of all are protected equally.

---

[1] *Memorandum to Congress on reforms to the Constitution and Criminal Justice System*, (AI Index: AMR AMR41/032/2004).

It is vital that the new government and members of the Federal Congress assume the long overdue responsibility of introducing substantive reform of the public security and criminal justice system to ensure that the legal framework in force at federal, state and municipal level is sufficient to protect human rights. Only when all officials rigorously apply laws consistent with international human rights standards will there be equal access to justice for all.

This report summarizes a 71 -page document (25,499 words): Mexico, Laws without justice: Human rights violations and impunity in the public security and criminal justice system (AI Index: AMR 41/002/2007) issued by Amnesty International in February 2007. Anyone wishing further details or to take action on this issue should consult the full document. An extensive range of our materials on this and other subjects is available at http://www.amnesty.org and Amnesty International news releases can be received by email:

http://www.amnesty.org/email/email_updates.html

INTERNATIONAL SECRETARIAT, 1 EASTON STREET, LONDON WC1X 0DW, UNITED KINGDOM

[EMBARGOED FOR: February 2007]                                    **Public**

# amnesty international

# Mexico
## Laws without justice: Human rights violations and impunity in the public security and criminal justice system



TABLE OF CONTENTS

Introduction ............................................................................................. 1

Chapter 1: International human rights standards ................................................. 3

Chapter 2: Preliminary investigation, arrest, charges and committal
proceedings......................................................................................... 19

Chapter 3: Torture, ill-treatment and impunity .................................................... 31

Chapter 4: The right to effective defence ......................................................... 41

Private defence..................................................................................... 44

Indigenous peoples and the right to an interpreter ........................................... 45

Chapter 5: Impunity and accountability............................................................. 50

Chapter 5: Impunity and accountability............................................................. 50

Chapter 6: Conclusions and recommendations................................................. 64

Appendix: Institutions in Mexico's criminal justice system at federal and state
level ................................................................................................. 69

# Mexico
## Laws without justice: Human rights violations and impunity in the public security and criminal justice system

## Introduction

Amnesty International hopes that the administration of Mexico's new president, Felipe Calderon, will seize the opportunity to achieve substantial and lasting progress in the protection of human rights within the country. A key challenge will be to advance some of the principal reforms to the criminal justice system proposed in 2004, but which have since remained stalled in Congress. This report examines in detail some of the failings of criminal justice system which often result in the arbitrary and unfair application of the law in Mexico, and presents recommendations to the government in five main areas: international human rights standards; public security and the criminal justice system; accountability; human rights defenders and rights of victims.

UN thematic mechanisms have consistently highlighted failings in the criminal justice system, particularly the lack of impartiality among key actors and the failure of the judiciary, prosecutors, police and military to uphold international human rights standards. In recent years there has been an apparent reduction in reports of human rights abuses committed by federal authorities.[2] However, only five percent of reported crime falls to the federal authorities to investigate and punish, while 95 percent takes place within the jurisdiction of Mexico's 31 states and the Federal District.[3] It is under these local jurisdictions that the population primarily comes into contact with the system of public security and justice and it is in this context that the majority of human rights violations are reported.

Impunity for human rights abuses remains the norm in many states, encouraging public security and criminal justice system officials to resort to abusive practices when carrying out their duties. Victims of these violations disproportionately come from the poorest and most marginalized sectors of society - members of indigenous communities, peasant farmers, women, children, migrants and socially excluded urban communities. Although the National

---

[2] Mexico is a federal republic with 31 states and the Federal District. There is a federal executive, legislature and judiciary. The Mexican Constitution sets out the relation between federal and state governments, which are "free and sovereign", each with its own constitution, executive, legislature and judiciary. Each state also has its own law enforcement police, judicial police and Public Prosecutor's Office. State criminal codes establish proceedings and punishments for all offences that are not federal in nature. Federal offences are primarily international or cross state crimes, particularly organized crime. All other offences fall within the jurisdiction of the state authorities.

[3] According to the National Statistics Institute, *Instituto Nacional de Estadísticas, Geografía e Informatica* (INEGI), 1,501,304 crimes were reported to the Public Prosecutor's offices in 2004. 1,419,756 were local state jurisdiction offences; that is 95%. www.inegi.gob.mx

---

Human Rights Commission (*Comisión Nacional de Derechos Humanos*, CNDH) and the network of state human rights commissions can play an important role in exerting pressure on the authorities to investigate abuses and punish those responsible, they often fail to adequately defend the rights of victims and secure redress.

In researching this report Amnesty International interviewed representatives of federal and various state governments, prosecutors, defence lawyers, members of the judiciary, non-governmental human rights organizations, victims of human rights abuses and their families. The organization's findings illustrate how law enforcement police, judicial police, prosecutors, judges and lawyers often fail to consistently enforce international fair trial standards.[4] These include the right not to be deprived of liberty arbitrarily, the right to physical integrity, the right to effective defence, the right to be presumed innocent until proven guilty and the right to effective legal recourse. In particular, it highlights the lack of impartiality among some police, prosecutors and judges, coupled with the significant discretional powers granted to the Public Prosecutor's Office in criminal proceedings, which undermine the principle of equality of arms between prosecution and defence.[5]

It is vital that the new government and members of the federal Congress assume the long overdue responsibility of introducing substantive reform of the public security and criminal justice system to ensure that the legal framework in force protects human rights. It is also vital that the federal authorities and state authorities take all necessary steps to ensure that state law and practice are consistent with these standards and that longstanding impunity for human rights abuses ends.

All too often, local public officials present the protection of human rights as an obstacle to combating crime, rather than a means of ensuring safe convictions, fair trial standards and the independence and impartiality of the justice system. If the new government is to succeed, it must show clear commitment to the protection of human rights as a fundamental step to securing improved effectiveness and public confidence in the criminal justice system. Only when laws consistent with international human rights standards are rigorously applied by all officials will there be equal access to justice for all.

---

[4] Refer to appendix for a description of institutions in the public security and criminal justice system at federal and state level.

[5] "Equality of arms" means that each party must be afforded a reasonable opportunity to present its case, under conditions that do not place it at a substantial disadvantage vis à vis the opposing party. Amnesty International Fair Trial Manual, December 1998, AI Index: POL 30/02/98; Chap. 13.2

# Chapter 1: International human rights standards

The International Covenant on Civil and Political Rights (ICCPR) and the American Convention on Human Rights (ACHR) establish a number of minimum core obligations on state parties to protect the right to freedom and security of person, the rights of criminal suspects and the right to a fair trial.[6] Other international instruments to which Mexico is a state party, such as the UN Convention Against Torture and Other Cruel, Inhuman or Degrading Treatment or Punishment, the Inter-American Convention to Prevent and Punish Torture and the Convention on the Elimination of all forms of Discrimination, set out clear legal obligations for the Mexican authorities. The United Nations has also established a set of codes of minimum standard for agencies responsible for the criminal justice system and the administration of justice that member governments have agreed to implement. These include the Basic Principles for the Treatment of Prisoners, Body of Principles for the Protection of All Persons under Any Form of Detention or Imprisonment, Basic Standard Minimum Rules for the Treatment of Prisoners, Code of Conduct for Law Enforcement Officials, Principles on the Independence of the Judiciary, Basic Principles on the Role of Lawyers, Guidelines on the Role of Prosecutors, and the United Nations Standard Minimum Rules for the Administration of Juvenile Justice.

### Formal commitment to international human rights standards

The Mexican government has shown an important commitment to international human rights law. Despite limiting the application of at least two key treaties by adding reservations and interpretive clauses, Mexico has now signed and ratified most international and regional human rights instruments – including the Rome Statute and the Optional Protocol to the Convention Against Torture.[7] The government has undertaken a Technical Cooperation Programme with the Office of the United Nations High Commissioner for Human Rights (OHCHR) and facilitated the presence of the OHCHR office in Mexico City. The government issued an open invitation to international and regional human rights mechanisms and non-governmental human rights organizations, which has resulted in field visits and reports by most of the human rights thematic mechanisms of the United Nations and the Inter-American Commission of Human Rights (IACHR).

This welcome engagement with international human rights bodies has produced a series of detailed recommendations to address Mexico's human rights situation, many focusing on the failure of the criminal justice system to guarantee the rights of criminal suspects and victims

---

[6] ICCPR ratified by Mexico 3 March 1981; ACHR ratified by Mexico 3 February 1982.

[7] The reservation on Article IX of the Inter American Convention on Forced Disappearances of Persons reinforces the role of military jurisdiction over alleged human right offences by military personnel. The general interpretive clauses placed on the same convention and the UN Convention on the Non-Applicability of the Statutory Limitations to War Crimes and Crimes against Humanity (ratified by Mexico in March 2002) seek to limit prosecution to only those offences committed subsequent to ratification, contradicting the aim and purpose of both conventions.

4       *Laws without Justice: Human rights violations and impunity in the public security and criminal justice system*

of crime.[8] In 2003 the office of the UNOHCHR carried out a wide consultation process to identify key human rights concerns and issued a set of recommendations to be implemented via a National Human Rights Programme. The OHCHR report recommended:

"The promotion of a profound transformation in the justice system in order to guarantee the rule of law at every level, including recognition of the rights of victims; the end of the inquisitorial model of criminal trials; the creation of specialized juvenile criminal justice; the inclusion of penitentiary justice and the restriction of military justice, as well as the extension of the protective reach of federal judicial review".[9]

In 2004 the government inaugurated the National Human Rights Programme (*Programa Nacional de Derechos Humanos,* PNDH) which took up some of the recommendations of the UN and IACHR. Unfortunately, the PNDH has so far lacked clear implementation mechanisms, resources or the widespread support of institutions and civil society necessary to secure many of the changes proposed. Nevertheless, it is vital that the progress made in identifying a concrete national human rights agenda is sustained.

**Enforcing laws protecting international human rights standards**
A key obstacle to improve the protection of human rights has been the failure to ensure that international human rights commitments assumed by the government of Mexico are applied in practice by the authorities throughout the country. Article 133 of the Constitution states that "This Constitution, the laws of the federal Congress that emanate from it and the treaties that are in accordance with it, are the Supreme Law of the Union.... State judges will abide by the federal Constitution, laws and treaties despite contradictory dispositions in state constitutions or laws".[10] This has always raised questions in practice about the precedence of international

---

[8] Mexico country reports include: Report by the Committee against Torture under article 20 of the convention, CAT/C/75, 2003, 26 May 2003; Report of the Special Rapporteur on Torture, E/CN.4/1998/38/Add.2, 14 January 1998; Report of the Special Rapporteur on the independence of judges and lawyers, E/CN.4/2002/72/Add.1, 24 January 2002; Report of the Special Rapporteur on the situation of human rights and fundamental liberties of indigenous peoples, E/CN.4/2004/80/Add.2, 1 December 2003; Report of the Special Rapporteur on extrajudicial, summary or arbitrary executions, E/CN.4/2000/3/Add.3, 25 November 1999; Report on Mexico by the Working Group on Arbitrary Detention, E/CN.4/2003/8/Add.3, 17 December 2002.

[9] "*Promover una profunda transformación en el sistema de justicia, que garantice el Estado de derecho en todos los órdenes, que comprenda el reconocimiento del derecho de las víctimas; el abandono del modelo de enjuiciamiento penal inquisitorio; la creación de una jurisdicción especializada para adolescentes en conflicto con la ley; la incorporación de una justicia penitenciaria y el acotamiento de la justicia militar a su ámbito propio; así como la ampliación del alcance protector del juicio de amparo*". General Recommendation 11, Diagnóstico sobre la situación de los Derechos Humanos en México, Oficina del Alto Comisionado de las Naciones Unidas para los Derechos Humanos en México, 2003 www.cinu.org.mx/prensa/especiales/2003/dh_2003/index.htm.

[10] "*Esta Constitución, las leyes del Congreso de la Unión que emanen de ella y todos los Tratados que estén de acuerdo con la misma, celebrados y que se celebren por el Presidente de la República, con aprobación del Senado, serán la Ley Suprema de toda la Unión. Los jueces de cada Estado se arreglarán a dicha Constitución, leyes y tratados, a pesar de las disposiciones en contrario que pueda haber en las Constituciones o leyes de los Estados.*"

---

treaties over national legislations and particularly prevented the application of human rights law that is deemed to be in contradiction with the Constitution. In 1999 the National Supreme Court (*Suprema Corte de Justicia de la Nación*, SCJN) issued an isolated ruling (*tesis aislada*) that international human rights treaties rank below the Constitution but above federal and state laws.[11] However, this ruling by the Constitutional chamber of the SCJN is not a binding precedent (*jurisprudencia obligatoria*) for lower federal and state courts, so is not generally applied.[12] As a result, while the government formally acknowledges Mexico's international human rights obligations, judicial rulings rarely take them into account and the SCJN has not taken steps to ensure its 1999 ruling is made into binding precedent. As a justice of the SCJN has recognized, defence lawyers, prosecutors and judges usually do not base their legal arguments on international human rights law, preferring to rely almost exclusively on the Constitution, federal law, jurisprudence and local state laws.[13] Even on the basis of national legislation the Supreme Court has been reluctant to develop jurisprudence effectively protecting due process rights of criminal suspects and victims.[14]

Another factor undermining the effective protection of human rights throughout Mexico is the failure of some of Mexico's 31 states and the Federal District, which the Constitution defines as "free and sovereign", to consistently protect human rights in their own jurisdictions and prevent impunity for abuses. Article 28 of the American Convention on Human Rights requires each government to "immediately take suitable measures, in accordance with its constitution and its laws, to the end that the competent authorities of the constituent units may adopt appropriate provisions for the fulfilment of this Convention". Despite this obligation on the Mexican state, the federal government has not established effective mechanisms to ensure international human rights standards, such as the ACHR, are enforced in all state jurisdictions. It is also the case that in many state jurisdictions police, prosecutors, lawyers and judges are even less likely to apply or refer to international human rights standards in the course of their work.

If a state level official is implicated in human rights violations, the state authorities, such as the local state police, Public Prosecutor's Office and courts, are responsible for holding perpetrators to account. While local authorities may frequently state that official conduct or

---

[11] Tratados internacionales se ubican jerárquicamente por encima de las leyes federales y en Segundo plano respecto de la constitución federal. Novena Epoca. Instancia Pleno. Semanario judicial de la Federación. Tomo X noviembre de 1999. Tesis: P. LXXVII/99 pagina 46, materia constitucional. Tesis aislada.

[12] Article 192 of the Amparo Law stipulates that the SCJN rulings only form binding jurisprudence for lower courts when there five consecutive decisions in the same vein on the same point of law.

[13] Comments by Supreme Court Justice, Cossio Díaz, "Cierto, la SCJN se pronuncia poco en derecho internacional: Cossío Díaz" La Jornada, 31 August 2005. This position was underscored by the 2005 decision of the Supreme Court to apply the statute of limitations to the prosecution of former president Echeverría for genocide, in contradiction with the UN Convention on the Non-Applicability of the Statutory Limitations to War Crimes and Crimes Against Humanity.

[14] Stephen Zamora, José Ramón Cossío, Leonel Pereznieto, José Roldán-Xopa and David Lopez; Mexican Law, Oxford University Press. 2005, page 349.

subsequent investigations into human rights violations comply with their legal responsibilities, Amnesty International receives many cases which demonstrate that this is often not the case. Those included in this report are a sample of this wider pattern.

The primary legal means of overcoming this serious obstacle to access justice at local level are the federal injunction (*amparo*) for violation of constitutional guarantees or the intervention of a federal authority to investigate the conduct of state officials. The first is the principal instrument for securing redress, but is slow and costly and as yet *amparo* injunctions can only be filed on the basis of alleged violations in constitutional guarantees, not explicitly human rights protected in international treaties and conventions.

The second relies on the Federal Public Prosecutor's Office (*Procuraduría General de la República*, PGR) claiming and the courts confirming jurisdiction to investigate and prosecute cases that occur in local jurisdictions.[15] Only a limited number of offences are federal, such as criminal association, possession of illegal drugs, human trafficking or offences committed by federal agents. In instances where the authorities at local level fail to prevent human rights abuses, such as the lack of effective investigations into hundreds of cases of murdered women in Ciudad Juárez, Chihuahua state, the PGR has argued that it cannot legally assume responsibility for prosecuting cases, despite systemic failure of the Chihuahua state authorities to do so.[16] In such instances, the involvement of the PGR is limited to coordination and cooperation. While this approach may be intended to encourage local authorities to enforce human rights standards, the state Public Prosecutor's Office is not bound to comply and is not accountable to federal authorities.

Under the Fox administration there were a number of proposals discussed in Congress to amend the Constitution in order to strengthen the recognition and application of international human rights standards in all jurisdictions. These include: explicit obligation to protect international human rights standards in the constitutional text; increased scope for PGR intervention in state jurisdictions when local authorities fail to prevent or punish serious human rights violations; and extension of the scope of federal *amparo* procedures to include alleged violations of international human rights laws. However, at the time of writing, after more than two years of debate, Congress has not agreed or approved reforms. As a result, despite the Fox government's commitment, efforts to harmonise federal legislation with international human rights obligations did not produce major advances. Therefore removing this obstacle to the effective protection of human rights in Mexico remains a fundamental challenge for the Calderón administration and the new Congress.

---

[15] Another mechanism available, but rarely used, is an ad hoc National Supreme Court investigation. Most recently, such an enquiry was opened in the case of human rights defender Lydia Cacho. However, the findings of the Court in such enquiries are not binding.
[16] Of the 379 murders recorded by the PGR in Ciudad Juárez since 1993, only 24 have ever been investigated directly under federal jurisdiction.

**Mexican legal guarantees**

Mexico's Constitution establishes a number of important individual guarantees, many of which reflect the human rights enshrined in international human rights treaties such as the International Covenant on Civil and Political Rights (ICCPR) and the American Convention on Human Rights (ACHR). These include: the right not to be held in slavery (art 1); the right to non-discrimination (art 1); the rights to freedom of expression and association (art 6, 7 & 9); the right not be tried by a special court (or protected from prosecution by special privileges (*fuero*)) (art 11); the right not be tried by retroactive laws (art 12); the right to liberty and property (art 14); the right not to be subject to arbitrary arrest or search (art 16), the right to prompt, complete and impartial justice (art 17); the right not to be forced to testify, held incommunicado, intimidated or tortured (art 20, A, II); the right to be tried in a public hearing before a judge (art 20, A, VI); [17] the right to present evidence in one's defence (art 20, A V, VII) and be informed of one's rights and to a defence lawyer or person of confidence (art 20, A, XI); the right to receive legal advice as a victim of crime and assist the public prosecutor (*coadyuvar*) as well as receive compensation (art 20, B, I,II, IV), the right to appeal a conviction to no more than two higher courts (art 23); the right to federal judicial review of a law or official acts that violate these individual guarantees (art 103, I).

The obligation on the authorities to respect rights and ensure the due process of law are further elaborated in federal criminal, procedural and regulatory codes as well as the constitutions of the 31 states and the Federal District and their respective criminal and procedural codes and regulatory codes of law enforcement agencies, the public prosecutor's offices, public defenders offices and the judiciaries. Punishment for breaches in these procedures, both criminal and administrative, are also set out in statutes such as federal and state penal codes, the Law for the Prevention and Punishment of Torture and state and federal laws for the administrative responsibilities of public servants (*Ley de Responsabilidades de los Servidores Públicos*). The latter establish the disciplinary procedures for resolving complaints against public officials.

These rights and procedures offer important safeguards. However, as this report demonstrates, national legal safeguards are often not effectively enforced in many parts of Mexico, creating a wide gap between legal principle and the experience of those who come into contact with the public security and criminal justice system.

**National surveys**

The lack of reliable detailed official data relating to criminal justice practices hinders a comprehensive analysis of the faults in the public security and criminal justice system at federal, state and municipal level. However, in recent years this has started to change as a number of organizations and academic institutions have begun to gather more reliable

---

[17] Criminal trials are held before a judge, with no jury.

information, exposing the wide gap between constitutional guarantees and their application in the justice system.[18] This process is also being assisted by the 2002 Federal Access to Information Bill, an important new legal instrument to compel traditionally secretive state institutions to release information.[19] However, the legislation is in its infancy and has yet to be fully tested and many state governments have either chosen to introduce weaker freedom of information legislation or none at all.

In 2003 the academic institution, Centre for Investigation and Teaching of Economics (*Centro de Investigación y Docencia Económicas, CIDE*) published a survey of inmates in prisons in the Federal District, Morelos state and Mexico state.[20] One aspect of the study considered the compliance by police, prosecutors and courts with criminal justice laws. These included the right:
-   to be informed of the reasons for detention and a suspect's rights during custody and trial,
-   to be held in custody for no longer than legally stipulated time limits before being brought before a prosecutor and a judge,
-   to make a phone call,
-   to legal counsel and an adequate defence,

The study found widespread institutional failure to uphold these legal obligations:

Law enforcement or public security police
Only 31% of criminal suspects were informed by the arresting police officer of the reason for their detention. Public Security Police took longer than reasonable to transfer a suspect to the Public Prosecutor's Offices.

Public Prosecutor's Offices
91% of criminal suspects were not informed of differences between the Public Prosecutor's Office and the courts. 80% were not informed of their right not to testify. 72% were not informed of their right to make a phone call.

Courts
66% of suspects were not informed of their right not to testify before the judge. 27% did not have a lawyer when making their statement to the judge. 71% stated that the judge was not

---

[18] For example, Centro de Investigación y Docencia Económicas (CIDE), Instituto Ciudadano de Estudios sobre la Inseguridad (ICESI), Instituto para la Seguridad y la Democracia (INSYDE), Centro de Investigación para el Desarrollo (CIDAC).
[19] Ley federal de transparencia y acceso a la información pública gubernamental, Official gazette June 2002.
[20] Bergman, Marcelo. Delincuencia, Marginalidad y Desempeño Institucional. Resultados de la encuesta a población en reclusión en tres entidades de la República Mexicana: Distrito Federal, Morelos y Estado de México. Documentos de Investigación. México: Centro de Investigación y Docencia Económicas. 2003.

present when they testified. 80% never spoke to the judge during the trial. 59% of suspects stated they could not hear or did not understand what was happening during the trial.

<u>Defence lawyers and public defenders</u>
70% of suspects did not have a lawyer while in the custody of the Public Prosecutors' Office and the majority of the remaining 30% were assigned a public defender by the prosecutor. 46% of those who had a lawyer present when making their statement to the judge were not allowed to consult with their lawyer before making their statement. 45% of defence lawyers did not present any evidence in favour of the defendant during the trial.

The report's authors concluded that "In general it is not the most dangerous criminals who populate prisons, but the poorest ones (*En los penales no habitan en general los delincuentes más peligrosos sino los más pobres*) and that there was an "alarming failure to uphold minimum due process standards... irredeemably undermining the credibility of the whole criminal justice system" (*una alarmante falta de apego a estándares mínimos del debido proceso legal...irremediablemente, minan la credibilidad del sistema de Justicia penal en su conjunto*).[21]

**Rights of victims**
In Mexico victims of crime by law enjoy several important rights, including the right to receive legal advice from the prosecutor, the right of the victim or their legal adviser to act as an auxiliary to the prosecution, *coadyuvante;* and the right to compensation.[22] Nevertheless, the reality experienced by many victims indicates a broad lack of confidence in police and prosecutors. According to national surveys, only one in five victims of crime make a complaint to the Public Prosecutor's Offices, and only 11.4% of these reported offences led to a suspect being charged (*consignado*) by a prosecutor.[23]

**Inequality and discrimination**
"All persons are equal before the law and are entitled without any discrimination to the equal protection of the law." [24]

The UN Human Rights Committee has stated in its general comments to the ICCPR that the term 'discrimination' as used in the Covenant should be understood to imply any distinction, exclusion, restriction or preference which is based on any ground such as race, colour, sex, language, religion, political or other opinion, national or social origin, property, birth or other

---

[21] Ibid, page 11 & 12.
[22] Mexican Constitution, Art 20, B (I-VI).
[23] Instituto Ciudadano de Estudios sobre la Inseguridad, Segunda Encuesta Nacional sobre la inseguridad, http://www.warebox.net/icesi-org-mx/images/pdf/Inseg02.pdf & Zepeda, 2004, p198.
[24] ICCPR, Art 26.

status, and which has the purpose **or effect of** nullifying or impairing the recognition, enjoyment or exercise by all persons, on an equal footing, of all rights and freedoms." [25]

In 2001 the Mexican Constitution was reformed to prohibit "all discrimination on the grounds of ethnic or national origin, gender, age, disability, social status, health, religion, opinions, preferences, marital status or any other grounds that attack human dignity and have the aim of nullifying or undermining the rights and liberties of persons." [26] In 2003 the Federal Law on the prevention and elimination of discrimination entered the statute books and established the National Council for the Prevention of Discrimination (*Consejo Nacional para Prevenir la Discriminacion*, CONAPRED) to implement legislation and receive complaints. A few state legislatures have followed suit and reformed local legislation along similar lines, but in many states anti-discrimination legislation remains inadequate.

In May 2005 CONAPRED published the first National Survey on Discrimination. [27] The report indicates clearly how disadvantaged groups, such as indigenous peoples, persons with disabilities or HIV/AIDS, women, children, religious minorities, senior citizens (*adultos mayores*) and lesbian and gay people, continue to suffer discrimination in society, and the key role that discrimination plays in reinforcing poverty that many members of these groups suffer. Unfortunately, the survey considers neither the direct nor indirect impacts of discrimination in the criminal justice system.

In relation to Mexico's 13 million indigenous peoples, CONAPRED has noted: "In Mexico the equality of indigenous peoples with the rest of society has not been achieved. The reproduction of a vicious circle which moves from discrimination to poverty, from this to greater discrimination, keeps indigenous people in a position of social disadvantage and defencelessness from which the enjoyment and equality of fundamental rights is impractical." [28]

---

[25] Para 7, Human Rights Committee, General Comment 18, Non-discrimination (Thirty-seventh session, 1989), Compilation of General Comments and General Recommendations Adopted by Human Rights Treaty Bodies, U.N. Doc. HRI\GEN\1\Rev.1 at 26 (1994). This definition also coincides with International Convention on the Elimination of All Forms of Racial Discrimination.

[26] Mexican Constitution, art. 1: "*queda prohibida toda discriminación motivada por origen étnico o nacional, el género, la edad, las capacidades diferentes, la condición social, las condiciones de salud, la religión, las opiniones, las preferencias, el estado civil o cualquier otra que atente contra la dignidad humana y tenga por objeto anular o menoscabar los derechos y libertades de las personas.*"

[27] Primera Encuesta Nacional sobre Discriminación en México, May 2005, Sedesol, http://www.sedesol.gob.mx/subsecretarias/prospectiva/subse_discriminacion.htm.

[28] CONAPRED http://www.conapred.org.mx/index.php, "*En México no se ha logrado articular a los indígenas en una posición de igualdad con el resto de la sociedad. La reproducción del círculo vicioso que va de la discriminación a la pobreza y de ésta a una mayor discriminación, mantiene a los pueblos indígenas en una situación de desventaja e indefensión sociales desde la cual es impracticable la igualdad y el ejercicio de derechos fundamentales*".

The Mexican government has also recently informed the United Nations Committee for the Elimination of all forms of Racial Discrimination that: "The treatment of indigenous peoples in the criminal justice system is routinely unfair, leaving many serving unfounded or disproportionate prison sentences." [29]

**Lack of institutional credibility**

In accordance with federal and state laws and regulations, the institutions primarily responsible for public security and criminal justice system are:

- Public security law enforcement police agencies at federal, state and municipal level responsible for maintaining public order. Each separate police force is under the control of the public security secretariat of the executive authority in federal, state and municipal governments;[30]
- Armed Forces, which have wide-ranging policing powers to combat drug trafficking in coordination with law enforcement agencies and the Federal Public Prosecutor's Office (PGR);
- Public Prosecutor's Offices and the judicial police that work directly under their control at federal and state level. [31] The Public Prosecutor's Offices are the only agencies empowered to open and run criminal investigations and bring prosecutions in each jurisdiction and represent the interests of the victim and wider society;
- Public defenders institutions in each jurisdiction;
- Federal and state judiciaries responsible for adjudicating criminal cases in their respective jurisdictions.

Mexico's Constitution states that the "conduct of police institutions will be governed by the principles of legality, efficiency, professionalism and honesty." (*La actuación de las instituciones policiales se regirá por los principios de legalidad, eficiencia, profesionalismo y honradez*).[32] The Organic Law of the Office of the Federal Attorney General states that judicial police, prosecutors and official forensic experts are bound by the principles of legality, efficiency, professionalism, honour and impartiality and respect for human rights (*legalidad, eficiencia, profesionalismo, honradez, lealtad e imparcialidad y de respeto a los derechos*

---

[29] Mexican Government report to the United Nations Committee for Elimination of All forms of Racial Discrimination, CERD/C/473/Add.1, Para 167.

[30] Federal Preventive Police (*Policía Federal Preventiva*); 31 State Preventive Police (*Policía Preventiva Estatales*) and Federal District Preventive Police; and municipal police forces in many of Mexico's 2,445 municipalities.

[31] Federal Public Prosecutor's Office (*Procuraduría General de la República*, PGR); 31 State Public Prosecutors' Offices (*Procuradurías Generales de Justicia de los Estados*, PGJEs) and Federal District Public Prosecutor's Office. Each of prosecutor's offices have their own judicial or investigative police some of which are now called Federal Investigation Agency (*Agencia Federal de Investigación*) or State Investigation Agency (*Agencia Estatal de Investigación*).

[32] Mexican Constitution, art 21.

*humanos*).[33]  Similarly, advancement in judiciary is dependent on the official adhering to the principles of "excellence, professionalism, objectivity, impartiality, independence" (*excelencia, profesionalismo, objetividad, imparcialidad, independencia*).[34]

Nevertheless, public opinion continues to be distrustful of many of these institutions, particularly the police, due to widespread corruption, human rights violations and failure to prevent high crime rates or bring to justice those responsible.[35] In 2002 the UN Special Rapporteur on Independence of judges and lawyers stated in his report that: "Impunity and corruption appear to have continued unabated. Whatever the changes and reforms, they are not seen in reality. Public suspicion, distrust and want of confidence in the institutions of the administration in general and the administration of justice in particular are still apparent." [36] In recent years there has been a degree of improvement in the reputation of some federal institutions, but in general distrust of institutions responsible for public security and justice remains high, particularly in many of Mexico's states.

**Impartiality and independence**
Representatives of the different public security law enforcement agencies, prosecution services and the judiciary regularly assert, as the law states, that their conduct is strictly determined by the impartial application of the rule of law. However, poor pay, limited resources, lack of training, and excessive workload, as well as continuing political interference in many spheres, often seriously undermines their independence and impartiality.

Law enforcement

---

**UN Code of Conduct for Law Enforcement Officials:**
*Law enforcement officials shall at all times fulfil the duties imposed on them by law, by serving the community and protecting all persons against illegal acts, consistent with the high degree of responsibility required by their profession. (art 1)*
*In the performance of their duty all law enforcement officials shall respect and protect human dignity and maintain and uphold the human rights of all persons. (art 2)*

---

Law enforcement agencies are under the direct control of the executive at federal, state and municipal level. In recent years, the federal police have developed a professional code of conduct to strengthen the principles of legality and respect for human rights incumbent on all officials. However, this in itself is not enough to overcome many of the ingrained abusive

---

[33] Organic Law of the Office of the Federal Attorney General's Organic Law (*Ley Organica de la Procuraduría General de la República*), Art 30, IV.

[34] Organic Law of Federal Judiciary (*Ley Órganica del Poder Judicial de la Federación*), Art 105.

[35] Consulta Mitofsky, Confianza en las instituciones, http://www.consulta.com.mx/interiores/99_pdfs/12_mexicanos_pdf/mxc_NA20050711_ConfianzaInstituciones.pdf

[36] Special Rapporteur on Independence of Judges and Lawyers, E/CN.4/2002/72/Add.1, 24 January 2002, Para. 166.

practices and corruption or the traditions of political interference in police operations, in such states as Oaxaca, Guerrero, Chiapas, Mexico and Jalisco. These practices remain particularly entrenched in some states and at municipal level, where law enforcement agencies are frequently perceived as working directly on behalf of the interests of local authorities in the selective enforcement of laws against political opponents, human rights defenders or community representatives.

Public prosecutors and judicial police

The Public Prosecutor's Offices are the direct responsibility of the Attorney General of the Republic at federal level and the 32 Attorney Generals in the states and Federal District. The Federal Attorney General is nominated by the President and ratified by Congress.[37] This selection process applies in some state administrations, while in others local legislation continues to allow the governor to directly select the Attorney General. The President or the respective state governor usually has the authority to dismiss the Attorney General from office (the state of Chiapas is an exception where the Attorney General has a set six year tenure). The Attorney General of the Republic and the 32 state Attorney Generals are key members of the federal and state executives.

The 32 Attorney Generals in the states and the Federal District are not under the responsibility of the Federal Public Prosecutor's Office (PGR), but are accountable to the local state executive and legislature. The principal instrument of coordination between the 33 Public Prosecutor's Offices is the National Conference for the Procuration of Justice (*Conferencia Nacional de Procuración de Justicia*) which is based on cooperative agreements.

---

**UN Guidelines on the Role of Prosecutors**
*Prosecutors shall, in accordance with the law, perform their duties fairly, consistently and expeditiously, and respect and protect human dignity and uphold human rights, thus contributing to ensuring due process and the smooth functioning of the criminal justice system. (art 12) In the performance of their duties, prosecutors shall: (a) Carry out their functions impartially and avoid all political, social, religious, racial, cultural, sexual or any other kind of discrimination; (b) Protect the public interest, act with objectivity, take proper account of the position of the suspect and the victim, and pay attention to all relevant circumstances, irrespective of whether they are to the advantage or disadvantage of the suspect. (art 13)*

---

Despite the fact that representatives of Public Prosecutor's Offices (including judicial or investigative police and official forensic experts) are legally bound to impartially apply the law, they are also accountable to the Attorney General and the State Governor. As a result, and as some of the cases in this report highlight, in those states where practices of political interference remain strong, the executive authority can determine much of the conduct and

---

[37] Mexican Constitution, Art 102.

---

14      *Laws without Justice: Human rights violations and impunity in the public security and criminal justice system*

---

priorities of the Public Prosecutor's Office, undermining the capacity of prosecutors and police to function impartially.[38]

Interference in dealings of the Public Prosecutor's Offices to initiate politically motivated prosecutions against critics or opponents or to hinder investigations against those suspected of involvement in human rights abuses has been a feature of Mexico's criminal justice system. Amnesty International has documented many cases over the last 40 years and adopted several prisoners of conscience imprisoned solely because of their legitimate activities, including in the last decade General Francisco Gallardo, Rodolfo Montiel, Teodoro Cabrera, Isidro Baldenegro, Hermenegildo Rivas and Felipe Arreaga.[39]

This report details several cases where there has been a clear misuse of investigative and prosecutorial powers in state jurisdictions, highlighting the failure to ensure the impartiality and legality of investigations by judicial police and prosecutors.

The Attorney Generals at federal and state level are also integral members of the National and local Public Security System, which is responsible for coordinating measures to combat crime.[40] This has further weakened the independence of public prosecutors as the political determination of public security priorities may conflict with the impartial application of criminal law.[41] Public and media concern about high crime and impunity is often translated into pressure on police, prosecutors and judges to secure visible results, such as the rapid detention and charging of suspects.

<u>Federal and state judiciaries</u>

---

**UN Basic Principles on the Independence of the Judiciary**
*The independence of the judiciary shall be guaranteed by the State and enshrined in the Constitution or the law of the country. It is the duty of all governmental and other institutions to respect and observe the independence of the judiciary. (art 1)*
*The judiciary shall decide matters before them impartially, on the basis of facts and in accordance with the law, without any restrictions, improper influences, inducements, pressures, threats or interferences, direct or indirect, from any quarter or for any reason. (art 2)*
*The principle of the independence of the judiciary entitles and requires the judiciary to ensure that judicial proceedings are conducted fairly and that the rights of the parties are respected. (art 6)*

---

[38] Inter-American Commission on Human Rights (IACHR), Report on the situation of human rights in Mexico, OEA/Ser.L/V/II.100, Doc. 7 rev. 1, September 24, 1998, Para 367, "the Office of the Public Prosecutor is really an office within the executive branch and under the President's (or Governor's) authority, and that has exclusive monopoly over the conduct of criminal proceedings. This has led to abuses and manipulations for which solutions have not been found".

[39] Refer to http://web.amnesty.org/library/esl-mex/index for previous Amnesty International reports.

[40] Mexican Constitution, Art 21; Ley General que establece las bases de coordinacion del sistema nacional de seguridad pública.

[41] IACHR country report, para 378.

---

"Numerous complaints about corruption, lack of independence and impartiality have made the judicial branch in Mexico one of the organs that enjoys the least public prestige. This mistrust is most pronounced with respect to the judicial branch at the state level..."[42]

Since the 1994 reform of the federal judiciary, when substantive steps were taken to develop its independence, there has been welcome progress in strengthening its impartiality and capacity. Conditions of employment, security of tenure and competitive selection procedures are gradually improving through investment, the introduction of a (non-binding) code of ethics, training and the development of the administrative disciplinary functions of the Federal Judicial Council (*Consejo Federal de la Judicatura*).

Reforms have been replicated to varying degrees in many state judiciaries. Nevertheless, there has been much less progress in strengthening the capacity, effectiveness and impartiality in the 32 state level judiciaries, where investment has in general been significantly less. As a result, the quality and number of courts and judges in some states is frequently insufficient to handle increasing caseloads and they sometimes fail to ensure effective and impartial scrutiny and adjudication of judicial proceedings.

### Tipping the scales in favour of the prosecution

"*The Public Prosecutor's Office has excessive powers to determine the value of evidence gathered, take statements from the accused, and restrict the defendant's access to an adequate defence. In practice, this allows cases that come before a judge to have strong procedural weight against the accused, as the case file is already completed.*" [43]

The weaknesses that undermine the impartiality of prosecutors and judges are further compounded by the procedures and practices that favour the prosecution case over the defence in criminal investigations and trials. National and international human rights organizations and lawyers have repeatedly highlighted the absence of equality of arms between prosecution and defence, which can lead to the denial of due process rights and sometimes result in unfair trials. [44]

---

[42] IACHR, OEA/Ser.L/V/II.100, Doc. 7 rev. 1, September 24, 1998, para 393.

[43] United Nations Office of the High Commissioner for Human Rights (UNHCHR) Diagnostic of the Human rights situation, 2003, 2.1.1.1, "el ministerio público tiene excesivas facultades para apreciar el valor de las pruebas recabadas, tomar declaraciones al inculpado, y la limitación para una adecuada defensa por parte del indiciado, esto permite que en la práctica, los casos que llegan a ser del conocimiento de un juez tengan una fuerte carga procesal en contra del acusado, en virtud de que los expedientes llegan ante el juez correspondiente ya integrados."

[44] Report on Mexico produced by the Committee under Article 20 of the Convention, and Reply from the Government of Mexico, CAT/C/75, 26 May 2003, para 220 (i). "In general, efforts should be made, through any necessary legal reforms, to modify the markedly inquisitorial methods used in criminal proceedings, and particularly in the initial stages of the preliminary investigation. Such reforms should aim to institute a genuinely

When a crime is reported, an agent of the public prosecutor's office opens a preliminary investigation (*averiguación previa*) and, assisted by the judicial police, investigates to determine that a crime has taken place (*cuerpo de delito*) and to identify the probable perpetrator (*probable responsabilidad*).[45] Only once the prosecutor has gathered sufficient evidence to demonstrate these two points may the suspect be formally charged (*consignado*). If the suspect is already in detention, he or she is then brought before a judge, or if still at large, a judicial arrest warrant may be issued for his or her arrest. While prosecutors and judicial police conduct a preliminary investigation they are considered by law to be impartial investigators gathering evidence both for and against a suspect. Only at the point a suspect is formally charged does the prosecutor officially begin to contend the case on behalf of the victim of the crime and society. The evidence and conclusions presented in the preliminary investigation are often the basis for subsequent convictions as there are significant obstacles to ensuring that its findings are effectively scrutinised and cross-examined during the trial stage. As this report illustrates, jurisprudence grants probative value to crucial evidence gathered during the preliminary investigation, and the criminal justice system in practice often restricts the right of defendants to challenge evidence and to effective defence counsel. The United Nations Working Group on Arbitrary Detentions referred to the powers of the public prosecutor during preliminary investigation as quasi-judicial because of the powers of the prosecutor to gather and evaluate evidence in judicial proceedings.[46]

Federal and state criminal procedural codes establish the judge's obligation to consider the evidence put forward in the preliminary investigation and during the trial on its merits.[47] However, procedural rules and jurisprudence encourage judges to presume the legality of evidence put forward by prosecutors, without ensuring that this is explicitly counter-balanced

---

open, transparent accusatory procedure that includes appropriate mechanisms to maintain the necessary balance of powers and rights among the various parties to criminal proceedings - judges, public prosecutors, victims and accused, counsel and police - and control mechanisms and resources to correct any violations"; Report of the Special Rapporteur on extrajudicial, summary or arbitrary executions, Ms. Asma Jahangir, submitted pursuant to Commission on Human Rights resolution 1999/35, E/CN.4/2000/3/Add.3Para 101, "The discretion placed with the public prosecutor to decide whether an investigation can be initiated in a criminal matter has resulted in gross injustice, resulting in impunity for perpetrators of human rights violations".

[45] Mexican Constitution, art 19; Federal Criminal Procedural Code, art1.

[46] Report of the working group on arbitrary detention on its visit to Mexico, E/CN.4/2003/8/Add.3, 17 December 2002, Para. 37, 38 "the Public Prosecutor's Office, which comes under the executive, performs quasi-judicial functions such as the presentation and evaluation of evidence, which are considered important by the courts, or taking statements from the accused, the value of which as evidence is not properly challenged even in the absence of an adequate defence."; "The lack of any regulation stipulating the presumption of innocence tends, de facto, to reverse the burden of proof."

[47] FCPC, art. 286: "The courts, according to the nature of the facts and logical and natural connections that necessarily exist, to a greater or lesser extent, between the known truth and that which is sought, will conscientiously evaluate the evidence to establish if it can be considered as plain proof (*Los tribunales, según la naturaleza de los hechos y el enlace lógico y natural, más o menos necesario que exista entre la verdad conocida y la que se busca, apreciaran en conciencia el valor de los indicios hasta poder considerarlos como prueba plena*).

---

by the presumption of innocence of a criminal suspect.[48] In a number of case files that Amnesty International has studied, statements made by police officers to prosecutors implicating criminal suspects have been granted probative value in judicial proceedings by the presiding judge on the grounds that the Public Prosecutor's Office is an institution of public confidence (*fe pública*), so testimony certified by the public prosecutor is reliable. Only in cases where a defendant has an effective defence lawyer and an active presiding judge willing to question the credibility of prosecution of evidence, is there a possibility of such testimony undergoing rigorous cross examination in court.[49] The presumption of official impartiality often contrasts starkly with the treatment of criminal suspects or witnesses testifying in their defence. A suspect's denial of charges can be dismissed on the grounds it is solely a natural defensive reaction, while supporting witness evidence may be dismissed or granted less probative value if provided by colleagues, friends or family. In this climate the presumption of legality of the official investigation may be given greater weight than the presumption of innocence in favour of the accused, often placing the burden of proof on the accused to prove his or her innocence, rather than on the state to prove the charges.

**The federal Government's reform proposals**
The administration of President Fox acknowledged some of the weaknesses in the federal public security and criminal justice system. In 2004 the government proposed significant legislative reforms to Congress. However, the proposals were not substantially consulted and Congress has failed to approve key elements of the proposed reforms to the justice system at the time of writing. According to the government's website, these are the central elements of the reform package put forward by the Fox administration:

To fight crime effectively it is necessary to substantially strengthen police forces
1. Create the Federal Police: merge the Federal Agency of Investigations (*Agencia Federal de Investigación*) and the Preventive Federal Police (*Policía Federal Preventiva*).
2. Give the Federal, State and Municipal Police powers to investigate under the direction of prosecutors and eliminate the organic command of prosecutors over police.
3. Transform the Federal Attorney General's Office (*Procuraduría General de la República*) into the Federal Public Prosecutor's Office (*Fiscalía General de la Federación*), to direct and supervise the investigation of the police and to contend cases before the courts. Prosecutors retain the legal direction of the investigation and the process.

---

[48] Criminal Procedural Code of the Federal District, art 286: "All procedures carried out by the Public Prosecutor's Office and judicial police will have full evidential weight, as long as they are in conformity with the rules of the penal code" (*Las diligencias practicadas por el Ministerio Público y por la policía judicial tendrán valor probatorio pleno, siempre que se ajusten a las reglas relativas de este código*).
[49] Police and prosecutors, like all public officials, are invested with fe pública (public confidence). This assumes their good faith and truthfulness, unless proven otherwise. In the same vein, it also enables them to certify the authenticity of documents.

18      *Laws without Justice: Human rights violations and impunity in the public security and criminal justice system*

4. Integrate a national policing system, with the creation of a National policing curriculum, as well as a police career system, by standardizing the professionalism and equipment of the police bodies. In addition, integrate policing intelligence system, fusing criminal and preventive intelligence.

5. Create the position of sentencing adjudicating judge, in order to provide judicial guarantees in the resolution of conflicts and monitoring of criminal sentences.

To protect human rights by transforming the criminal procedural system from a written system to an oral one

1. Change the current semi-inquisitorial written system to an adversarial and oral accusatory system to reinforce the principles of the due process, equally for the victim as for the accused.

2. Introduce expressly the presumption of innocence to the constitution.

3. Increase the quality of legal defence, eliminating the possibility of a "person of confidence" representing a suspect rather than a professionally qualified lawyer.

4. Guarantee that all statements made by the accused will have to be made before a judge in the presence of his/her lawyer.

5. Create alternative procedures to criminal trials.

6. Establish abbreviated procedures (when there is an agreement between the defence and the prosecutor, in relation with the execution of the punishment).

7. Create a criminal justice system for juveniles with due process guarantees.

8. Establish the position of a judge to control the pre-trial procedures to ensure that due process rights are upheld and ensure the equality of arms between defence and prosecution.[50]

In 2004 Amnesty International wrote to members of Congress urging the approval of some important elements of the proposal, such as ending the practice of granting probative value to statements made to prosecutors without the presence of a judge and the requirement for evidence to be scrutinised in open court before the judge. However, the organization also called for other elements of the proposals to be strengthened, particularly the removal of wide-ranging exemptions from the new guarantees and for major improvements in the internal and external accountability mechanisms of the police, prosecutors and judges to end impunity for abuses.[51]

---

[50] See http://seguridadyjusticia.presidencia.gob.mx/index.php?idseccion=105

[51] Memorandum to Congress on reforms to the Constitution and Criminal Justice System, (AI Index: AMR AMR41/032/2004). Serious flaws in the proposed legislation included the planned wide-ranging regime of exceptions from judicial protection for the category of criminal suspects accused of organized crime offences.

# Chapter 2: Preliminary investigation, arrest, charges and committal proceedings[52]

*1. Every person has the right to personal liberty and security; 2. No one shall be deprived of his physical liberty except for the reasons and under the conditions established beforehand by the constitution of the State Party concerned or by a law established pursuant thereto. 3. No one shall be subject to arbitrary arrest or imprisonment. (ACHR, art 7)*

According to Article 16 of the Constitution, no one can be detained without a judicial arrest warrant, which can only be issued once a legally recognized criminal offence meriting a prison sentence has been reported and the commission of the crime and the probable responsibility of the suspect has been demonstrated before a judge in a preliminary investigation (*averiguación previa*). Anyone detained on the basis of a judicial warrant must be placed at the disposition of the judge "without any delay" (*sin dilación alguna*). The same article allows two circumstances in which a judicial warrant is not required to carry out an arrest: a) when someone is detained red handed or shortly after committing a criminal offence (*en flagrante*) and must be taken without delay to the Public Prosecutor's Office, or b) in "urgent cases", when a prosecutor may authorise the arrest of a suspect of a serious crime if a judge is not available to issue a warrant.

A suspect can be held for 48 hours in the custody of the Public Prosecutor's Office - the crucial period when a suspect is interrogated by judicial or investigative police. After that time he or she must be released or charged and placed in prison under the authority of a judge.[53] An exception to this rule is when the Public Prosecutor's Office is investigating organized crime offences and can extend the period of custody to 96 hours. Breaches in these procedures are a criminal offence.[54]

When a prosecutor files charges before a judge and requests an arrest warrant on the basis of a preliminary investigation, this is supposed to ensure that the evidence gathered is scrutinised and to prevent inadequately founded charges progressing. When there is insufficient evidence to proceed, a case is closed and archived or left on file pending new information. High crime

---

[52] Committal proceedings are when a judge must determine if there is sufficient evidence to proceed to the trial and confirm the detention, bail terms or release of the suspect unconditionally or pending further investigation.

[53] A further exception to this rule exists where a judge can order a suspect to be retained in *arraigo* by the public prosecutor for up to 90 days without charge pending further investigations, amounting to a form of administrative detention. *Arraigo* continues to be used widely despite a National Supreme Court ruling in 2005 that its use in Chihuahua State violated the constitutional right to liberty.

[54] Mexican Constitution, art 16.

rates and lack of resources often mean that this is the fate of many official investigations. This backlog of cases can stimulate discretional decisions by prosecutors to keep preliminary investigations on file for many months or years before bringing charges and seeking an arrest warrant. Furthermore, prosecutors are not required to substantially justify delays in filing charges before the courts. As a result, the principle of legal certainty of alleged suspects may not be upheld in practice.

Furthermore, as this report shows, the lack of effective and/or impartial judicial control when charges are filed can sometimes result in the authorization of arrest warrants and prosecutions on the basis of insufficient or fabricated evidence. This is particularly the case when judges have insufficient time or resources to scrutinize the preliminary investigation and are under intense pressure not to hinder the efforts of police and prosecutors to detain suspects.

When an arrest warrant is issued, the suspect may not be detained for many years or at all – even when he or she continues to live openly in the community. Public Prosecutor's Offices often argue that the widespread failure to carry out their legal obligation to enforce arrest warrants is the result of lack of manpower or the flight of the accused. Nevertheless, the result is that arrest warrants are often left on file and their enforcement may be left to the discretion of the judicial police or prosecutors or may depend on political decisions. The enforcement rate of arrest warrants varies greatly between states, but in 2000 in Oaxaca and Guerrero only 15% of warrants were acted on.[55] Reasons for delays in the enforcement are also not adequately scrutinised by the judiciary once a suspect is brought before court in committal proceedings.

As the cases highlighted below demonstrate, many local social or political activists in Mexico face the threat of criminal charges, are subject to ongoing preliminary investigations or live under the threat of unenforced arrest warrants that remain pending for years. For local authorities, this may serve to deter legitimate protests and induce individuals and organizations to withdraw social demands or complaints of official wrongdoing.

**Procedures for committal to trial**

When a suspect is charged (*consignado*) and placed under the authority of the courts, the judge assumes responsibility for the process (*auto de radicación*). The judge then has a maximum of 72 hours to determine if there are sufficient grounds to proceed to trial with an *auto de formal prisión* or to order the suspect's release.[56] This time period may be extended to 144 hours, but only on the request of the defence. If a judge fails to issue an *auto de formal prisión*, prison authorities must take steps to release the suspect. Failure to comply with these

---

[55] Guillermo Zepeda Lecuona; Crimen Sin Castigo, Procuración de Justicia penal y Ministerio Público en México, CIDAC, Fondo de Cultura Económica, 2004, page 208. In the case of Oaxacan indigenous social activist, Alejandro Cruz López, his 2005 arrest was carried out seven years after a warrant was issued in 1998.

[56] In Mexican law the trial is made up of the evidentiary proceedings (*instrucción*) and the juicio (judgement).

time limits is punishable by law.[57] This constitutional time period is the crucial point of judicial control both to confirm that a detainee's rights have been respected and to assess the evidence put forward in the public prosecutor's preliminary investigation.

Within the first 48 hours after being placed under a judicial authority, the suspect must appear in court to hear the case against him or her and may make his or her first statement in response (*declaración preparatoria*).[58] According to the Federal Criminal Procedural Code, if the custody under the Public Prosecutor's Office exceeds the legal time limits, the judge should rule the suspect's first statement inadmissible on the grounds that he or she has been held incommunicado.[59] However, an independent survey of judicial practices in the Federal District in 2002 found that these custody time limits were routinely broken with impunity. Fifty-percent of suspects were detained in excess of the 48-hour legal limit in public prosecutor custody, and 96% of such cases were still ruled to be legal.[60] The 2003 CIDE survey also found that the 72-hour (or 144 hours) time limit for the judge to determine the legal status of the suspect was broken on 50% of occasions.[61]

During the 72-hour time period when the judge must determine if there are grounds to proceed to trial, the prosecution and defence may present further evidence. In theory, this allows the defence to demonstrate that prosecution evidence does not meet the threshold of "probable responsibility" and enables prosecutors to strengthen the case put forward in the preliminary investigation. The Constitution guarantees the rights of suspects to all information required for their defence and which is part of judicial proceedings.[62] However, human rights organizations and lawyers have repeatedly highlighted to Amnesty International delegates that bureaucratic hurdles often limit access of lawyers to prosecution evidence contained in case files, particularly during initial proceedings. Prosecutors or police may claim files are

---

[57] Mexican Constitution , art 19.

[58] Art 20, A, III, Constitution "In a public hearing within 48 hours of being charged, the suspect will be informed of the name of his accuser, the nature and cause of the accusation, with the aim of ensuring he fully understands the offence he is accused of and can respond to the charge, making his preparatory statement in the same hearing" (*Se le hará saber en audiencia pública, y dentro de las cuarenta y ocho horas siguientes a su consignación a la justicia, el nombre de su acusador y la naturaleza y causa de la acusación, a fin de que conozca bien el hecho punible que se le atribuye y pueda contestar el cargo, rindiendo en este acto su declaración preparatoria*).

[59] Art 134, FCPC, "In cases which the detention of the person exceeds the periods stipulated in article 16 of the Consitution, it will be assumed that he was held incommunicado and statements made by the accused will not have legal value" (*En caso de que la detención de una persona exceda los plazos señalados en el artículo 16 de la Constitución Política citada, se presumirá que estuvo incomunicada, y las declaraciones que haya emitido el indiciado no tendrán validez*).

[60] Ana Laura Magaloni and Layda Negrete, Coords; Justicia y Seguridad Ciudadana, Centro de Investigación y Docencia Económicas and the TSJDF, 2002.

[61] Bergman, Marcelo, *Delincuencia, Marginalidad y Desempeño Institucional. Resultados de la encuesta a población en reclusión en tres entidades de la República Mexicana: Distrito Federal, Morelos y Estado de México. Documentos de Investigación*, México: Centro de Investigación y Docencia Económicas (CIDE), 2003.

[62] Mexican Constitution, art 20, A, VII: (*Le serán facilitados todos los datos que solicite para su defensa y que consten en el proceso*).

---

unavailable, being updated or the files at the court may not contain all prosecution evidence. Defendants may also be unable to afford to pay for the copy of the case file limiting their lawyer's opportunity to study the evidence to the discretion of prosecutors. In reality, this decisive period is not sufficient time for the defence to gather evidence and present witnesses, particularly if suspects are unfamiliar with judicial proceedings or lack resources. Witnesses may need to be located and persuaded to appear before court, which may require them to travel long distances and incur considerable costs. The poorest defendants, who rely on public defenders or poorly qualified private lawyers, frequently do not present any defence evidence in the committal stage. As a result, the defence is at a severe disadvantage during the earliest and most crucial stage of the process, seriously undermining basic fair trial standards.

Furthermore, the overload in the court system means that judges may have to make committal decisions in up to 20 cases over a three-day period, seriously restricting their capacity to substantively assess evidence put forward.[63] As a result the evaluation of evidence made by the prosecutor in the conclusions of the preliminary investigation is frequently the determining factor in many judges' decisions to commit a suspect to trial. In many cases this may also be the basis for the verdict at the end of the trial.

While defendants with more resources are more likely to be able to ensure that their right to effective defence is upheld at this stage, for many others the judge's committal decision may be a formality rather than the crucial hearing to determine both the procedural and substantial merits of the case. Furthermore, as the evidential conclusions of the prosecutor's preliminary investigation are transferred directly to the court record, this can also serve as the moment when the impartiality and good faith of prosecution evidence is validated by the judge. This is particularly important as the excessive caseload of many criminal courts means that judges are often not present to direct the limited number of evidentiary public hearings in the pre-trial and trial stages. Court officials are routinely delegated the responsibility of documenting these hearings and the judge signs the official record which is appended to the casefile (expediente). In the primarily written judicial process, the case file, which includes the prosecutor's preliminary investigation, contains the evidence that the judge will deliberate over when reaching a verdict.64

Defendants with resources to secure effective defence counsel may be able to take advantage of their constitutional right to be given access to "all information requested for their defence" ("*todos los datos que soliciten para su defensa*", MC 20, A, VII) and challenge prosecution evidence in court. However, there is no requirement for evidence presented in the preliminary enquiry to be repeated and cross-examined in open court unless the defence requests and the

---

[63] Zepeda (2004), page 250.
[64] Only 8 % of inmates believed the judge controlled the hearings and the judge was not present when 79% of defendants made their first judicial statement, Bergman, Marcelo; Delincuencia, Marginalidad y Desempeño Institucional; CIDE 2003, page 47.

witnesses obey court summonses. As a result, the lack of access to effective defence council for many defendants means that evidence put forward in the preliminary investigation is often insufficiently challenged or scrutinised in trial proceedings. Mexican criminal legal expert Guillermo Zepeda Lecuona notes that, "By the extension and reach of the powers of the public prosecutor during this stage (the preliminary enquiry), just as the procedural importance granted the preliminary investigation by legislation and jurisprudence, this is the decisive stage in the trial process and in the delivery of justice".[65]

**Preventive pre-trial detention**
*"It shall not be the general rule that persons awaiting trial shall be detained in custody" (ICCPR, Art9, 3).*

The use of preventive detention while a suspect is on trial is widespread in Mexico. In 2004 88,000 suspects were in pre-trial detention, making up 42.7% of the prison population.[66] Despite legislation stipulating that criminal trial proceedings should last no longer than a year, and only four months for minor offences, these time limits are routinely broken without any impact on proceedings. In some states suspects can spend years on remand facing criminal charges before finally being acquitted and released.

The Inter-American Commission on Human Rights stated in its 1998 country report on Mexico that: *"Another reason for the serious overcrowding in Mexican prisons is the widespread recourse to preventive detention for accused persons. The IACHR has established that preventive detention as a norm of general application in criminal cases is contrary to the provisions of the Convention, since it violates the right to personal freedom and the presumption of innocence".*[67]

The Constitution establishes the obligation on the judge to grant freedom under caution on the request of a criminal suspect, except, a) in cases for serious offences or, b) in non-serious cases when the Public Prosecutor shows that the suspect has been convicted of a serious offence in the past or constitutes a threat to the victim or society.[68]

The federal and state criminal codes contain a long list of crimes categorised as serious. As a result the presiding judge is compelled to order pre-trial detention in these cases and is prevented from setting bail conditions on a judicial assessment of the details of the case or the

---

[65] Guillermo Zepeda Lecuona, *Crimen sin castigo: Procuración de Justicia Penal y Ministerio Público en México*, Fondo de Cultura Económica y Centro de Investigación para el Desarrollo (CIDAC), Mexico City, 2004, page 111 (*Por la extensión y alcance de las atribuciones del ministerio público durante esta etapa, así como la trascendencia procesal que la legislación y los criterios jurisprudenciales otorgan a la averiguación previa, esta etapa resulta determinante para el proceso penal y para el rumbo de la impartición de Justicia*)
[66] Open society Justice Initiative, *Myths of Pretrial detention*, © 2005 Open Society Institute, page 6.
[67] OEA/Ser.L/V/II.100, Doc. 7 rev. 1, September 24, 1998, para 233.
[68] Mexican Constitution, 20, A, I.

circumstances of the suspect. The long list of serious offences under federal and state law may also encourage prosecutors to file disproportionate charges in order to ensure the suspect's detention.

The IACHR has defined the legitimate grounds for determining pretrial detention as "the presumption that the accused has committed a crime, the risk of flight, the risk that new crimes will be committed, the need to investigate and the need for collusion, the risk that pressure will be brought to bear against witnesses and the preservation of public order".[69] The present law prevents judges in many cases from weighing these factors in relation to individual cases and encourages an environment of widespread pre-trial detention.

### Compensation

Despite the fact that detainees can spend months or years in custody awaiting the outcome of their trial, there is no right to compensation if charges are dropped during the course of proceedings or if they are found innocent. In such cases, the authorities consider that justice has run its course. In 2002 the Constitution was amended in order that "administrative irregularities" causing damage to the goods or rights of individuals are the responsibility of the state and liable to compensation claims.[70] However, a successful case depends on proving that the prosecution was mounted in bad faith or that preventive detention was not merited or excessively long. As chapter 5 demonstrates, the weakness of accountability mechanisms makes proving such wrongdoing extremely difficult for compensation claims to succeed.

Amnesty International continues to regularly document violations in due process and misuse of the criminal justice system in many different Mexican states. The cases included in this section are a representative sample of the cases the organization receives. They highlight the misuse of the criminal justice system in order to secure the detention and prosecution of social or political activists and human rights defenders. In the majority of these cases the accused have eventually been released because of the efforts of non-governmental human rights organizations and defence lawyers. However, Amnesty International is not aware of the authorities carrying out investigations into the conduct of officials involved or sanctioning those responsible for unwarranted detentions and prosecutions (An exception is the case of Lydia Cacho where the National Supreme Court is carrying out an enquiry). Neither is it aware of any case in which the victims have received reparations.

### Agustín Sosa

Agustín Sosa, a grassroots political activist of the United Front of Huautla (Frente Unión Huautleco) linked to the Party of the Democratic Revolution (*Partido de la Revolución Democratica*, PRD), was detained on 10 December 2004 at his home in Huautla de Jiménez, Oaxaca State. Over subsequent months he was subject to unfounded criminal charges

---

[69] Ibid, footnote 39.
[70] Mexican Constitution, art 113.

apparently in reprisal for his role in opposing the election of state governor Ulises Ruiz Ortiz of the Revolutionary Institutional Party (*Partido Revolucionario Institucional*, PRI) in July 2004.



**Agustin Sosa's family, lawyer and supporters ©AI**

On 27 July 2004, PRI and PRD activists clashed in the town of Huautla de Jiménez, when PRD supporters tried to prevent PRI activists holding a political rally in Ulises Ruiz Ortiz's election campaign. During the clash retired teacher and PRD supporter, Serafín García Contreras, was beaten to death with sticks by a number of PRI activists. His murder was caught on camera and several PRI activists were arrested in the following days. However, prosecutors also opened a preliminary investigation against a leading local PRD activist, Agustín Sosa. In the preliminary investigation, prosecutors argued that Agustín Sosa was responsible for the murder because he "somehow instigated" (*de alguna forma instigó*) the PRD to set up the roadblock, and was therefore directly responsible for the murder of Serafín García Contreras. Despite the absence of evidence linking him to the murder or the crime scene, the prosecutor concluded that by "making a natural logical connection between a fact and the truth sought, circumstantially we are drawn to the conclusion that the accused Sosa is probably responsible".[71] The judge accepted the prosecutor's arguments without further evidence and ordered his detention and then his committal for trial with an *auto de formal prisión* for murder and aggravated injuries (*lesiones calificadas*).

Agustín Sosa and his lawyers, believing the charges to be politically motivated filed a federal injunction (*amparo*) against the state judge's decision to proceed to trial (*auto de formal prisión*) on the grounds of lack of evidence. In February a federal court accepted the petition and ordered his release. However, as Agustín Sosa was about to leave prison further charges of aggravated assault (*asalto calificado*) and robbery with violence were filed against him, alleging that he had seized a lorry containing building materials to be distributed by the PRI in Huautla prior to the state elections. Once again the judge accepted the charges and he was placed in custody pending trial. His defence lawyers filed another federal injunction against

---

[71] "*haciendo un enlace lógico natural que existe entre el hecho cierto y la verdad que se busca, circunstancialmente nos llevan a la conclusión de que el inculpado Sosa es probable responsable*" (page XXXVII of the case file).

the *auto de formal prisión* as the complainant and prosecution witness acknowledged under cross-examination in the committal hearing that he was unsure whether a robbery had actually taken place. The first federal injunction sought by the Agustín Sosa's lawyer was rejected, but in June a higher federal court reversed this decision. On 10 June 2005 he was finally released from custody without charge.

The manner in which prosecutors carried out investigations and brought unsubstantiated and unfounded criminal charges, coupled with the failure of the state court judge to ensure impartial scrutiny of evidence, enabled charges to proceed against Agustín Sosa, keeping him in custody for six months. In the face of intense national and international pressure highlighting the misuse of the justice system, no further charges were filed against him. However, the local authorities simply maintained the law had been applied impartially and to Amnesty International's knowledge there was no enquiry into the conduct of police, prosecutors or judges involved.

**Felipe Arreaga Sánchez**
In November 2004, state judicial police arrested human rights defender Felipe Arreaga Sánchez at his home in Petatlán municipality, Guerrero State, for the 1998 murder of Abel Bautista, the son of a local political boss (*cacique*).

Felipe Arreaga, a well-known local peasant-farmer environmentalist who has campaigned for an end to excessive logging of the forests in the municipality, was a founder member of the Peasant Environmentalist Organization of Petatlán Mountains (*Organización Campesina Ecologista de la Sierra de Petatlán*, OCESP). In recent years, he had worked with the organization established by his wife, Celsa Valdovinos, the Environmentalist Women's Organization, *Organización de Mujeres Ecologistas.*

In 1999 OCESP activists Rodolfo Montiel and Teodoro Cabrera were detained and tortured by members of the military and forced to make false confessions to drug and arms possession. In 2001 under intense international pressure, the two men were released. However, neither military personnel nor local *caciques*, who were reportedly behind their detention and prosecution, were ever held to account. On Felipe Arreaga's arrest, the warrant for his detention also ordered the capture of many of the other founding members of the OCESP, including Rodolfo Montiel.

Despite witness statements in Felipe Arreaga's favour, he was committed for trial and placed in preventive detention by a judge on the basis of the evidence in the preliminary investigation. This contained serious irregularities: unexplained delays in the investigation and filing of charges; witnesses not questioned nor the crime scene inspected until two years after the event; one of the suspects who was reportedly identified by the half brother of the victim - the only reported eyewitness - was already dead at the time of the murder; and no

steps were taken to establish the veracity of the principle testimony or check the whereabouts of the accused by investigators.



**Felipe Arreaga Sánchez celebrates his release from prison with his granddaughter © private**

**In January 2005 human rights lawyers representing Felipe Arreaga presented witnesses and video footage demonstrating that he had been in a distant community at the time of the murder. When the only other material witness besides the eyewitness was questioned in** court, he admitted under cross examination that he had been forced to fabricate his statement on the orders of the local political boss (cacique) and a judicial police investigator. Other community witnesses also confirmed Felipe Arreaga's good character in contrast to the evidence put forward in the preliminary investigation. Nevertheless, the Attorney General of Guerrero refused to halt the prosecution.

Felipe Arreaga's defence lawyers helped secure international attention, effective judicial scrutiny of prosecution evidence and substantive defence evidence. This helped ensure that the judge ordered the only direct eyewitness and the *cacique* to appear in court to face cross-examination. In addition the judge visited the crime scene to verify the details of the prosecution case. As a result, Felipe Arreaga was acquitted in September 2005.

Felipe Arreaga regained his freedom, but the State Attorney General stated that the Public Prosecutor's Office had applied the law impartially. Amnesty International is not aware of any measures to review procedures that led to the fabrication of evidence and his unfounded prosecution. Furthermore, during the trial the *cacique* reportedly made threats against Felipe Arreaga, raising concern for the safety of him and his family.

### Víctor Ramírez de Santiago

Víctor Ramírez de Santiago is a lawyer who often advises local indigenous peasant farmers (*campesinos*) communities in the Huasteca region of San Luis Potosí State on land rights issues. He has been subject to repeated judicial investigation and threatened with criminal charges since 2003. On 9 February 2005 police arrested him in his offices in Ciudad Valles with a warrant on charges of criminal association and theft (*asociación delictuosa y despojo*

*en su calidad de autor intelectual).* The Public Prosecutor had filed charges against him on the grounds that the lawyer had allegedly induced a group of indigenous peasant farmers to illegally occupy a disputed plot of land.

A local judge had issued the warrant on the basis of statements made to the public prosecutor by several of the 34 detained indigenous farmers in which they allegedly named the lawyer as their leader. According to reports, the Huasteca indigenous detainees were not provided with legal assistance or interpreters when making their initial statements to the public prosecutor (*declaración preparatoria*). They subsequently retracted the statements when brought before a judge, stating that Víctor Ramírez de Santiago was not involved in the land occupation. Despite this, the judge reportedly accepted the initial statements as evidence and on 15 February 2005 committed Víctor Ramírez de Santiago to trial. Criminal association is categorised as a serious criminal offence incurring mandatory preventive detention during the trial with no right to bail.

In March 2005 the lawyer won a federal injunction against the state judge's decision to commit him to trial. The federal judge stated that the evidence "is insufficient to demonstrate he was responsible for theft". However, the state prosecutor filed an appeal against this decision. Only when this appeal was rejected in July 2005 were the charges dropped against Víctor Ramírez who was released after spending six months in custody. Amnesty International believes that his detention and the charges filed against him were unfounded and intended to prevent him from providing legal advice and defence to peasant farmers in the region.

Despite being denied their legal rights to translators when making their statements, the testimony of the indigenous farmers served as primary evidence in their trial and in bringing charges against Víctor Ramírez de Santiago. Nevertheless, Amnesty International is not aware of any action by the state authorities to investigate the filing of unfounded charges against Víctor Rámirez Santiago, except the commitment by the president of the State Human Rights Commission to "give orders to remain alert in following up on this case".[72]

**Lydia Cacho**
On 16 December 2005 at the women's refuge which she runs, Lydia Cacho, a women's rights defender and journalist, was arrested in Cancún, Quintana Roo State. Judicial police from Public Prosecutor's Office in Puebla State travelled to Cancún to arrest her on the basis of a warrant issued by a Puebla State court judge for the criminal offence of defamation. A powerful local businessman had filed a complaint against Lydia Cacho for allegedly defaming his reputation in her book, *Los Demonios del Edén,* published earlier in the year.

---

[72] *"..independientemente de la libertad ortorgada al abogado de referencia, he girado instrucciones al Segundo Visitador de mantanerse alerta en el seguimiento del caso."*

Lydia Cacho was taken by road by her arresting officers to Puebla City. According to her testimony, during the 20 hour journey police reportedly implied that she might suffer ill-treatment, sexual assault and "disappearance". On arriving in Puebla City she was held for several more hours before being released on bail and ordered to register at the Puebla court on a weekly basis pending the outcome of her trial. In January 2006, in the face of widespread national and international concern, judicial proceedings were transferred to her home state of Quintana Roo.

On 14 February 2006, audiotapes were leaked to the media reportedly containing telephone conversations between senior government officials in Puebla, including the governor, and leading businessmen, including the complainant in the Lydia Cacho case. In one alleged conversation recorded prior to Lydia Cacho's arrest, the Governor reportedly agreed to organize the detention of Lydia Cacho on behalf of the businessman, who reportedly expected Lydia Cacho to be sexually assaulted while in detention. The tape caused a major public outcry at the apparently illegal conduct of senior officials and increased concern for the safety of Lydia Cacho. It also appeared to demonstrate that interference in the judicial system for personal or political interests remains an important factor in judicial decisions. At the time of writing, federal deputies are pursuing measures to try the governor for misuse of public office. The National Supreme Court has undertaken an investigation, the results of which are pending.

Defamation is a criminal offence in most states, with a prison term of between six months and four years in Puebla state.[73] Amnesty International has documented the use of defamation laws on several occasions in state jurisdictions to detain and prosecute journalists and human rights defenders who are legitimately seeking to expose official wrongdoing. The Inter-American Commission on Human Rights has repeatedly called for defamation to be a non-custodial civil law offence. In April 2006, in direct response to this case, the federal congress decriminalised defamation in the federal criminal code, but it remains a criminal offence in state laws.

### Martín Barrios Hernández

On 29 December 2005 human rights defender Martín Barrios Hernández was detained at his home in Tehuacán, Puebla State, on charges of blackmail. Despite compelling evidence that the case against him had been fabricated in reprisal for supporting sacked factory workers, a local judge confirmed his detention and committed him to trial on 4 January 2006. Blackmail is categorised as a serious criminal offence in the



Martín Barrios Hernández ©AI

---

[73] Art 357, Código de Defensa Social del Estado Libre y Sobe
http://info4.juridicas.unam.mx/adprojus/leg/22/524/385.htm?s

# Chapter 3: Torture, ill-treatment and impunity

> No one shall be subjected to torture or to cruel, inhuman, or degrading
> punishment or treatment. All persons deprived of their liberty shall be treated
> with respect for the inherent dignity of the human person. (ACHR, Art. 5, 2).

Despite a welcome reduction in the reports of torture in recent years, particularly at federal
level, its use remains widespread in many parts of Mexico. A suspect is most vulnerable to
coercion while in pre-trial detention in the custody of judicial police of the Public
Prosecutor's Office, before being placed under judicial authority. This is when a suspect
makes his or her first official statement (*declaración ministerial*) to the prosecutor. This
statement is often granted primary evidential weight in judicial proceedings, despite the
absence of judicial supervision.[75] While Article 20 (IX) of the Constitution requires a suspect
to be adequately represented by a lawyer or a person of his or her confidence (*persona de su
confianza*) in all stages of the criminal proceedings (*actos del proceso*), this report shows how
criminal suspects are frequently denied the opportunity to effectively consult with a lawyer
during custody prior to signing their first statement.[76]

In 2003, 34 % of convicted inmates surveyed by the *Centro de Investigación y Docencia
Económicas* stated that they had made confessions while in the custody of the Public
Prosecutor's Office, and of these, 35% said they made the confession because of torture or
threats, primarily by judicial police.[77] This indicates that perhaps one in nine suspects
confessed to a crime due to torture or ill-treatment.

Following a visit to Mexico, the UN Committee against Torture concluded in 2003 that the
use of torture was not restricted to "exceptional situations or occasional violations committed
by a few police officers but that, on the contrary, the police commonly use torture and resort
to it systematically as another method of criminal investigation, readily available whenever

---

[75] "the Public Prosecutor's Office is the "representative of society" and presumed unfailingly to act in good faith. It
is for this reason that a statement made to the Public Prosecutor's Office carries so much weight in judicial
proceedings". UN Special Rapporteur on Torture, Report on Mexico, E/CN.4/1998/38/Add.2, 14 January 1998,
para 41.
[76] The 2003 CIDE survey found 70% of defendants did not have access to a lawyer during Public Prosecutor
custody; the remaining 30% were assigned a public defender by the prosecutor; Delincuencia, Marginalidad y
Desempeño Institucional, 2003, pages 48-49.
[77] Ibid, page 46.

required in order to advance the process".[78] Amnesty International continues to document cases of torture in many different states in Mexico.[79]

In 2003 the US-based non-governmental organization Physicians for Human Rights carried out an anonymous survey of nearly 200 forensic doctors working for the federal and state Public Prosecutors' Offices who conduct the official medical examinations of detainees. Forty-nine percent of federal doctors and 58% of state doctors said that torture is a severe problem for detainees in Mexico.[80]

In November 2005 the National Human Rights Commission (*Comisión Nacional de Derechos Humanos*, CNDH) issued General Recommendation 10 highlighting that torture remains widespread in Mexico. The methods used in the 2,166 torture complaints documented by the CNDH between 1990 and 2004 (this does not include cases reported to the state human rights commissions) included: "beatings to hands and feet with hard objects; beating of buttocks and ears with sticks; asphyxiation and suffocation with water or carbonated water in the nose, mouth and ears; immersion in rivers, wells, streams or buckets; as well as plastic bags over the head; electric shock to testicles, rectum, feet, legs and thorax; burns from cigarettes, irons and car exhausts; permanent injuries such as gun shot wounds; sexual violence; suspension by the feet, fingers and neck; exposure to chemicals such as the introduction of rags covered in petrol in the mouth; and torture by positions or postures straining tendons, joints and muscles".[81]

---

[78] Report on Mexico produced by the Committee under Article 20 of the Convention, and Reply from the Government of Mexico, CAT/C/75, 26 May 2003, para 218.

[79] Amnesty International reports include: *Allegations of abuse dismissed in Guadalajara: reluctance to investigate human rights violations perpetuates impunity* (AI index: AMR 41/034/2004); *Indigenous women and military injustice* (AI index: AMR 41/033/2004); *Unfair trials: unsafe convictions* (AI index: AMR 41/007/2003); *Ten years of abductions and murders of women in Ciudad Juárez and Chihuahua* (AI Index: AMR 41/026/2003); Torture cases - calling out for justice (AI index: AMR 41/08/01).

[80] Dr Michele Heisler, Assessment of Torture and Ill Treatment of Detainees in Mexico, Attitudes and Experiences of Forensic Physicians; Physicians for Human Rights; Journal of the American Medical Association, Vol. 289 No. 16, April 23, 2003.

[81] "traumatismos por golpes con manos, pies u objetos contundentes, golpes con tablas en glúteos y oídos, asfixia o ahogamiento con aplicación de agua simple o gaseosa en nariz, boca y orejas, e inmersiones en ríos, pozos, piletas o cubetas, así como colocación de bolsas de plástico en la cabeza; descargas eléctricas en testículos, recto, pies, piernas y tórax; quemaduras con cigarrillos, con fierros calientes o escapes de motor; lesiones permanentes tales como heridas de arma de fuego; violencia sexual; suspensión colgado de los pies, los dedos o el cuello, exposición a sustancias químicas tales como la introducción de estopa con gasolina en la boca, y tortura a partir de posiciones o posturas que afectan tendones, articulaciones y músculos". CNDH press release to General Recommendation 10, CGCP/135/05, México, D. F., a 22 de noviembre de 2005.

---

### *Flagrante delicto* detentions

Torture and ill-treatment most commonly occur when suspects are detained under *flagrante delicto* exceptions to the requirement for judicial arrest warrants. Federal and state legislation defining the scope of *flagrante delicto* detentions extend the scope of these legitimate powers beyond their "natural and obvious meaning" for serious offences so that arrests can take place up to 48 hours after the offence – 72 hours in the case of the Federal District.[82] In effect these are "less stringent criteria than the Public Prosecutor's Office must meet in order to obtain an arrest warrant from the courts".[83]

The 48 hours (or 96 hours for organized crime offences) that a suspect may then spend in the custody of judicial police and prosecutors is a crucial period for gathering evidence to file charges. Sixty percent of arrests are carried out using *en flagrante* exceptions, so judicial scrutiny of arrests is therefore routinely avoided until the suspect is already in custody and has made his or her first statement.[84]

The UN Working Group on Arbitrary Detentions (WGAD) has called for these exceptions to judicial control "incompatible with the principles of presumption of innocence and generate danger of arbitrary detention and extortion" and called for legislation governing their use to be brought into line with international human rights treaties ratified by Mexico.[85] The 2003 report of the Office of the High Commissioner for Human Rights called for the authorities to: "restrict the concept of flagrancy in line with its constitutional meaning, which permits the detention of a suspect by any person only on the basis that there is certainty that he or she is responsible for the crime".[86] However, neither the Government nor legislators have taken such steps nor has the judiciary established jurisprudence to tighten the criteria for judges to scrutinise such detentions and determine their legality.

### Jurisprudence

Despite the widespread use of torture or ill-treatment, the judiciary continues to uphold an interpretation of the rule of procedural immediacy that grants greater evidential weight to the first statement taken by the public prosecutor (*declaración ministerial*) during the preliminary investigation when a suspect is held in judicial police custody, than any subsequent statement made before a judge or court.[87] By law a judge cannot convict on the basis of a confession

---

[82] Committee Against Torture, CAT/C/75, 26 May 2003, para 177.

[83] Ibid, para 178.

[84] Crimen Sin Castigo, Procuración de Justicia penal y Ministerio Público en Mexico, Guillermo Zepeda Lecuona, CIDAC, Fondo de Cultura Economica, 2004, Page 245

[85] Working group on Arbitrary Detentions, E/CN.4/2003/8/Add.3 para39 and 72(a)

[86] "*Delimitar el concepto de flagrancia, para adecuarlo a su sentido constitucional, en el que se permite la detención de la o el infractor por parte de cualquier persona sólo en razón de la certeza de que existe la autoría del delito*", Office of the United Nations High Commissioner for Human Rights, Analysis of the Human Rights Situation in Mexico, 2.1.1.14, page 14. http://www.cinu.org.mx/prensa/especiales/2003/dh_2003

[87] Confesión, Primera declaración del Reo., Segundo Tribunal Colegiado del Segundo Circuito, SJF Parte: 64. Abril de 1993, Tesis: II. 2o. J/5 Pagina: 33. *Segundo Tribunal Colegiado del Sexto Circuito, SJF, Tomo XIV, Julio*

alone. However, the evidence provided by prosecutors to support a confession, such as testimony of arresting officers, is not required to stand alone to prove the probable responsibility of the suspect and it may be used in conjunction with a coerced confession to secure convictions.

Federal jurisprudence further strengthens the evidential value of information obtained in the initial statement and restricts a defendant's capacity to challenge the legality with which it was secured by encouraging judges to dismiss the retraction of a confession or allegations of torture by detainees on the grounds that this is an inevitable reaction of a criminal suspect.[88] Other jurisprudence permits judges to accept confessions even when gained through violence; to dismiss allegations of ill-treatment even when documented during medical examination unless a suspect can prove a particular official caused a particular wound; and, to set aside those parts of a confession that contradict the prosecution case, while granting probative value to those parts that are consistent with the prosecution case. [89]

International human rights organizations have repeatedly criticised both the interpretation of the rule of procedural immediacy and the excessive burden of proof on defendants to prove they have been tortured into making a confession.[90] The Inter-American Commission on Human Rights has stated: "The Mexican State is construing the guarantee of procedural immediacy in a way which, instead of serving as a procedural guarantee for those accused of a crime, is becoming its very antithesis, the source of abuse of the rights of accused persons. Instead of being brought promptly before an impartial and competent organ for the protection

---

*1994, Página 515,* "Value of confession: The first statement rendered by the prisoner to a prosecutor should prevail over later manifestations made in the first statement to the judge, because it is to be presumed that this latter is due only to a defensive reaction of the individual as it is in contradiction with previous statements and is not supported by any other fact, whereas the first statement rendered without sufficient time to be coached deserves greater credence"( *Confesión Valor de: Debe Prevalecer la confesión rendida por el reo en su primera declaración ante el representante social, sobre posterior manifestación hecha en la ampliación de la declaración preparatoria, en virtud de que ésta se presume obedece solamente a un reflejo defensivo del quejoso, por ser contraria a las anteriores declaraciones y no estar apoyada por ningún otro dato, mientras que su primera declaración efectuada sin tiempo suficiente de aleccionamiento merece mayor crédito*).

[88] Ibid.

[89] *Tercer Tribunal Colegiado del Segundo Circuito. SJF Tomo 58, octubre de 1992 tesis II.30. J/35 Pagina 43, Confesión.* If the coercion that the suspect claims that he or she suffered in order to extract the confession is not proven, the retraction of the confession is insufficient to deny it probative value (*Confesión. Si no se comprueba la coacción que el quejoso dice sufrió para emitirla, su retracción es insuficiente para negarles valor probatorio*) *Tribunal Colegiado del Vigésimo Circuito, SJF Tomo 78, junio 1994, tesis XX. J/61 pagina 81:* Co-accused's confession. Even when medical certificates and validation exists of injuries, if it is not proven that these were caused by the police, the confession has probative value (*Confesión del coacusado. Aún cuando en autos exista certificado y fé de lesiones si no se demostró que esas alteraciones las hubiese producido la policía, tiene valor probatorio*).

[90] "A statement by the accused, even one made under duress, carries such weight that it is difficult to refute on other grounds given prevailing attitudes". UN Special Rapporteur on Torture, Report on Mexico, E/CN.4/1998/38/Add.2, 14 January 1998, para 39, 40.

---

of their rights, such as the competent judge in each specific case, accused persons are held for 48 hours or 96 hours by the judicial police without any judicial oversight".[91] Or as another Mexican legal expert has called it: "when the accused's individual guarantees are least protected, the greater the value granted the evidence gathered, meanwhile the more these guarantees are protected (before a judge), the less the evidence is worth".[92]

The United Nations Special Rapporteur on Torture has stated that: *"where allegations of torture or other forms of ill-treatment are raised by a defendant during trial, the burden of proof should shift to the prosecution to prove beyond reasonable doubt that the confession was not obtained by unlawful means, including torture or similar ill-treatment".* [93]

International standards explicitly state that no confession obtained with the use of torture shall be invoked as evidence and require those responsible to be punished. These include the UN Convention on Torture and Other Cruel, Inhuman or Degrading Treatment or Punishment ratified by Mexico in 23 January 1986, the Inter-American Convention to Prevent and Punish Torture ratified by Mexico on 23 June 1987. While the 1991 Federal Law for the Prevention and Punishment of Torture codifies some of the key elements of international standards in the case of federal offences, the majority of legislation enacted by the 32 federal entities to criminalise torture in local jurisdictions fails to meet international standards.

Furthermore, when allegations of torture are filed with police, Public Prosecutor's Offices or Human Rights Commissions, these are routinely reclassified as lesser offences such as abuse of authority or injuries (*lesiones*) which frequently result in solely disciplinary action against the official.

Jurisprudence applied in criminal courts across the country often seriously undermines legal protections against the use of torture. In its latest 2005 report to the Committee Against Torture the federal government has recognized this anomaly. However, it highlights the government-proposed judicial reform which sought to end the probative value of statements made to prosecutors and to ensure that only those statements made before a judge in the

---

[91] *"El Estado mexicano está concibiendo el principio de inmediación procesal en una forma tal que, en vez de servir como una garantía procesal para los inculpados de los delitos, tiende a transformarse en su antítesis, en una fuente de abusos para los inculpados. Ello se debe a que en vez de llevar sin demora a los inculpados ante el órgano imparcial y adecuado para la cautela de sus derechos, como es el juez competente en cada caso concreto, son retenidos por 48 o 96 horas por policías judiciales sin supervisión judicial alguna"*. IACHR, 1998 Mexico Report, para 315

[92] *"cuando menos garantías tiene el acusado, mayor es el valor de las pruebas, mientras que en la medida en que cuenta con mayores garantías (ante el juez), se reduce el valor de las pruebas"*, Miguel Sarre, Control del Ministerio Público, en Anuario de Derecho Público 1997: los controles constitucionales, ITAM-McGraw-Hill, México, 1998, páginas 131-149.

[93] Para 169, E/CN.4/2001/66/Add.2. "Report of the Special Rapporteur, Sir Nigel Rodley, submitted pursuant to Commission on Human Rights resolution 2000/43. Visit to Brazil, 30 March 2001.

presence of a lawyer could be used as evidence in judicial proceedings.[94] However, as this proposed reform has yet to be approved, the fact remains that courts continue to accept unreliable evidence extracted under torture, thereby continuing to stimulate its use as an effective method of evidence gathering and investigation.

**Medical evidence**

In recent years the Federal Public Prosecutor's Office (*Procuraduría General de la República*, PGR) has developed procedures for documenting medical evidence of torture based on the Manual on Effective Investigation and Documentation of Torture and Other Cruel, Inhuman or Degrading Treatment or Punishment (the "Istanbul Protocol") adopted by the UN. In August 2003 the Federal Attorney General ordered the new procedures be applied by all PGR officials in cases of alleged torture or ill-treatment.[95] A number of State Public Prosecutor's Offices are also developing such procedures with the assistance of the PGR. These procedures and increased training of forensic doctors appear to be an improvement on those previously in place, which frequently led to the improper or inadequate evaluation and documentation of evidence of ill-treatment or torture. However, there has not so far been an independent assessment of the effectiveness of the new procedures to investigate allegations of torture to determine whether many of the obstacles that prevented effective documentation and punishment have been overcome, particularly the impartiality of those responsible for carrying out the assessment.

The key problem that has repeatedly undermined official medical examination of evidence of ill-treatment and torture remains. Forensic doctors are part of the Public Prosecutor's Office and work under the direct orders of prosecutors. The procedures for investigating allegations of torture or ill-treatment, particularly when implicated officials belong to the Public Prosecutor's Office, often do not meet the standard of an independent and impartial enquiry. Furthermore, in the majority of states, forensic services are of limited quality; necessary equipment, trained-staff and procedures to ensure the standard, integrity and reliability of official forensic evidence are often lacking. Despite these limitations, when a defendant wishes to counter the prosecutor's forensic evidence, studies or examinations carried out by private doctors or technical experts are generally accorded less evidential weight by the judge than that of the official forensic services, making it extremely difficult to challenge official findings.[96] Some local human rights organizations have argued that this tendency has been exacerbated by the apparent efforts of the PGR to promote its new procedures for assessing evidence of torture as the legal standard for the application of "Istanbul Protocol", ignoring the concerns that exist about the impartiality with which procedures are applied.

---

[94] Periodic report provided by the Mexican government to the United Nations Committee Against Torture; CAT/C/55/Add.12, 28 Febrero de 2005, Para 271-279.,

[95] Acuerdo Oficial A/05/2003

[96] According to the criminal procedural code when the conclusions of prosecution and defence experts (peritos) disagree, a third expert is named to resolve the contradiction. However, this will usually be an official expert from the prosecutor's office. (FCPC, Art 236)

At federal level, there are proposals to make forensic services an autonomous agency separate from PGR. However, states that have introduced similar reforms, such as Jalisco, retain the Governor's power to appoint and dismiss the director of the institute, enabling the executive to maintain considerable influence over forensic services.

The cases below illustrate how the use of torture and ill-treatment to secure confessions or testimony implicating other suspects remains a crucial part of many criminal investigations, particularly at state level. These cases are only a sample of those documented by Amnesty International in recent years, but demonstrate how evidence gathered by coercion is frequently the primary basis for securing pre-trial detention and subsequent convictions. Despite compelling evidence presented by defendants, lawyers and independent medical experts that evidence has been gained through coercion, prosecutors and judges routinely fail to institute a separate and impartial enquiry to establish if the defendant's allegations are founded. Some defence lawyers may also discourage defendants from reporting ill-treatment or torture, and judges often do not take steps to assess the physical condition of a defendant brought to court unless the defendant and defence lawyer specifically raise the issue. Once a complaint of torture has been officially filed, a defendant must overcome insurmountable obstacles to demonstrate the substance of the allegations, and even this may not be enough to ensure that evidence gained through torture is ruled inadmissible. The failure of legislators and courts to end reliance on the first statement made to the public prosecutors as the primary evidence in mounting prosecution cases against criminal suspects, continues to encourage the widespread use of torture as an investigative technique. In the cases that follow, Amnesty International is not aware of any official being held to account for their involvement in human rights violations.

### Víctor Javier García

In 2004 **Víctor Javier García** was convicted of the murder of eight women in Ciudad Juárez on the basis of a confession reportedly extracted under torture. The judge in passing sentence rejected the allegation of torture largely on the grounds that the confession contained details that matched those of the crimes and could only have been known to the perpetrator. However, this common argument of using the content of a confession to validate its reliability ignores the possibility that police or prosecutors might have supplied this information to ensure the credibility of the confession.[97] In his ruling the judge cited precedents and academic literature stressing that allegations of torture by criminal suspects are inevitable and should be dismissed, ignoring the principle that such allegations should be evaluated on the concrete circumstances of each case.

When reviewing the cases of men reportedly tortured into confessing to involvement in the abduction and murder of women in Ciudad Juárez, a special team of international prosecutors

---

[97] Sentence of trial judge.

from the UN Office on Drug and Crime concluded that the weighing of evidence by the presiding judges in reaching their verdicts was frequently discretional and not substantiated in an objective evaluation of the merits of the evidence. Such practices often resulted in apparently unsound convictions which were reliant on deeply flawed preliminary investigations (in which allegations of torture were simply ignored).[98] On 14 July 2005 Víctor Javier García was released on appeal on the grounds that he had been detained illegally. However, the appeal failed to consider the allegations of torture and those responsible have not been brought to justice. Those responsible for the murder of the eight young women also remain at large.

### Torture used to secure detention and conviction of protestors in Guadalajara

On 28 May 2004 a group of demonstrators clashed with police in Guadalajara, Jalisco state, at the end of the Summit of Latin American, Caribbean and European Union Heads of State, resulting in injuries and damage to property. In response, police detained more than 100 people during and after the disturbances. Police later recorded that all arrests had been made of suspects caught *en flagrante* committing criminal offences. Forty-five people were subsequently charged with criminal offences.

**Dagoberto Rivera Servín**, aged 26, said that he was detained on 28 May after the disturbances, while receiving medical attention at a Red Cross station to head wounds caused by a flying bottle. On 29 May he was taken to the State Public Prosecutor's Office (PGJE) where he remained handcuffed in a cell for seven hours and was reportedly threatened and punched by the judicial police. He was later transferred to another PGJE office where he was reportedly beaten up again during interrogation. On 30 May he was coerced into signing a confession, admitting criminal offences and implicating other suspects. A public defender did not reportedly assist him during the first statement (*declaración ministerial*), which he was not allowed to read. When brought before the judge he stated that he had been forced to sign the confession, that he had not seen a lawyer and that he had not been allowed to read his statement. On 7 June, the judge committed him to trial for a number of offences including injuries, riot, gang activity and offences against public officials (*lesiones, motín, pandillerismo, delitos cometidos contra representantes de la autoridad*). Despite the allegations of torture and violations in due process, the judge ruled that his first statement to the prosecutor had probative value without further investigation. Dagoberto Rivera Servín spent several months in prison before being released on bail pending the outcome of his trial which continues at the time of writing.

---

[98] Report of the commission of international experts of the United Nations Office on Drug and Crime on the misión to Ciudad Juárez, Chihuahua, Mexico. UN Office on Drug and Crime, November 2003, page 25 (*Informe de la Comisión de Expertos Internacionales de la Oficina de las Naciones Unidas contra la Droga y el Delito, sobre la Misión en Ciudad Juárez, Chihuahua, México, Oficina De Las Naciones Unidas contra la Droga y el Delito, noviembre 2003, página 25*).

*Laws without Justice: Human rights violations and impunity in the public security and criminal justice system*    39

According to 19-year old **Aarón Alejandro García García**, he was beaten and kicked by municipal police officers during the disturbances. He was arrested and placed in PGJE custody, where he was forced to undress and hit with a gun. During the next day, he and others were interrogated while being beaten and threatened. He was also forced to lie on the floor while police jumped on him and was then partially asphyxiated with a plastic bag over his head. As a result, he signed a confession and on 31 May was charged. When brought before a judge he stated that his confession had been extracted under torture. However, no investigation was undertaken and this confession served to secure his subsequent conviction for



**Dagoberto Rivera Servín © AI**

offences against public officials and injuries (*lesiones y delitos contra representantes de la autoridad*). He spent 10 months in prison.

The National Human Rights Commission carried out an investigation and found that at least 19 of the detainees had been tortured and recommended a full investigation, but the Jalisco state authorities refused to comply.[99] Amnesty International has also raised the case with the state authorities who stated that the allegations of torture were invented by demonstrators. The federal authorities have denied they have jurisdiction in the case. Amnesty International is not aware of any official facing disciplinary or criminal proceedings as a result of the abuses.

---

[99] Special Report of the CNDH relating to the violence which took place in the City of Guadalajara, Jalisco state, on 28 May 2004, in the context of the III Latin America, Caribbean and European Union Summit, CNDH Gazette, No 169, August 2004. (*Informe Especial de la CNDH relativo a los hechos de violencia suscitados en la ciudad de Guadalajara, Jalisco, el 28 de mayo de 2004, con motivo de la celebración de la III Cumbre de América Latina, el Caribe y la Unión Europea., Gaceta de la CNDH, No. 169, agosto 2004*).

40      *Laws without Justice: Human rights violations and impunity in the public security and criminal justice system*



**Figure 1 Central American migrants in Saltillo, Coahuila recounting their experiences to AI delegates. Undocumented migrants are vulnerable to abuses by police and private security guards, but rarely file official complaints. © AI**

## Chapter 4: The right to effective defence

*"The services of public defenders and counselling assistants are the only legal aid services provided by the Government. Though measures appear to be being undertaken to improve these services, the poor quality of services provided by public defenders continues to be a source of concern. This is more the case in the States. Lack of manpower, overwork, insufficient qualification or experience, and low salaries, particularly in the States, are some of the causes."[100]*

Everyone in detention or facing a possible criminal charge has the right to the assistance of a lawyer of their choice. If the person cannot afford to hire a lawyer, effective and qualified counsel should be assigned. The person must be given adequate time and facilities to communicate with their lawyer. Access to counsel should be immediate.[101] International human rights law also establishes other correlated rights which underpin the right to effective defence that come into effect immediately on arrest:

- The right to be informed immediately of the reasons for arrest.
- The right to be informed of the rights a detained suspect and how to avail her or himself of these rights, including the right to be notified of the right to legal counsel.
- The right to be informed promptly of the charges against them.
- The right to be informed of the above in a language the detainee understands, and for a competent interpreter to be made available to ensure this right.
- The right to communicate with the outside world and not to be held in prolonged incommunicado detention.
- The right to silence.[102]

The Mexican Constitution guarantees many of these rights, including the right to an adequate defence. "From the beginning of the process the suspect will be informed of his or her rights enshrined in the Constitution and will have the right to an adequate defence, conducted by the suspect, by a lawyer or a person of confidence. If the accused cannot or will not name a defender, after being required to do so, a judge will designate a public defender."[103] However,

---

[100] Para 184, Report of the Special Rapporteur on the independence of judges and lawyers, E/CN.4/2002/72/Add.1, 24 January 2002.

[101] Chapter 3, Amnesty International Fair Trial Manual, first published December 1998, AI Index: POL 30/02/98; Art I, Basic Principles on the Role of Lawyers, Adopted by the Eighth United Nations Congress on the Prevention of Crime and the Treatment of Offenders, Havana, Cuba, 27 August to 7 September 1990; Art. 17 Body of Principles for the Protection of All Persons under Any Form of Detention or Imprisonment, adopted by General Assembly, resolution 43/173 of 9 December 1988.

[102] ICCPR (Articles 9(2) and 14(3)(a), ACHRs Articles 7(4) and 8(2)(b); Body of Principles for the Protection of All Persons under Any Form of Detention or Imprisonment, Adopted by General Assembly resolution 43/173 of 9 December 1988".

[103] MC Art. 20, A IX Desde el inicio de su proceso será informado de los derechos que en su favor consigna esta Constitución y tendrá derecho a una defensa adecuada, por sí, por abogado, o por persona de su confianza. Si no

---

the criminal procedural codes do not identify the "beginning of the process" as the moment of detention. As a result, the practice of prosecutors, which is routinely accepted by courts, is to allow access to defence counsel when it is first required by law: when the defendant makes a statement to the prosecutor or is brought before a judge. As a result, when a suspect is detained *en flagrante,* access to defence counsel is usually denied during the hours spent in the hands of law enforcement police and with the judicial police during interrogation before making the first statement to the prosecutor.

Furthermore, Amnesty International research (which is supported by the CIDE survey) indicates that in many states access to legal counsel is often routinely denied or seriously deficient even during those stages of proceedings, such as the first statement to the prosecutor or judge, when criminal procedural laws require their participation. [104] This seriously undermines the right to a fair trial and disproportionately impacts the poorest and least equipped to understand and defend themselves against criminal charges.

A statement made by a defendant before the public prosecutor or judge is only admissible as evidence in the indictment or trial if defence counsel or a "person of his or her confidence" assists the accused and he or she is duly informed of the procedures and the process. [105] In determining the compliance with these obligations the courts rely on the presence of the signature of the defence council or "person of confidence" on the official record. However, defendants in several cases have informed Amnesty International that when making their first statement in a busy Public Prosecutor's Office that there was no opportunity to consult with the public defender who signed their statement.

Anyone accused of a criminal offence must have adequate time and facilities to consult with their lawyer to prepare their defence as well as have the opportunity to present evidence and cross-examine or challenge prosecution evidence in open court. [106] Nevertheless, according to one study in 2003 only 1 in 10 criminal suspects were able to consult with their lawyers before making their initial statement in Morelos state, Mexico state and the Federal District. [107]

The majority of criminal suspects do not have the knowledge or resources to organize a private lawyer to attend the first statement before the public prosecutor. In several cases reported to Amnesty International, prosecutors would only allow defendants to be represented by public defenders during the initial statements preventing access to private lawyers. As a

quiere o no puede nombrar defensor, después de haber sido requerido para hacerlo, el juez le designará un defensor de oficio.

[104] Bergman, Marcelo. Delincuencia, Marginalidad y Desempeño Institucional. Resultados de la encuesta a población en reclusión en tres entidades de la República Mexicana: Distrito Federal, Morelos y Estado de México. Documentos de Investigación. México: Centro de Investigación y Docencia Económicas. 2003.

[105] Mexican Constitution, art 20, A, II; Federal Criminal Procedural Code, Art 287.

[106] Article 14(3)(b) of the ICCPR, Article 8(2)(c) of the American Convention).

[107] Bergman, Marcelo,CIDE, 2003.

result, defendants are reliant on the prosecutor to assign a public defender or a "person of confidence" to act as their legal counsel.

A "person of confidence" does not need to possess legal expertise or to have any prior knowledge of the defendant and as such falls short of international human rights law protecting the right to effective defence.

### Public defenders

International human rights standards require the authorities to ensure that state appointed lawyers have the experience and competence commensurate with the nature of the offence of which their client is accused.[108] The authorities have a special duty to take measures to ensure that the accused is effectively represented[109]. If the appointed counsel is not effective, the authorities must ensure that counsel performs their duties or is replaced.[110]

However, this is frequently not the case in Mexico. According to the UN, the gravest deficiencies in state appointed legal assistance exist in Mexico's 31 states and the Federal District, and leave the poorest and most disadvantaged with least protection, seriously undermining the fairness of judicial procedures.[111]

In recent years, following federal reforms to create the Federal Public Defence Institute (*Instituto Federal de Defensoría Pública, IFDP*), there have been welcome improvements in the quality and capacity of federal public defenders. A few state governments have initiated similar reforms, making the Office of Public Defenders autonomous agencies in the judiciary. However, public defenders continue to answer directly to local interior ministry (*Secretaría de Gobierno*) or other executive authorities in many states. At federal level the IFDP has

---

[108] Principle 6 of the Basic Principles on the Role of Lawyers.

[109] [*Kelly v. Jamaica* (253/1987), 8 April 1991, Report of the HRC, (A/46/40), 1991, at 248, para. 5.10]

[110] [*Artico Case*, 13 May 1980, 37 Ser. A 16]

[111] 2.2.2.9 Strengthening the public defenders service, page 13, *Analysis of the Human Rights Situation in Mexico*, UNOHCHR, 2003: "In general, in the states the Public Defender's Offices function in a very deficient manner. They have few staff, are extraordinarily badly paid with an excessive workload. It is a publicly known fact that in many cases public defenders only turn up to sign official records of hearing or proceedings that they were not actually present during. Their performance does not constitute a real defence of the accused, rather a formality to be complied with, but without any real content. Only on rare occasions do they file motions and they limit themselves to the minimum. It can be stated that the majority of poor people that are forced to use a public defender, do not have a defence during criminal trial proceedings". (*Fortalecimiento de la defensoría pública, página 13, Diagnóstico sobre la situación de los Derechos Humanos en México, OACNUDH, 2003 (En general, en las entidades federativas las defensorías funcionan de manera muy deficiente. Cuentan con muy poco personal, extraordinariamente mal pagado y con excesivas cargas de trabajo. Es un hecho de conocimiento público que muchas veces los abogados de oficio se presentan solamente a firmar las diligencias a las que ni siquiera han asistido, su actuación no constituye una verdadera defensa del procesado o procesada, sino una formalidad que se debe cumplir, pero sin ningún contenido real. En raras ocasiones interponen algún recurso y se limitan a hacer lo mínimo. Se puede afirmar que la mayoría de la gente pobre que se ve obligada a recurrir a la defensoría de oficio, no tiene defensa en un juicio penal*).

received increased resources for recruitment, training, and conditions of employment and supervision for public defenders to raise their status nearer to that of prosecutors. Nevertheless, in the majority of states there has not been comparable investment or improvement in the service provided. As a result public defenders rarely win cases - one public defender in the Federal District claimed the rate was as low as six in 100 cases.[112]

In 2001 constitutional reforms guaranteed the right of Mexico's 13 million indigenous peoples to be represented by a lawyer with knowledge of their language and culture.[113] According to a census conducted by the IFDP in 2004 there were only 82 lawyers with the required qualifications. The IFDP is reportedly investing in increased funding of public defenders to meet this requirement.

Despite the Constitution and criminal procedural codes including the right to "adequate" defence, and requiring defence lawyers to carry out a minimum number of actions on behalf of their clients, it is extremely difficult to prove that these actions have not been carried out substantively through the appeal process. An example of this is the dependence on the signed court record of a suspect's statement as the proof that the defendant had access to legal council, without requiring a substantive evaluation of the defence of the client's interests. Legislators have not established sufficiently high standards for the right to effective defence in criminal codes and higher federal courts have failed to establish jurisprudence to ensure the right to adequate defence meets the standards required by international law, particularly in the pre-trial period of detention in the custody of judicial police.

**Private defence**

Paying for a private defence lawyer is the only other means of avoiding the often inadequate legal assistance provided by many public defenders. Families of poor detainees may take on substantial debts to hire a private lawyer. However, the service provided is extremely variable with virtually no means of holding lawyers to account for misconduct. In 2002 the UN Special Rapporteur on Independence of Judge and Lawyers was highly critical of the organization of the legal profession and called for change in order that "its integrity, independence and accountability are respected by the Government and society in general".[114] There has not been substantial progress in implementing this recommendation.

The failure of the authorities to effectively incorporate and apply Mexico's international human rights obligations in domestic law at federal and state level, as well as insufficient attention on international human rights law in the training of lawyers, has also deterred

---

[112] "Falta preparación a defensores de oficio", *Reforma*, 26 May 2005, *http://www.reforma.com/justicia/articulo/527953/.*
[113] Mexican Constitution, art 2. A VII. In 2002 article 15 of the Federal Criminal Procedural Code was reformed requiring indigenous defendants to be assisted by lawyers with full knowledge of their language and culture.
[114] Special Rapporteur on independence of judges and lawyers, E/CN.4/2002/72/Add.1, 24 January 2002, para 181.

defence lawyers and judges from basing their legal arguments on the greater protection offered in international human rights treaties, preferring to refer solely on national and local legislation and jurisprudence.

### Indigenous peoples and the right to an interpreter

International minimum fair trial standards require that all suspects shall be entitled to the free assistance of an interpreter or translator if he or she does not understand or does not speak the language of the court.[115] Widespread violations of this right led the UN Committee on the Elimination of Racial Discrimination to recommend the Mexican Government to *"guarantee the right of indigenous peoples to use interpreters and court-appointed defence counsel who are familiar with the language, culture and customs of the indigenous communities."*[116]

Members of marginalized groups that suffer discrimination, such as indigenous peoples are particularly vulnerable to abuses in the right to effective defence. By the Mexican Government's own admission, *"the trials in which indigenous peoples are involved are often plagued by irregularities, not only because of the lack of trained translators and public defenders, but also because the public prosecutors and judges usually ignore indigenous customs. On occasions the sentences passed are out of all proportion to the alleged crime"*.[117]

The right to an interpreter is formally guaranteed during the preliminary investigation and trial.[118] In the case of indigenous peoples, the law also states that the defence lawyer as well as the interpreter must have full knowledge (*pleno conocimiento*) of the defendant's language and culture and that the judge should also take into account the specific social, cultural and economic characteristics of an indigenous defendant.[119] However, the UN Special Rapporteur on the situation of human rights and fundamental freedoms of Indigenous Peoples found during his visit to Mexico in 2003 that "that many indigenous suspects are unprotected when facing a public prosecutor or judge since they do not speak or understand Spanish and there is no interpreter available to translate into their own language, although this right is laid down by law."[120] Amnesty International frequently receives reports, such as those included in this

---

[115] ICCPR, Art 14, (3)(f); ACHR, art 8(2)(a).

[116] Concluding Observations of the Committee on the Elimination of Racial Discrimination, CERD/C/MEX/CO/15 (2006). March 2006, para 13.

[117] Report submitted by the Mexican Government to the UN Committee on the Elimiation of All Forms of Racial Discrimination, CERD/C/473/Add.1, May 2005, para 167: *"los juicios en que se ven involucardo los indigenas están con frecuencia plagados de irregularidades, no solamente por la falta de intérpretes y defensores capacitados, sino también porque el Ministerio Público y los jueces suelen ignorar las costumbres indígenas. En ocasiones las sentencias dictadas están fuera de toda proporción con los delitos imputados"*.

[118] Federal Criminal Procedural Code, Art. 124 Bis.

[119] Ibid, Art. 146.

[120] (*muchos indígenas indiciados se encuentran desamparados ante los agentes del ministerio público o el juez por no hablar o entender el castellano y no contar con un interprete en su lengua, a pesar de que la ley establece este derecho.*) Special Rapporteur on Indigenous Peoples , E/CN.4/2004/80/Add.2, 23 December 2003,para 29.

---

report, that the right to an interpreter has not been upheld in practice, particularly during public prosecutor custody.

As the cases in this section indicate, if a defendant fails from the outset to stipulate that he or she wishes to have an interpreter, this may be understood at a later date by a judge to indicate that he or she understood the proceedings and did not require an interpreter and even that the defendant is not in fact indigenous. In such cases it may be difficult to win an appeal for violation of this vital due process right or ensure that statements rendered without an interpreter are inadmissible as evidence. As such, in all judicial proceedings burden of proof should rest with the State to demonstrate that the defendant has had access to an interpreter and fully understands the process.

In recent years the National Commission for the Development of Indigenous Peoples (*Comisión Nacional de Desarollo de los Pueblos Indígenas,* CNDPI), a governmental body that promotes indigenous rights and development, has sought to foster better provision of interpreters and lawyers at federal and state level who speak and understand local indigenous languages and cultures and some states have established specialist state appointed Indigenous Public Defender's Offices, (*Defensorías del Indígena*). The CNDPI helped secure interpreters in 287 cases in 2003.[121] However, this is insufficient to cater for the number of indigenous defendants at federal level alone.

In recent years, in recognition of the injustices often suffered by indigenous peoples in the justice system, the federal government and some state governments in collaboration with the CNDH have apparently secured the early release of a number of indigenous prisoners convicted of less serious crimes.[122] The head of the CNDPI also recently announced the development of forms of alternative justice in indigenous communities to deal with lesser offences. While these measures are welcome, they do not address many of the underlying issues of social exclusion affecting indigenous communities nor the direct or indirect discrimination indigenous peoples suffer when coming into contact with the justice system and which may lead to serious miscarriages of justice.

The three cases that follow are illustrative of the regular denial of due process rights to indigenous suspects, in particular the right to an interpreter and lawyer who speak and understand their language and culture. The cases also exemplify how public defenders assigned to the most disadvantaged defendants often fail to effectively defend their rights or represent their client's interests in judicial proceedings. Despite this, it is often extremely

---

[121] Para 181, Examen de los Informes Presentados por los Estados Partes de Conformidad con el Artículo 9 de la Convención International Sobre la Eliminación de todas formas de Discriminación. CERD/C/473/Add.1.

[122] On the basis of CNDH recommendations federal and state executive bodies reportedly ordered early releases of 1,206 indigenous prisoner in 2002 and 688 in 2003. Para 180 CERD/C/473/Add 1.

difficult to demonstrate inadequate defence and prove the unreliability of prosecution evidence.

**Felipe García Mejía**, aged 17, and his older brother, Eduardo García Mejía, both from a Mazateco indigenous community in Oaxaca State, were detained in Mexico City on 2 January 2004 in connection with a robbery and taken to the Federal District Public Prosecutor's Office. According to the investigations subsequently undertaken by the Federal District Human Rights Commission (CDHDF), the brothers could hardly speak Spanish, and could not read, but at no time were they given an interpreter. When they were charged, the judge committed them to trial and placed them both in preventive custody in an adult prison. On 16 January Felipe García Mejía was killed by another inmate. According to Eduardo García Mejía, while in the custody of the public prosecutor he was pressured to sign a statement that he could not read and when brought before the court, the judge failed to take into account the absence of an interpreter. When CDHDF investigated the case, the judge justified his failure to uphold the right to an interpreter stating: "the accused spoke and understood Spanish perfectly because the police who detained them did not indicate otherwise." (*los agraviados hablaban y entendían perfectamente el español porque los policías que los detuvieron no realizaron una manifestación contraria).[123]* The CDHDF also verified that when making their first statement, the public prosecutor had failed to make any reference to the ethnicity, race or language spoken by the defendants. The CDHDF also found the prosecutor, judge and public defender had all failed in their legal responsibility to verify Felipe's age before sending him to an adult prison.

**Ricardo Ucán Seca**, from an indigenous Maya community, was arrested and convicted of the murder of a neighbour, Bernardino Chan Ek, in Akil, Yucatán State on 5 June 2000. In Ricardo Ucán's first statement he stated that he understood and spoke little Spanish and could not read or write. He was not assigned a translator and his public defender did not discernibly participate in the process nor did she sign the record of his statement. When making his statement before the judge, Ricardo Ucán stated that he had shot Chan Ek in self-defence. The judge failed to take into account the absence of the public defender's signature from the record (which was mysteriously amended in subsequent copies) and also failed to provide an interpreter. During the trial, the first statement before the prosecutor was granted probative value. The public defender failed to challenge this or effectively argue that Ricardo Ucán had acted in self-defence. He was subsequently convicted of premeditated murder and sentenced to more than 20 years in prison.

Petitions filed to the State Superior Court and federal judiciary (*amparo*) against the sentence were subsequently rejected on the grounds Ricardo Ucán did not inform the prosecutor or judge that he required a translator, that there was not sufficient evidence to prove his limited knowledge of Spanish and that the judge and prosecutor spoke some Maya. Nevertheless, the

---

[123] Comisión de Derechos Humanos del Distrito Federal; http://www.cdhdf.org.mx/index.php?id=bol6004

*48      Laws without Justice: Human rights violations and impunity in the public security and criminal justice system*

appeal courts failed to place any burden on the judge or prosecutor to ensure that the defendant fully understood the judicial proceedings and ruled the translator is for the benefit of the judge not the defendant.

Despite recognizing that Ricardo Ucán Seca spoke Maya and little Spanish, the appeal rulings also determined there was no proof that Ricardo Ucán Seca belonged to an indigenous group with clearly specific customs (*con costumbres claramente específicas*) and as a result there was no requirement to guarantee the right to an interpreter. This conclusion appears to use Article 2 of the Constitution, which recognizes that indigenous peoples have their own "social, economic, cultural and political institutions" (*instituciones sociales, económicas, culturales y políticas*) as criteria by which the court can determine which defendant is indigenous and therefore eligible for an interpreter. As such, the judgement appears to undermine the right to an interpreter of any defendant who does not sufficiently understand or speak the language of the court.

Ricardo Ucán remains in prison. The case has been filed with the IACHR by a local human rights organization, *Grupo Indignación,* and the Yucatan State Human Rights Commission.

In December 2001 three Tzotzil indigenous men, **Vicente López Pérez** and his two sons, **Vicente López Rodríguez** and 17-year-old **Mariano López Rodríguez**, were detained in Simojovel de Allende, Chiapas State, accused of murder and robbery. Despite reportedly being tortured by members of the state judicial police (*Agencia Estatal de Investigación*), the three men denied involvement in the crimes in their statements to the public prosecutor and judge. Vicente López Pérez was released without charge, but his sons were charged. In 2002, despite evidence that prosecutors had altered key witness statements, Vicente López Rodríguez was convicted of murder and robbery and sentenced to 12 years in prison. His brother, Mariano López Rodríguez, was convicted by the Juvenile Council (*Consejo del Menor*) and sentenced to 5 years.

In 2002 Vicente López won an appeal on the grounds that when he made his initial statement, the interpreter had not signed the document and a retrial was ordered. In 2003 the human rights organization *Centro de Derechos Humanos Fray Bartolomé de las Casas*, which had originally filed the complaint on behalf of the family, took over the legal defence of Vicente López and Mariano López, after concluding that they had not been effectively defended. The new lawyers presented witnesses who testified to Vicente Lopez's presence in another location at the time of the crimes; demonstrated that police and prosecutors continued to press charges of robbery even after the complainants informed them money had not in fact been stolen; that the only eye witnesses had not in fact identified the brothers (they had never been cross examined in the first trial); and that statements had been altered with corrector fluid to falsely implicate the defendants.

*Laws without Justice: Human rights violations and impunity in the public security*    *49*
*and criminal justice system*

In November 2005 Mariano López was unconditionally released from custody after winning a federal appeal on the grounds of lack of adequate defence. In March 2006 Vicente López won his appeal on the grounds of lack of evidence. Amnesty International is not aware of any review of the case by the authorities to establish if there were criminal or administrative responsibility of officials involved in their prosecution and conviction.

# Chapter 5: Impunity and accountability

The failure to consistently hold to account officials responsible for committing abuses or failing to carry out their duties diligently to investigate crimes, whether committed by non-state actors or other officials, remains a key obstacle to ending impunity and ensuring the impartial and effective application of justice.

Discrimination against marginalized and vulnerable sectors of society, which often undermines access to justice, also tends to limit access to these accountability mechanisms. Amnesty International has consistently documented cases of indigenous peoples unsuccessfully seeking official action for abuses suffered either at the hands of officials or *caciques*; women seeking redress for official failure to investigate allegations of violence, or undocumented migrants who are afraid to file complaints against those officials responsible for committing abuses.

In Ciudad Juárez and Chihuahua City, many of those responsible for the murder and abduction of 400 women since 1993 evaded detection and prosecution. At the very least, this can be attributed to the lack of due diligence over several years of officials from the local State Public Prosecutor's Office responsible for investigations. The recent federal review of these investigations concluded that 177 officials from the State Public Prosecutor's Office may have committed disciplinary or criminal offences in the mishandling of investigations. Despite this, the state authorities have failed to satisfactorily prosecute any of those responsible.

Although there have been advances over the last decade in developing accountability mechanisms to expose abuses and enable victims to bring complaints against officials, these have not proved sufficient to overcome many of the obstacles that frequently prevent holding those responsible to account. The continuing lack of public confidence, particularly in law enforcement agencies and judicial police, indicates the limited advances in this area.

Domestic accountability mechanisms:

1. Redress though the courts, particularly *amparo* injunction;

2. Internal disciplinary procedures of the institutions responsible for the alleged abuse;

3. Criminal investigations conducted by the Public Prosecutor's office;

4. A complaint to the National Human Rights Commission or the network of 32 local Human Rights Commissions.

1.    *Amparo and appeal*

The judiciary is responsible for determining the legality of arrest warrants and detentions; setting the terms of pre-trial bail or custody; evaluating the evidence in order to commit a suspect to trial; convicting or acquitting a suspect at the end of the trial and determining sentences. A defendant may appeal these judicial decisions to a second instance court.

However, an appeal is often considered a less effective judicial remedy than a federal amparo injunction, particularly in state jurisdictions. This is because the federal judiciary is generally considered to be more impartial and the legal challenge is based on whether the action of a public official or agency is unconstitutional, rather than the application of secondary legislation. Amparo legislation empowers federal courts to review the contested action and issue an order nullifying its effects. If it considers the action or potential action violates the constitutional rights of the victims, the court ruling has the effect of requiring the government authority not to carry out the action and re-establish the rights of the victim.[124]

A successful amparo may overturn a lower court decision or a judicial order and require the reestablishment of violated rights, for example suspending an arrest warrant or court order to imprison a suspect pending trial (*auto de formal prisión*). In the cases of Agustín Sosa and Víctor Ramírez de Santiago amparo injunctions were essential to ensuring access to justice which state judicial authorities had denied.

However, a federal injunction does not address issues of possible criminal responsibility of officials who may have violated human rights, leaving unchallenged breaches in procedures and ethics that are common in the criminal justice system, which give rise to the abuses. It has also been argued that the overarching role of federal judiciary through amparo injunction to overrule all state court decisions has prevented necessary attention to state courts to ensure their greater impartiality and effectiveness.[125] In addition, an amparo injunction may take many months to go through the courts, is costly and to be successful generally requires an expert private lawyer. The state only provides the services of public defenders for lower court and first instance appeals, not for amparo injunctions, often leaving the poorest defendants reliant on the justice they can secure in state jurisdiction.

While an amparo injunction also functions as a form of habeas corpus to challenge illegal detention and possible forced disappearance, it is not necessarily effective. One of the legal requirements for filing an injunction in such cases is that the petitioner states where the detainee is being held and which authority was responsible. This is the very information that may not be available to the petitioner, such as a family member. Also once a suspect has

---

[124] This report does not deal in detail with the many different aspects of *amparo* injunctions and their central role Mexico's legal system.

[125] "this appear to have generate a relative lack of attention to local justice: if every case can end in the federal courts, there is little reason to invest in state level justice" (*parece haber generado un relativo descuido de la justicia local: si todo puede terminar en los tribunales federales, no hay muchas razones para invertir en justicia local*) Informe sobre Desarrollo Humano México 2004, © 2005 por Programa de las Naciones Unidas para el Desarrollo, http://saul.nueve.com.mx/informes/index.html p156,

been formally committed for trial with the auto de formal prisión, federal jurisprudence prevents an amparo ruling on the legality of the original detention.[126]

For several years there have been discussions about the reform of the *amparo* legislation. Nevertheless, this has yet to produce results and it also remains unclear what impact if any the proposed reforms would have in extending access to justice.

2. Disciplinary or administrative investigations

Laws governing public administration at federal and state level establish a Comptroller (Auditor) General (*Contraloría General*) to evaluate and monitor public institutions, as well as receive citizens' complaints. The Federal Law on the administrative responsibilities of public officials (*Ley federal de responsabilidades administrativas de los servidores públicos),* and regulatory laws and codes for all public institutions at federal and state level, including the police, Public Prosecutor's Office, judiciary or Public Defenders Office, establish the standards of conduct of officials.

Legal codes of conduct require any official who believes he or she has been ordered to break the law to communicate in writing directly to the institution's director. All officials are also obliged to report any violations by colleagues to their immediate superior.[127] Every institution is required to establish its own internal control mechanisms to monitor institutional performance, investigate complaints against officials and administer disciplinary punishments where appropriate. When the allegations of wrongdoing are of a criminal nature, the case should also be passed to the Public Prosecutor's Office in the respective jurisdiction for criminal investigation.

Efforts have been made at federal level in recent years to improve the impartiality and credibility of these internal oversight mechanisms with strengthened procedures. They usually rely on fulltime officers responsible for investigations and committees made up of senior institutional officials to hear complaints and consider the evidence. Nevertheless, they are not open to public scrutiny and do not generally involve representatives of civil society or other independent monitors which might strengthen their impartiality and engender public confidence.[128]

---

[126] "Ratification of the detention: the amparo against this is inadmissible, because of change in the legal situaiton once the formal prison committal order has been emitted" (*Ratificación de la detención: el amparo en su contra es improcedente, por cambio de situación jurídica, cuando con posterioridad se dicta auto de formal prisión*) (interpretación de la fracción X del artículo 73 de la ley de amparo, vigente a partir del nueve de febrero de mil novecientos noventa y nueve). Novena Epoca Instancia: Primera Sala Fuente: Semanario Judicial de la Federación y su Gaceta Tomo: XIX, Mayo de 2004 Tesis: 1a./J. 14/2004 Página: 441 Materia: Penal Jurisprudencia

[127] Federal Law on administrative responsibilities of public servants, Art. 47.

[128] The PGR internal control panel envisages the participation in its procedures of two academics.

At federal level, there have been improvements in making public some of the basic information surrounding internal disciplinary investigations, but these are usually restricted to number of complaints, procedures concluded, and punishments. At state level, even such limited information is often difficult to ascertain. Furthermore, many state level internal oversight procedures are often much weaker and reliant on the discretion of the executive authority with little accountability or transparency.[129]

The creation of the Federal Judicial Council has strengthened the internal disciplinary procedures in the federal judiciary. However, even here the record of holding officials to account for alleged offences against the administration of justice does not appear to be sufficiently effective. In 2005 it was reported that of 800 complaints received against judges and judicial officials in the decade, only 20 judges or court administrators (*secretario de acuerdos*) were dismissed. Even in these cases, the National Supreme Court reinstated a quarter of the officials on review.[130]

Furthermore, internal oversight procedures may take considerable time before referring a case to the Public Prosecutor's Office for criminal investigation, potentially weakening the possibility of successful prosecutions. In the cases highlighted in this report, despite the strong evidence of fabrication of evidence, torture and ill-treatment or failure to carry out legal duties, officials have not been prosecuted. In these cases, disciplinary procedures appear to serve as an alternative to criminal investigations rather than a parallel process. As a result, internal investigations are often perceived as a means of protecting the interests of the institution, rather than ensuring justice for a complainant and appropriate punishment for an official.

Internal accountability mechanisms are vital for the effective management of public security and criminal justice agencies. However, at federal and state level they often fail to provide an environment in which victims of alleged abuses can have confidence that a complaint will lead to an impartial and effective disciplinary procedure, or that where appropriate, criminal prosecutions will take place.

In recent years many federal and state institutions, particularly the Public Prosecutors' Offices, have established human rights divisions or units. These units sometimes provide an important means of promoting and coordinating institutional human rights initiatives and training, and are often primarily responsible for following up recommendations or agreements on cases with the National or State human rights commissions or cases presented by non–governmental

---

[129] For example, Art 103 of Oaxaca Organic code of the Public Prosecutor's Office grants authority to the Attorney General to impose sanctions on personnel that commit minor offences without establishing criteria or procedures for effective and impartial investigations or punishment mechanisms.

[130] La Jornada, 1 November 2005. *"En el Poder Judicial, ínfima cifra de castigos en relación a quejas"*.

human rights organizations. However, the regulatory codes setting out the functions and powers of the Public Prosecutors' Offices establish these offices as separate from either the main investigative agencies or internal enquiries bodies of the institutions. As a result, national non-governmental human rights organizations have questioned the primary purpose of many of these human rights units as some appear to concentrate resources more on improving the external reputation of the institution, rather than effectively addressing the lack of accountability of officials accused of human rights violations.

3.  Criminal investigation by Public Prosecutor's Offices
When an alleged criminal offence is brought to the attention of the Public Prosecutor's Office - whether through a complaint of the victim, their family, or a witness, or as a result of an internal enquiry into misconduct of an official or a recommendation by the National or State human rights commissions – a preliminary investigation must be opened.

In cases where the implicated official is not a member of the Public Prosecutor's Office, such as members of the law enforcement police, there may be more likelihood of a successful investigation and prosecution. However, the process for holding officials to account is extremely slow and inadequate. Furthermore, where a representative of the Public Prosecutor's Office, whether a prosecutor, judicial police officer or forensic expert, is accused of negligence, wrongful arrest, torture and ill-treatment, fabrication of evidence, malicious prosecution or other irregularities, the alleged perpetrator belongs to the institution that is solely responsible for conducting the criminal investigation. As a result, such investigations may fail to meet minimum standards of impartiality and independence.

At federal level there have been efforts to strengthen the credibility of these investigative units. However, progress in developing independent and credible mechanisms to carry out criminal investigations against colleagues from the same institutions have been limited, particularly in many states where the primary responsibility for criminal investigations falls to the general investigation unit (*Averiguaciones Previas*).[131] As a result those responsible for carrying out the investigation may have worked alongside those implicated or may be hindered by the institutional culture.

Furthermore, the fact that the Public Prosecutor's Office remains part of the executive significantly increases the likelihood of political interference in the accountability mechanisms, particularly at state level. Therefore, despite the fact that the majority of complaints made to human rights commissions usually relate to alleged abuses by

---

[131] As set out for example in the Regulations of the Organic Law of Public Prosecutor's Office of Puebla State (*Reglamento de la ley Orgánica de la Procuraduría General de Justicia del Estado de Puebla*).

representatives of the Public Prosecutor's Offices, successful prosecutions for human rights violations are very rare. [132]

Under Mexican law, only if the Public Prosecutor's Office takes the decision to prosecute or not to prosecute (*acción penal*), can the victim or their relatives challenge the decision via an *amparo* injunction to the federal courts to review the prosecutor's decision.[133] However, given the prosecutor's control of investigations and evidence, it is extremely difficult to mount a successful challenge. Furthermore, it is much more common for prosecutors and police to demand the complainant provide the evidence of the offence and the probable perpetrator, while leaving the case formally open on file without carrying out an active official investigation. In such instances, the victim does not have an effective means of appealing against the lack of due diligence of the Public Prosecutor's Office.

**Military courts**

Amnesty International issued a report in 2004 highlighting the ongoing impunity generated by the wide scope granted military jurisdiction.[134] For this reason this report does not focus on this pressing issue. Nevertheless, it is important to reiterate that in cases of serious human rights violations allegedly committed by military personnel, the federal judiciary continues to interpret Article 13 of the Constitution to grant jurisdiction to the military justice system to carry out investigations and prosecutions before military courts. Amnesty International and other international and national human rights organizations have repeatedly documented the lack of impartiality and independence of the military justice system, which has consistently ensured impunity for those military officials accused of serious human rights violations, denying victims and their families their right to truth and justice. International human rights mechanisms from the UN and IACHR have called for Mexico to ensure such cases are investigated and tried by the appropriate civilian authorities.

All the cases of indigenous women reportedly raped by military personnel documented in Amnesty Inernational's 2004 report remain under military jurisdiction, despite the Minister of Defence acknowledging that rape could never be related to legitimate mlitary functions.[135]

---

[132] For example, in 2005 the Federal District Human Rights Commission (Comisión de Derechos Humanos del Distrito Federal, CDHDF) in Mexico City received 5518 complaints against the PGJDF, 33.5% of all complaints against Federal District authorities (page 137), http://www.cdhdf.org.mx/informes/aldf/2006/DEFENSA.pdf). In 2005 the CNDH reported that 675 complaints received against the PGR (675) were second only to 807 against the Mexican Institute for Social Security (807); Informe de actividades 2005, www.cndh.org.mx

[133] "The resolutions of the Public Prosecutor's Office on wether to prosecute or not may be appealed via judicial review in the manner set out in the law" (*Las resoluciones del Ministerio Público sobre el no ejercicio y desistimiento de la acción penal, podrán ser impugnadas por vía jurisdiccional en los términos que establezca la ley*), Mexican Constitution, art 21.

[134] *Indigenous women and military injustice*; November 2004; AI Index: AMR 41/033/2004.

[135] Meeting held between Secretary General, Irene Khan, and General Clemente Vega, the Minister of Defence in August 2005.

Amnesty International is not aware of any steps by the Mexican authorities to bring these cases under civilian jurisdiction and ensure access to justice for the victims.

In 2005 the National Supreme Court confirmed the judicial precedent of granting military jurisdiction wide scope when determining the criminal responsibility of military officials even when not on active duty or carrying out military activities.[136] This ruling also has particularly important ramifications due to the intensive involvement of the military in policing operations to combat drugs trafficking in recent years. Furthermore, many military officials have been transferred as active members of the armed forces to the Federal Preventive Police raising serious concern that these officials carrying out civilian policing functions are not clearly subject to civilian oversight.

### 4. Human Rights Ombudsman

In 1990 the government founded the National Human Rights Commission (*Comisión Nacional de Derechos Humanos,* CNDH) to protect and promote human rights. Constitutional reforms to Article 102 B in 1999 made the Federal Congress responsible for establishing the CNDH and granted the institution "administrative and budgetary autonomy". The 32 legislative assemblies of the federal entities are responsible for establishing state human rights commissions (*Comisiones Estatales de Derechos Humanos,* CEDHs) in their jurisdictions. The commissions are not competent to deal with environmental, electoral, labour or judicial issues.

Anyone can present a report of an abuse by a public authority to a human rights commission. If the agent implicated is federal (and any other agents belong to state or municipal authorities), this is within the competence of the CNDH. If the agent or agents solely belong to state or municipal authorities the complaint is within the competence of the relevant CEDH. The Commissions are legally bound to register a complaint and open an enquiry unless it is manifestly unfounded or not within its competence. From the outset the ombudsman must inform the authority accused and "try to reach reconciliation between the interests of the parties, always respecting the human rights of those affected, in order to secure an immediate solution to the conflict".[137] If the Commission does not find a satisfactory solution to the complaint or identify the official responsible, the case is archived, unless the complainant files a request within 90 days for the enquiry to be reopened. If the Commission judges that the complaint does not merit its involvement, it requests further justification from the complainant. If no response is received, the case is archived on grounds of lack of interest.

---

[136] Novena Epoca Instancia: Primera Sala Fuente: Semanario Judicial de la Federación y su Gaceta Tomo: XXIII, Febrero de 2006 Tesis: 1a./J. 148/2005 Página: 247 Materia: Penal Jurisprudencia. "Offences against military discipline referred to in paragraph i of Article 57 of the Military Penal Code. To demonstrate they have occurred it is enough that the subject who commits them is a military official on active service" (*Delitos contra la disciplina militar a que se refiere la fracción i del artículo 57 del código de justicia militar. Para su acreditación basta que el sujeto que los realice tenga la calidad de militar en activo*).

[137] Law of the National Human Rights Commission, art 36.

---

All information and documentation on cases is kept confidential, unless a recommendation is issued in which case some information is released in the report.

If an investigation does not lead to conciliation, the commission may either find the authority not responsible, in which instance the case is closed, or if the authority is found responsible a recommendation is issued. Whilst a recommendation is not binding, the authority must respond within 15 days informing the commission whether it accepts the recommendation or not. If it accepts, it has a further 15 days to inform what measures have been taken to comply with the recommendation. The commission may make public the failure or refusal of an authority to implement a recommendation. However, this often only amounts to a reference to the case in the commission's annual report.

The CNDH is also responsible for resolving disputes arising from recommendations, agreements and omissions by the 32 state human rights commissions, either by individuals complaining about decisions of their local commission; or against recommendations issued by the local commission or failure of local authorities to comply with a recommendation. This latter can result in a modification of the local commission's recommendation or its ratification backed up by a direct recommendation by the CNDH to the relevant authority. The CNDH is also responsible for a range of measures to promote human rights and prevent violations and may recommend modifications to practice and legislation to this effect.

The Federal Senate is responsible for selecting the president of the CNDH, who serves a five-year term and can only be removed via an impeachment process for misconduct. The Senate can re-elect the president for a further a term of office. The president of the CNDH reports annually to three branches of the state on its activities and is questioned by Congress.

In the 32 federal entities, the process of selecting the president of each CEDH and tenure of the office varies considerably. However, in most situations the local governor maintains direct or indirect control through the local governing party's majority in the legislature and the limited autonomous status of CEDHs.

The selection procedures at national and state level fall short of the effective participation of civil society, particularly of non-governmental human rights organizations, in determining the composition of the Commissions as set out in the Paris Principles on National Institutions for the protection and promotion of Human Rights.[138]

The emergence of the network of human rights ombudsmen's offices has been an important factor in promoting and protecting human rights in Mexico. Several human rights commissions, such as that of Guerrero and the Federal District have played important roles in

---

President of a State Human Rights Commission

The president of the Chiapas State Human Rights Commission, **Pedro Raúl López Hernández**, reportedly received death threats and was subject to a smear campaign by the state authorities questioning his capacity during 2003 and 2004, which appeared to be linked to strongly critical recommendations issued by the commission. The threats were never effectively investigated and in August 2004 a dispute over procedures to carry out an audit of the Commission led to the impeachment of the president of the CEDH, forcing him from office. The local Congress named a former public prosecutor, with a reported record of failing to investigate allegations of human rights violations, in his place without a consultation process with civil society. Many local non-governmental human rights organizations have concluded that the manner in which the former president was removed and the replacement selected has left the institution without legitimacy or credibility.

highlighting abuses and seeking to hold relevant authorities to account. However, the performance of many other commissions is inconsistent and some lack sufficient independence to operate effectively. In those states where CEDHs are weakest, this acts as a deterrent to the reporting of human rights abuses by victims or non governmental human rights organizations. As a result, the information gathered on abuses in some state jurisdictions by CEDHs is at best incomplete.

Efforts by civil society to evaluate the performance of the CNDH using freedom of information legislation have been hampered by the CNDH's interpretation of its legal statute that prevents access to virtually all substantive case information – including by the complainants themselves. In particular, criticism has focused on the high number of cases that are archived because of lack of interest of the complainant; the high number of cases that result in conciliation agreements between the complainant and the authority (where there is no available information to determine whether conciliation was appropriate or if the authority complied); and the very few number of cases that result in recommendations. Without impartial and transparent audit of these cases it is impossible to determine the standard of performance of the CNDH and CEDHs.

The legislative framework of the CNDH also tends to reinforce national interpretation of human rights guarantees, as the institution is mandated to protect human rights recognized in Mexican legislation, rather than international human rights standards. The CNDH and CEDHs have not generally been at the forefront of efforts to ensure the effective application of international human rights standards in Mexican law.

Non-governmental human rights organizations and academics in Mexico have also criticised the failure of the CNDH and CEDHs to follow up vigorously on recommendations or conciliation agreements. While these agreements are not binding, failure to either publicise recommendations sufficiently or to effectively evaluate compliance, limits their effectiveness. In many cases, when commissions recommend an authority to improve training of officials and open an official investigation into an alleged abuse, it is not clear what steps are taken to assess if the relevant authority has substantively complied.

The cases included in this section illustrate the obstacles that victims of serious human rights violations and their families face when filing complaints and seeking justice, particularly if identified by the police as criminal suspects. Despite some improvements in accountability mechanisms in recent years, these cases show how difficult it is to challenge the legality of police conduct and force the authorities to undertake serious and impartial investigations to hold those responsible to account. Human rights violations, particularly committed by public security and judicial police, frequently go unreported as victims and their families have little trust in the reliability or fairness of official investigations. As a result, impunity for human rights violations remains the norm and victims and their families are denied access to justice and redress.

### Nadia Ernestina Zepeda Molina

On the evening of 23 January 2003, 18-year-old student Nadia Ernestina Zepeda Molina was walking with two young men in the streets of Iztacalco District (*Delegación*) of Mexico City. According to her testimony, she and the two men were approached and detained by the Federal District Law Enforcement Police (*Policía Preventiva del Distrito Federal*) when they observed a police anti-drugs raid on a nearby house. Officers reportedly tried to force her to undress in the street, and once placed in a police vehicle, she was threatened and insulted. One officer then reportedly sexually assaulted her while others shouted encouragement.

When the police finally presented the detainees to representatives of the PGR, they stated that the three suspects were reportedly carrying illegal drugs when they were stopped and searched. The two male suspects made statements that they only vaguely knew Nadia Zepeda and were released without charge. While in the custody of the public prosecutor, she was reportedly denied her right to make a phone call and forced to sign a document she was not permitted to read. Her initial statement (*declaración ministerial*) was taken in which she denied possessing drugs. She was then charged and placed in judicial custody.



During the first few days of detention, forensic doctors of the PGR reportedly examined Nadia Zepeda on three occasions, but failed to document bruises that were reportedly visible on various parts of her body. No investigation was undertaken into her treatment during arrest. In May 2004 she was sentenced to five years in prison.

In July 2003 Nadia Zepeda filed a complaint with Federal District Human Rights Commission (*Comisión de Derechos Humanos del Distrito Federal,*

**Nadia Ernestina Zepeda Molina © private**

CDHDF) for sexual assault. In April 2005 she filed another complaint for sexual assault against the three arresting police officers with the Federal District Public Prosecutor's Office (*Procuraduría General de Justicia del Distrito Federal*, PGJDF). The CDHDF concluded that the Federal District Law Enforcement Police failed to provide accurate information relating to Nadia Zepeda's detention and proposed that the three implicated officers be investigated. Nevertheless, the criminal investigation against the three officials was closed by the PGJDF in 2006, despite her lawyers' efforts to appeal this decision to the courts.

In 2005 a medical examination by the special unit for sexual violence cases of the PGJDF identified previously undocumented psychological evidence of her sexual assault. Nevertheless, in 2006 PGJDF also sought to close the criminal investigation for lack of evidence. Her lawyers are seeking to appeal this decision.

In August 2005 Nadia Zepeda was released early from prison after completing two thirds of her five-year sentence.

**Unlawful police killings in Reynosa**

According to reports, on the night of 21 May 2005 22-year-old **Hernán Alemán Serrato,** was driving through the city of Reynosa, State of Tamaulipas with his friends, **Jorge Castillo Fuentes** and **José Reyes Avendaño García**, when they were overtaken by a police van containing at least 30 members of Federal Support Forces to the Federal Preventive Police (*Fuerzas Federales de Apoyo de la Policía Federal Preventiva*). Shortly afterwards, the agents reportedly opened fire on their car without warning or provocation. More than 100 bullets reportedly hit the vehicle, killing Jorge Castillo Fuentes and José Reyes Avendaño. Hernán Alemán Serrato was taken to hospital where he later recovered. A federal police officer, **Pedro Moreno Feria**, who participated in the police operation, also died the same night in circumstances that have not been clarified.

Almost an hour later 22-year-old **Alberto Jorge González** was driving nearby when three Federal Preventive Police agents stopped him. He was forced to get out of the car and held face down while a police officer held a gun to his head. After the police checked his car, he was allowed to go. According to reports, shortly afterwards Alberto Jorge's vehicle crashed and police then opened fire on the car, killing Alberto Jorge González.

A statement issued by the Federal Preventive Police immediately after the two shootings claimed that the police had returned fire after being shot at by four members of organised crime. The report alleged that guns had been discovered in the two vehicles at the scene of the incidents. However, witnesses contradicted this version of events and claimed the attack had been unprovoked. On 30 June 2005 an administrative investigation carried out by the internal oversight body of the PFP (*Órgano Interno de Control*) was archived, concluding there was no evidence of police misconduct.

Following an official complaint presented by the families of the victims, the PGR opened a preliminary investigation into the killings. Amnesty International was informed in January

2006 that the investigation was being handled by the PGR's Special Unit to Investigate Crimes Committed by Public Officials and Against the Administration of Justice (*Unidad Especializada en Investigación de Delitos por Servidores Públicos y contra la Administración de Justicia*) and the Internal Affairs Unit within the Federal Preventive Police (*Dirección General de Asuntos Internos*) was conducting a new administrative investigation.

A local human rights organization, the *Centro de Estudios Fronterizos y de Promoción de los Derechos Humanos,* and families of the victims also filed a complaint with the National Human Rights Commission (CNDH), which undertook an investigation and issued a recommendation of 20 December 2005. The CNDH concluded that the use of lethal force by the police was disproportionate and contrary to the UN Basic Principles on the Use of Force and Firearms by Law Enforcement Officials According to its report, chemical forensic tests confirmed that the victims had not used firearms; and that the guns allegedly found inside the vehicles were probably placed there afterwards, suggesting the manipulation of evidence in order to divert the course of the investigation.



**Rosa Elba Avendaño, sister of José Reyes Avendaño © private**

Despite the seriousness of the evidence exposed by the CNDH report, the recommendation issued to the authorities focused on human rights training of police and compensation for the victims' families. The recommendation called for an internal administrative investigation and criminal enquiry into the incident – already ongoing. However, it did not highlight specific conduct or evidence to be investigated or refer to the possible fabrication of evidence. Despite the limited nature of the recommendation, the PGR and Federal Public Security Secretariat (*Secretaría de Seguridad Pública*, SSP) both refused to comply. However, the CNDH did not

make public this information and failed to inform the families or their representatives until June 2006, advising them that the only public reference to the case would be made in the next CNDH annual report of activities. In June 2006 Amnesty International published a document on the case, but at the time of writing the organization has not received a response from the PGR, PFP or CNDH. [139]

### Ill-treatment, torture and unfair trials: San Salvador Atenco

On 3 and 4 May 2006, municipal, state and federal police operations in the town of Texcoco and **San Salvador Atenco**, Mexico state, resulted in the detention of 211 people, the death of two civilians and scores of injured protesters and police. On 4 May, more than 2000 state police entered San Salvador Atenco in response to disturbances and released at least 4 police officers still reportedly being held hostage by supporters of a local political organization, the People's Front for the Defence of Land, (*Frente de Pueblos en Defensa de la Tierra*, FPDT).

According to information gathered by Amnesty International, police carried out indiscriminate detentions against members of the population using excessive force, ill-treatment and torture. **José Gregorio Arnulfo Pacheco**, his wife and their son were beaten and arrested in their home by police early in the morning of 4 May. When his wife and son informed police that José Gregorio Arnulfo suffered from a degenerative disease severely restricting his balance, movement and speech, officers refused to believe them. They repeatedly beat and kicked José Gregorio Arnulfo as he was dragged to waiting police vehicles. As with the other detainees, his head was covered and he was forced to lie on the floor of the police vehicle while others were made to walk on top of him. He was repeatedly beaten and threatened. Amnesty International recently issued a report documenting the cases of several of the 47 women detained who reported suffering sexual assault during the bus journey to the state prison of Santiaguito. [140]

The severity of José Gregorio Arnulfo's physical injuries led prison doctors to order his transfer to a hospital in nearby Toluca. He was subsequently diagnosed with fractured ribs, a fractured trachea, cranial fissures and severe bruising. Despite his medical condition and his degenerative illness, he was returned to the prison hospital wing after five days.

Even though he had not been brought before a judge to make an official statement or made aware of the charges against him, on 10 May the presiding judge remanded José Gregorio Arnulfo into custody, along with 28 other detainees on charges of attacking public roads and kidnapping. His wife and son were charged with attacking public roads, a lesser offence, and released on bail.

The charges against José Gregorio Arnulfo were based on the statement made to a prosecutor by a police officer, alleging that he was the person who bound and gagged her while being

---

[139] *"How can a life be worth so little?"*, Unlawful killings and impunity in the city of Reynosa ( AI Index: AMR 41/027/2006).
[140] Violence against women and justice denied in Mexico state (AI Index: AMR 41/028/2006).

held in San Salvador Atenco. However, the officer did not appear in court to substantiate the statement or verify the identification of José Gregorio Arnulfo. He spent a further month in prison in a serious condition without receiving adequate medical attention.

On 21 June he was brought before the judge and ordered to lift various objects. As a result of this hearing, the judge ordered his release on 23 June on grounds of lack of evidence. The Public Prosecutor's Office has appealed against his release. Amnesty International is not aware of any investigations arising from the arbitrary detention, ill-treatment and the unfounded prosecution of José Gregorio Arnulfo Pacheco

At the time of writing, investigations conducted into the police operation in San Salvador Atenco have resulted in disciplinary proceedings against nine police officers and criminal charges against 22 for the minor offence of abuse of authority. Despite concerns about the fairness of judicial procedures, more than 150 people of those arrested are being prosecuted for attacking public roads, 31 of whom are in detention facing further charges of kidnapping.

# Chapter 6:  Conclusions and recommendations

Amnesty International continues to document cases of arbitrary detention, torture, ill-treatment, denial of due process rights and unfair trials, particularly at state level. The human rights abuses that occur in the public security and criminal justice systems are not primarily due to lack of resources. As evidenced in this report, the inadequate legal recognition of international human rights standards, the widespread failure to enforce existing legislation and continuing political interference in the administration of justice, prevent full respect for human rights across the country. Furthermore, deficient accountability mechanisms result in widespread impunity for those responsible for human rights abuses.

The lack of effective and impartial judicial scrutiny of the preliminary investigation carried out by the Public Prosecutor's Offices often establishes a significant procedural advantage in favour of the prosecution. This is also closely linked to the lack of explicit constitutional protection of the presumption of innocence, which tends to strengthen the presumption of legality of prosecution evidence and leads to excessive use of preventive detention. The evidential weight granted statements rendered to the prosecutor over those made in court has the effect of encouraging torture and miscarriages of justice. The lack of independent, well-trained and adequately paid state-appointed lawyers and the denial of access to legal counsel in the early period of detention often deny the right to effective defence. Criminal suspects and victims from the poorest and most marginalized communities are the most vulnerable and least well equipped to challenge the police and prosecution evidence. Their treatment by the criminal justice system often amounts to discrimination.

The impartiality and independence of the judiciary, particularly at state level, is weak. Excessive case workloads and court practices which do not require judges to actively direct all hearings, lead to inadequate judicial scrutiny of police, prosecutors and lawyers during the pre-trial and trial stages. The National Supreme Court has not established binding jurisprudence on the application of international human rights treaties in domestic law. The higher federal courts have not developed jurisprudence to ensure that due process rights are sufficiently protected in substance or prosecution evidence ruled inadmissible where appropriate.

The functions of the Public Prosecutor's Office are highly susceptible to political or personal influence to secure unwarranted or even fabricated prosecutions against opponents, community leaders and human rights defenders. The failure of the authorities to ensure representatives of key institutions, such as police, prosecutors, state-appointed lawyers and judges act in accordance with standards of impartiality and legality to protect human rights allows the frequent misuse of the justice system.

The internal and external accountability mechanisms to investigate and hold to account officials responsible for human rights violations are frequently ineffective. As a result many victims are denied access to justice and the public security and judicial institutions charged

with upholding the law and protecting human rights are often not answerable to the community they serve.

The frequent failure of Mexico's public security and criminal justice system to ensure security or justice has been widely documented by national and international human rights organizations and academics. There is wide recognition that the justice system is not serving society adequately and needs substantial reform to ensure effectiveness and respect for the human rights of both criminal suspects and victims of crime. However, legal reforms are a necessary but not sufficient condition to ensure respect for human rights in the criminal justice system. Real change can only be measured in the effective and impartial application of appropriate legislation in which the protection of human rights is fully integrated.

It is time for the new federal government and legislature, as well as state governments and legislatures, to respond to the needs of Mexican society and ensure that law and practice is reformed at federal, state and municipal level to guarantee equal access to justice and respect for human rights.

## Amnesty International recommendations to the Mexican Government:

International human rights standards and mechanisms
- Amend the Constitution and secondary legislation to ensure that Mexico's international human rights treaty obligations are fully enshrined in law and upheld by all public institutions.
- Amend the Constitution to enable direct federal involvement in state jurisdictions in specific cases where conflict of interests or inadequate judicial remedies violate international human rights standards requiring the prevention and punishment of serious human rights violations as recognized in international human rights law.
- Comply with Mexico's obligations under the Optional Protocol to the Convention against Torture and other cruel, inhuman or degrading treatment or punishment by establishing a system of regular visits, reporting and follow-up by an independent national mechanism, in which diverse representatives of civil society play an active role, to places where people are deprived of their liberty.
- In consultation with the UN Office of High Commissioner for Human Rights in Mexico, review and strengthen the role of office in order to improve its capacity to support the development of measures to protect human rights at national and state level.

Public security and criminal justice system
- Reform the criminal procedural system to ensure that federal and state judiciaries vigorously uphold international fair trial standards. The right to the presumption of innocence should be established in Constitution. All evidence gathered in the prosecutor's preliminary investigation should be subject to effective judicial control

and rigorous testing, including through cross examination in public hearings before a judge.

- Take immediate steps, in line with international human rights standards, to:
  - ❖ Amend the Constitution and procedural codes in order that only statements rendered before a judge and in the presence of defence lawyer are admissible as evidence;
  - ❖ ensure that judges proactively and impartially assess the circumstances under which suspects are detained and held in custody in order to guarantee any evidence of torture or other ill-treatment, illegal detention, coercion, or failure to ensure effective access to legal counsel, family or medial assistance is impartially and effectively investigated and where appropriate sanctioned;
  - ❖ establish clear criteria for the use of information and admissibility of evidence, placing the burden of proof on the prosecution to demonstrate it has been obtained legally, particularly where suspects allege arbitrary arrest or torture or other ill-treatment;
  - ❖ ensure in practice the right to effective defence, and an interpreter when appropriate, from the moment of detention;
  - ❖ amend legislation on *en flagrante* arrests to bring it in line with international human rights standards;
  - ❖ ensure that preventive custody is the exception not the rule and that judges are authorized to remand a criminal suspect into custody only on the criteria established by the IACHR that include: "the presumption that the accused has committed a crime, the risk of flight, the risk that new crimes will be committed, the need to investigate and the need for collusion, the risk that pressure will be brought to bear against witnesses and the preservation of public order".[141]
  - ❖ Restrict the scope of military jurisdiction in order that military personnel accused of committing human rights violations are investigated and tried by civilian authorities.
- Ensure that international human rights standards, including guidelines, are integrated into public security and investigative police operations and procedures.
- Establish the autonomy of the Public Prosecutor's Offices from the executive authority at federal and state level; ensure that the Offices are subject to effective judicial oversight and provide full and transparent account of their activities to civil society.
- Establish the effective autonomy of forensic services from the Public Prosecutor's Offices. Internationally recognized protocols on the collection, storage and assessment of forensic evidence should be enforced and monitored.

---

[141]IACHR Country report on Mexico, OEA/Ser.L/V/II.100 Doc. 7 rev. 1 September 1998, para 233, footnote 39.

- Develop investigative procedures and resources that prioritise the use of scientific-based forensic evidence to avoid reliance on insufficiently corroborated statements by suspects or witnesses.
- Strengthen judicial independence and impartiality, particularly at state level, to ensure judges actively guarantee the equality of arms between defence and prosecution at all stages of the judicial process and uphold the presumption of innocence and all other due process rights. Presiding judges should be legally bound to be present and actively direct pre-trial and trial hearings and proceedings (*audiencias y diligencias*). Failure to do so should be grounds for appeal. Ensure knowledge of international human rights law is an integral element of training and recruitment of all judicial officials.
- Reform *amparo* legislation to ensure prompt and equal access to justice and to guarantee its effectiveness in cases of alleged human rights violations, including arbitrary detention, torture and forced disappearance.
- Establish a regulatory framework for the legal profession, to ensure its members are subject to uniform training, qualifications and an enforceable ethical code.
- Ensure the autonomy of the Public Defender's Offices in all states. Guarantee sufficient investment in training, pay and conditions of state appointed lawyers and ensure their work is regularly scrutinised in order to uphold the right to effective defence of all criminal suspects.
- Ensure the sufficiency of well-trained public defenders and interpreters who speak and understand fully the different indigenous languages.
- Gather reliable data on access to justice and discrimination against persons on the basis of their status or membership of a disadvantaged group, whether as criminal suspects or victims of crime.
- Develop specific measures to ensure that individuals from these groups enjoy equal access to justice, taking into particular account the situation of the poorest and most socially excluded and their right to effective defence.

Accountability
- Recruit, train, evaluate and discipline police, prosecutors, public defenders, state forensic experts and judicial officials on the basis of statutory professional ethical codes in line with international guidelines on the role of each profession.
- All public officials and lawyers should be required to receive substantive training in international human rights law.
- Ensure effective, credible, impartial and prompt criminal investigation of officials implicated in human rights violations, including failure to report abuses or prevent abuses by others. The investigating authority should report publicly on its findings.
- Strengthen the capacity and independence of Public Prosecutor's Offices to conduct impartial and effective criminal investigations of officials accused of human rights violations, particularly in cases where the accused work for the Public Prosecutor's

Office. In order to strengthen the credibility of these mechanisms, procedures should be transparent and involve representatives of civil society.

- Strengthen the internal supervisory mechanisms of the police, public prosecutors office, public defenders office and judiciary in order to ensure credible, effective and transparent disciplinary investigations of alleged wrongdoing and breaches in professional ethical codes. Disciplinary proceedings should be open to public scrutiny and should not replace the responsibility to prosecute officials implicated in criminal offences.

- Investigate promptly and effectively allegations of misuse of the criminal justice system by public officials or private individuals for political or other motives without judicial foundation.

- Strengthen the National Human Rights Commission and State Human Rights Commissions to ensure their autonomy and their obligation to promote and monitor the implementation of international human rights standards; develop their legal faculties to enhance investigative procedures and their obligation to monitor and question the failure of authorities to comply with agreements or recommendations; and ensure their practices and procedures are transparent and open to public scrutiny.

- Strengthen the capacity of Judicial Councils to ensure the impartial and effective supervision and discipline of the judiciary in every jurisdiction.

- Ensure the effective application of freedom of information legislation and introduction of and strengthening of such legislation in all states.

**Human rights defenders, community representatives and political opponents**

- Ensure that human rights defenders, community representatives and political opponents, are not subject to unsubstantiated or fabricated criminal charges in relation to legitimate activities and the exercise of their fundamental freedoms.

- Develop national and state plans of action to implement the UN Declaration on the Right and Responsibility of Individuals, Groups and Organs of Society to Promote and Protect Universally Recognized Human Rights and Fundamental.

**Rights of victims**

- Reinforce and guarantee in practice the rights of victims of crime in order to ensure that filing a complaint is not excessively costly or time consuming; that police and prosecutors carry out impartial, prompt and thorough investigations; that victims can participate actively in proceedings as auxiliaries *(coadyuvantes);* that victims have the right to receive independent legal advice; and that victims are adequately protected from reprisals.

- Ensure that victims of human rights violations, including arbitrary detention and unfounded prosecutions, enjoy the right to full remedy and reparation, as provided under international law and standards, including restitution, compensation, rehabilitation, satisfaction, and guarantees of non-repetition.

# Appendix: Institutions in Mexico's criminal justice system at federal and state level

Mexico is a federal republic with 31 states and the Federal District. There is a federal executive, legislature and judiciary. The Mexican Constitution establishes the relation between federal and state governments, which each has its own constitution, legislation, executive, legislature and judiciary, which must not violated the Constitution of the Union. State criminal and procedural codes establish proceedings and punishments for all offences that are not federal in nature. Federal offences are primarily limited to international or cross state crimes, particularly organized crime. The vast majority of criminal offences, from petty crime to murder, kidnapping, rape and other violent crimes are investigated and tried in state jurisdictions, unless federal agents or organized crime is involved.

**Law Enforcement or Public Security Police** are generally under the control of the **Public Security Secretariats** (*Secretarías de Seguridad Pública*) of federal and state governments, while municipal police answer to locally elected officials. These police forces are responsible for crime prevention and public order on the streets, as well as acting as auxiliaries to prosecutors and investigative police to enforce arrest warrants.

**Judicial or Investigative Police** (*Agencia Federal de Investigación and Agencia Estatal de Investigación* – known variously as *policia ministerial, policia investigativa or policia judicial*) work under the authority each of the Public Prosecutor's Offices at federal level, the 31 states and the Federal District. They carry out investigations and arrests under the order of public prosecutors (*agentes del ministerio público*).

The Federal **Public Prosecutor's Offices** (Ministerio Público federal) is part the Office of the Attorney General of the Republic (*Procuraduría General de la República,PGR*). The Public Prosecutor' Offices in the 31 states and the Federal Distrcit are part of state Attorney General's Offices (*las Procuradurías Generales de Justicia de los Estados, PGJE*) and the Federal District Attorney General's Office (*Procuraduría General de Justicia del Distrito Federal, PGJDF*). The Public Prosecutor's Offices are the only institution in each jurisdiction that are legally empowered to investigate and prosecute offences.

The **National Supreme Court of Justice** (*Suprema Corte de Justicia de la Nación*, SCJN) is responsible for the federal judiciary (along with the **Federal Judicial Council**, *Consejo de la Judicatura Federal*), whose criminal court division is made up of first instance district courts (juzgado de distrito) and unitary and collegiate courts which are appellate courts, including for amparo injunctions. There are 31 **state judiciaries** and Federal District judicary, whose criminal courts adjudicate in cases in relation to criminal offences committed in each state's

70      *Laws without Justice: Human rights violations and impunity in the public security and
        criminal justice system*

jurisdiction. Justices of the **State Superior Courts** function as appeal court judges. The president of the State Superior Court is head of the state judiciary.

The authorities in each jurisdiction are responsible for providing state appointed legal advice (public defenders) via the **Public Defenders' Office** (*Defensoría Publica*) for those who cannot afford their own legal representation.

The **National Human Rights Commission** (*Comisión Nacional de los Derechos Humanos, CNDH*), 31 **State Human Rights Commissions** (*Comisiones Estatales de Derechos Humanos, CEDH*) and the **Federal District Human Rights Commission** (*Comisión de Derechos Humanos del Distrito Federal, CDHDF*) are autonomous state institutions empowered to receive complaints of abuses committed by officials and to carry out non-judicial investigations and make recommendations to the relevant authorities.

**Glossary**

| | |
|---|---|
| ACHR | American Convention on Human Rights |
| AFI | *Agencia Federal de Investigación*, Federal Investigation Agency (formerly the federal judicial police) |
| AEI | *Agencia Estatal de Investigación*, State Investigation Agency (formerly the state judical police) |
| CEDH | *Comisión Estatal de Derechos Humanos*, State Human Rights Commission |
| CNDH | *Comisión Nacional de Derechos Humanos,* National Human Rights Comisión |
| IACHR | Inter-American Comission on Human Rights |
| ICCPR | International Covenant on Civil and Political Rights |
| INEGI | *Instituto Nacional de Estadística, Geografía e Informática*, National Institute of Statistics, Geography and Computing |
| MP | *Ministerio Público*, (Public Ministry) – Public Prosecutor. The prosecution services are part of the Office of the State Attorney Generals or State Public Prosecutor's Office in the 31 states and the Federal District. |
| MPF | *Ministerio Público Federal*, Federal Public Prosecutor. Federal prosecution services are part of the Office of the Attorney General of the Republic. |
| NGO | Non-governmental organization |
| OACNUDH | *Oficina del Alto Comisionado de las Naciones Unidas para los Derechos Humanos*(Office of the United Nations High Commissioner for Human Rights) |
| PAN | *Partido Acción Nacional*, National Action Party |
| PFP | *Policía Federal Preventiva*, Federal Preventive Police |
| PGJE | *Procuraduría General de Justicia del Estado*, State Public Prosecutor's Office |
| PGJDF | *Procuraduría General de Justicia del Distrito Federal*, Federal District Public Prosecutor's Office |
| PGR | *Procuraduría General de la República,* Office of the Attorney General of the Republic or Federal Public Prosecutor's Office |
| PJE | *Policía Judicial del Estado,* State Judicial Police |
| PRI | *Partido Revolucionario Institucional*, Institucional Revolutionary Party |

72    *Laws without Justice: Human rights violations and impunity in the public security and criminal justice system*

PRD         *Partido de la Revolución Democrática*, Party of the Democratic Revolution.
SCJN        *Suprema Corte de Justicia de la Nación*, Nacional Supreme Court of Justice
SEGOB       *Secretaría de Gobernación*, Interior Ministry
SSP         *Secretaria Seguridad Pública*, Public Security Secretariat

# AMNESTY INTERNATIONAL
# PRESS RELEASE

AI Index:          AMR 41/013/2003   (Public)
News Service No:     063
25 March 2003

**Embargo Date: 25 March 2003 17:00 GMT**

## Mexico: Reform the criminal justice system and end torture

(Mexico City) Torture continues to play a key role in Mexico's criminal justice system -- it is still widely used by state agents and forms the basis of numerous unfair convictions, Amnesty International said today as it launched its report *Unfair trials: unsafe convictions.*

The new report documents several cases in which the defendants' right to a fair trial has been violated and the criminal justice system has failed to provide effective judicial remedy.

"These cases are but an example of how people are still tortured by police into confessing to serious crimes, and how these confessions are then accepted as evidence in court against the most fundamental principles of justice," said Rupert Knox, Amnesty International's researcher on Mexico.

"While the federal government has acknowledged the continuing use of torture, effective action to end this practice is still a long way off and those caught up in these perverse justice mechanisms continue to suffer daily injustice."

Amnesty International has received reports of irregularities at every stage of judicial proceedings, indicating that fair trial procedures that conform to international standards ratified by the Mexican government are routinely and consistently undermined.

The judicial system is seriously flawed as a result of:
arbitrary detentions;
suspects not being brought before a judge within the legal time frame;
poor legal representation;
inadequate forensic examinations to substantiate signs of torture by doctors attached to the Public Ministry;
insufficient judicial supervision of procedures.

"These flaws in the system in turn perpetuate a culture of impunity for torturers and encourage the continuation of this unacceptable practice," Rupert Knox added.

The cases included in Amnesty International's report demonstrate how difficult it is to challenge evidence tainted by torture and force the criminal justice system to recognise the abuses perpetrated in the name of justice.

One such case is that of brothers Enrique and Adrián Aranda Ochoa who were arrested in June 1996 and forced -- after several hours of torture at the hands of judicial police -- to sign a confession they were not allowed to read. They were told that if they did not ratify their confession before the judge, their families would suffer the consequences. Despite medical evidence of torture, their confessions were used to convict and sentence them to 50 years' imprisonment. Over six years later, an arrest warrant issued against one of the policemen involved in their torture has not been acted on, while the brothers remain in prison awaiting the outcome of their final appeal.

"The right to effective redress is a fundamental principle of international human rights law. The fact that those convicted on the basis of forced confessions are denied this right is an ongoing violation and further fuels the cycle of impunity and abuse," Rupert Knox stressed.

Amnesty International's report documents cases that clearly demonstrate the use of torture to extract confessions and the repeated failure of respective authorities to address the injustice and abuses suffered by the victim. While the acts of torture mentioned in the report took place under previous governments, the present authorities are responsible for ensuring that these victims have access to effective redress. Nevertheless, Amnesty International continues to receive reports of torture, with more recent cases documented in Oaxaca and Ciudad Juarez.

"It is vital that the authorities begin to tackle not only the ongoing use of torture, but also the legacy of its use which resulted in numerous unsound convictions. There must be an independent review of these and other similar cases in order to prevent further injustice," Rupert Knox said.

"The present administration has released a number of prisoners whose ongoing detention was manifestly unjust and continued to cause national and international concern, but this is not enough. The challenge now is to secure redress to those suffering injustice, and to tackle the roots of the problem."

Amnesty International and other Mexican and international human rights organizations have repeatedly identified many of the problems in the criminal justice system -- from policing practices to the role of public prosecutors and defence attorney, to the judiciary -- and have suggested solutions.

The present administration has made a number of important commitments to seriously tackle these issues. The proposed *Reforma del Estado* and the UN Technical Assistance Programme provide a vital framework for developing and agreeing policies to this effect at the federal, state and municipal level.

"The implementation of these measures requires not only clear sighted determination on the part of the executive, but also the endorsement and support of all branches of the state," Rupert Knox warned.

"To build public confidence in the criminal justice system, it is crucial that the Mexican government implements a thorough reform of the judicial system, targeting all those mechanisms which facilitate torture and ill-treatment and contribute to the impunity of those responsible."

**Background**

The document is the latest in a series of reports published by Amnesty International as part of its long-term campaign against torture and impunity in Mexico. In 2001 Amnesty International published *Justice betrayed - torture in the judicial system* (AI Index: AMR 41/021/2001) that examined some of the main reasons behind the failure of the Mexican authorities to effectively address and put a stop to torture and *Torture cases - calling out for justice* (AI Index: AMR 41/008/2001) documenting several cases of torture and ill-treatment that reflected many of the key issues the government needs to address.

Public Document

\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*

For more information please call Amnesty International's press office in London, UK, on +44 20 7413 5566

Amnesty International, 1 Easton St., London WC1X 0DW.  web: http://www.amnesty.org

For latest human rights news view http://news.amnesty.org

**Previous**

# AMNESTY INTERNATIONAL PRESS RELEASE

AI Index: AMR 41/004/2007 (Public)
News Service No: 023
7 February 2007

**Embargo Date: 7 February 2007 16:30 GMT**

## Mexico: Criminal justice system in crisis

(Mexico City) In a new report published today, Amnesty International called on the newly elected Mexican Government and Congress to urgently modernize Mexico's public security and justice system in line with international human rights standards.

Amnesty International's report analyses the deep flaws in the Mexican criminal justice system -- including the wide gap between legal principles and effective protection, the irregularities during pre-trial and preventive detention, the fabrication of criminal charges to persecute political activists and human rights defenders and the absence of the "presumption of innocence" clause from the Mexican constitution. The report also examines the impact of these flaws on the most vulnerable members of the community, such as indigenous peoples.

"The flaws in Mexico's judicial system mean that arbitrary detention, torture, unfair trials and impunity are systematic at a state and federal level across the country. If the new administration doesn't take effective action, they will be sending the message that human rights violations are tolerated in Mexico," said Esteban Beltrán, leader of Amnesty International delegation in Mexico.

Amnesty International research found that scores of individuals across Mexico are often detained on the basis of flawed or non existent evidence and denied basic rights, resulting in miscarriages of justice and destroying all confidence in the justice system and the rule of law. Even in the few cases where official investigations have been undertaken into abuses, accountability mechanisms are so weak that those responsible are rarely brought to justice, encouraging a culture of impunity.

On 9 August 2006, German Mendoza Nube, a leading teacher and political activist, was detained outside his home in Oaxaca City by armed plain clothed state police. Despite being paraplegic, he was bundled into a vehicle and his wheel chair and medicine were discarded.

Mendoza's detention followed an arrest warrant that was issued on the basis of an investigation that courts had previously halted because of lack of evidence. State police subsequently also claimed that German was arrested in possession of arms – a claim contradicted by a number of people who witnessed the arrest.
Mendoza was never informed of the reasons for his arrest or allowed to call relatives. Furthermore, the lack of adequate medical attention resulted in hyperglycemia, which led to his temporary hospitalization. After more than two months, Mendoza was subsequently released by the authorities, but the status of the case against him remains unclear and he fears that he might be arrested at any time if he returns to Oaxaca.

As Amnesty International's report shows, most criminal suspects are denied access to adequate legal advice and representation at the point of detention when they are most at risk of torture and intimidation. Reports of ill-treatment while in custody are routinely dismissed or ignored by the authorities.

In most cases, it is the poorest and most vulnerable members of society who suffer abuses while in custody and they are also provided with the least experienced and competent defence lawyers. According to a census conducted by Mexico's Federal Public Defense Institute, in 2004 there were only 82 lawyers with the required qualifications to represent Mexico's 13 million indigenous people.

On 4 May 2006 Magdalena Garcia Durán, a Mazahua indigenous woman was arrested with more than 200 other people in Atenco. She later said she was beaten by police and denied access to adequate defence and a translator. Despite having been able to prove to a federal court that she was not present at the time of the offences, Magdalena was charged again by state officials with kidnapping police and attacking a public highway and still remains in prison.

"A strong, impartial, and accountable criminal justice system, which protects human rights of the accused and victims alike,

Case 1:08-mc-00085    Document 13-6    Filed 07/14/2008    Page 81 of 85

is the cornerstone of a just society and as such major improvements at federal and state level must be a top priority in public security measures being developed by the new Mexican administration," said Esteban Beltrán.

Public Document
******************************************

For more information please call Amnesty International's press office in London, UK, on +44 20 7413 5566
Amnesty International, 1 Easton St., London WC1X 0DW. web: http://www.amnesty.org

For latest human rights news view http://news.amnesty.org

**Previous**

# AMNESTY INTERNATIONAL

> Home  >  Learn About Human Rights  >  Human rights by country  >  Mexico

Region:  -Central America        Country:  Select a country        GO

## MEXICO

### UNITED MEXICAN STATES

Taken from the Amnesty International Report 2007

> Head of state and government: Felipe Calderón Hinojosa
> Death penalty: abolitionist for all crimes
> International Criminal Court: ratified

Felipe Calderón of the National Action Party (Partido de Acción Nacional, PAN) was elected president in controversial elections. President Vicente Fox completed his mandate without fulfilling the administration's commitment to end human rights violations and impunity, which remained widespread. The Federal Congress once again failed to approve reforms to the Constitution and the public security and criminal justice systems to improve the protection of human rights.

There were continuing reports of torture, arbitrary detention, excessive use of force and unfair judicial proceedings, particularly at state level. Serious human rights violations were reported in Oaxaca State in the context of a protracted political crisis. Violence against women remained endemic in many states and the campaign for justice for the women of Ciudad Juárez and Chihuahua City continued. Several journalists were killed.

Human rights defenders and political opponents in some states remained at risk of harassment or unfounded criminal prosecutions. Measures to prosecute those responsible for systematic human rights violations in previous decades failed. Indigenous peoples in several states continued to face discrimination including in access to basic services, such as health care and education.

### BACKGROUND

High levels of violent crime and public insecurity continued to be major public concerns. In November several armed opposition groups reportedly claimed responsibility for the detonation of three explosive devices in Mexico City. Central American and Mexican migrants seeking to cross the border to the USA could face increased threats to their safety with the proposed extension of the border wall by the US government.

### ELECTIONS AND THEIR AFTERMATH

The fairness of the national elections and the narrow margin of the PAN victory were challenged by the second-placed candidate, Andrés Manuel López Obrador, of the Democratic Revolutionary Party (Partido de la Revolución Democrática, PRD). After several weeks of major street protests by PRD supporters demanding a full recount of votes, the Federal Electoral Tribunal ruled there were only sufficient grounds for a partial recount of ballot boxes. In September the Tribunal confirmed Felipe Calderón as President. Andrés Manuel López Obrador and his supporters refused to accept the results and in November set up a "parallel" government. On

1 December, Felipe Calderón was sworn in as President, without making any clear commitment to strengthen the protection of human rights. The appointment of the Governor of Jalisco State as federal Interior Minister raised concern owing to his failure to prevent or punish serious human rights violations committed in Jalisco during his governorship.

### INTERNATIONAL HUMAN RIGHTS MECHANISMS AND REFORM

The Mexican government appeared before six UN thematic committees to assess its compliance with treaty obligations. These included the UN Children's Convention, the UN Convention against Racism, the International Covenant on Economic, Social and Cultural Rights, the UN Women's Convention, the Convention against Torture and the Migrant Workers' Convention. The respective committees made a series of recommendations. The government of President Fox played a positive role in UN reform to strengthen human rights protection. Mexico took over the presidency of the new UN Human Rights Council.

There was little progress on government human rights initiatives. The implementation of the National Human Rights Programme remained inadequate. The federal judiciary published the results of its consultation on reform of the judicial system. With the exception of some reforms to the juvenile justice system, there were virtually no advances in introducing proposed constitutional and legal reforms to ensure the protection of human rights in the public security and criminal justice system.

### OAXACA CRISIS

In June, state police used excessive force against striking teachers occupying Oaxaca city centre and bringing it to a standstill. The Popular Assembly of the People of Oaxaca (Asamblea Popular del Pueblo de Oaxaca, APPO) was formed to support the teachers and demand the resignation of the governor. Its supporters occupied official buildings and TV and radio stations. State police, often wearing civilian clothes, reportedly shot at APPO supporters, resulting in the deaths of at least two and injuries to many others. APPO supporters established barricades blocking city streets. During the crisis, state police reportedly arbitrarily arrested, held incommunicado and tortured several teachers and APPO supporters before filing charges on the basis of allegedly fabricated evidence.

At the end of October, municipal and state police reportedly attacked several barricades set up by APPO supporters, leading to the deaths of three civilians and injuries to many others. Some 4,500 Federal Preventive Police (Policía Federal Preventiva, PFP) entered the city using tear gas, batons and water cannons. Some protesters responded with violence and scores were arrested. Many were reportedly beaten and threatened by the PFP once in custody. At least 19 PFP officials were reportedly injured. In November, after clashes with police, more than 140 people were arrested, many of whom were reportedly not involved in violence. Scores were reportedly beaten and denied access to family, medical attention and legal advice. More than 90 remained in custody at the end of the year.

In early November teachers returned to work, but some faced threats and detention. In December, scores of APPO leaders and supporters were subject to warrants issued during the protests, some allegedly on the basis of fabricated evidence. There was concern that those involved in peaceful protest would be detained and be subject to unfair judicial proceedings. During the crisis, more than 17 civilians were reportedly killed and scores of others injured. Federal and state authorities failed to effectively investigate allegations of serious human rights violations by the end of the year.

On 27 October, US reporter Bradley Roland Will was shot and killed on a barricade while filming a clash between protesters and armed gunmen, later identified as local governing party officials. Two officials were detained, but later released without charge after state authorities concluded APPO supporters were responsible. There was serious concern about impartiality of the official investigation.

On 29 October Jorge Alberto López Bernal died as a result of being struck by a tear gas canister reportedly fired by the PFP. Federal authorities did not conduct criminal investigations into this or other reports of human rights violations allegedly committed by PFP agents.

## EXCESSIVE FORCE - PUBLIC SECURITY

High levels of violent crime, often related to drug trafficking, undermined public security in many parts of the country. Massive policing operations against protesters led to serious violations of human rights.

In April, federal and state police evicted striking miners blocking access to the Lázaro Cárdenas steel plant in Michoacán State. Violent clashes ensued in which José Luis Castillo Zúñiga and Héctor Álvarez Gómez were shot and killed by police and 54 other people were injured, including police officers. In October the National Human Rights Commission found that federal and state police had acted illegally and had used excessive force, and called for a criminal investigation. The authorities refused to comply with the recommendation.

On 3 May, Mexico State Police clashed with demonstrators in Texcoco resulting in a major state and federal police operation in the neighbouring town of San Salvador Atenco where a number of police were reportedly held hostage. Police used tear gas, batons and firearms against members of the community, detaining 211 people over the two days, many of whom were repeatedly beaten and tortured while being transported to the state prison. Twenty-six people remained in custody at the end of the year accused of kidnapping, despite serious concerns about the reliability of evidence presented against several of them and the fairness of judicial proceedings. Even Magdalena García Durán, who won a federal injunction against her unfair detention, remained in custody. A number of state police officers were under investigation for assault at the end of the year.

## VIOLENCE AGAINST WOMEN AND CIUDAD JUÁREZ

Violence against women and gender discrimination remained widespread throughout Mexico. The Special Federal Congressional Commission on Feminicide produced a major report on murders of women in 10 states. The report highlighted the consistent failure of state governments to compile reliable information on gender-based violence or to put in place effective measures for its prevention and punishment. A federal law strengthening the right of women to live free from violence was passed. In February a Special Federal Prosecutor's Office for Crimes of Violence against Women was established.

There were continued reports of murders of women in Ciudad Juárez and the City of Chihuahua. The Chihuahua state authorities introduced some improvements in response to new killings. However, they failed to prosecute many previous cases or hold to account any officials implicated in the original botched investigations. The Federal Attorney General's Office concluded its investigation into past cases, but failed to acknowledge the scale of gender-based violence in Ciudad Juárez over 13 years, leading to criticism that it was seeking to downplay the murders and abductions of women in the city.

In June, after two and half years in custody, David Meza Argueta was acquitted of the murder of Nayra Azucena Cervantes in Chihuahua City in 2003. The basis of the case against him was a confession reportedly extracted under torture by Chihuahua judicial police. David Meza filed a complaint of torture against state officials. Two state judicial police were reportedly expelled from the force for using torture during their investigations.

In May, during the police operation in San Salvador Atenco, Mexico State, 47 women were detained and transported to prison. At least 26 women reported to the National Human Rights Commission that they had been sexually assaulted or raped by state police officers during the journey to prison. At the end of the year, the local state-led investigation had resulted in only minor charges against one of the officials involved.

## ARBITRARY DETENTION, TORTURE AND UNFAIR JUDICIAL PROCEDURES

Arbitrary detention, ill-treatment, torture and violations of due process rights of criminal suspects remained common. Courts continued to overlook reports of such abuses. Access to legal counsel was often denied in the early stages of detention and state-appointed lawyers frequently failed to guarantee the right to effective defence. The poorest and most disadvantaged detainees, such as Indigenous peoples, were often denied minimum fair trial standards.

In May, two Indigenous men, Aureliano Álvarez Gómez and Tiburcio Gómez Pérez, were detained in connection with an alleged kidnapping in the municipality of Huitiupán, Chiapas State. No arrest warrant was produced and they were reportedly severely beaten during interrogation by state judicial police. The two men were denied legal assistance and were not charged, but held by judicial order (arraigo) for more than 50 days in a secure house run by the State Prosecutor's Office. Lawyers from a local human rights organization were denied access to the men for four days and when they were able to visit them were unable to talk in private or document the visible signs of their injuries. In June the two men were charged and remanded in Amate prison where they were tortured by other inmates, reportedly with the consent of prison authorities. No investigation into the two men's treatment was known to have been initiated by the end of the year.

On 4 May, José Gregorio Arnulfo Pacheco was repeatedly beaten and kicked by state police officers at his home in San Salvador Atenco. He was subsequently diagnosed with fractured ribs, a fractured trachea, cranial fissures and severe bruising. He was released from custody at the end of July after the judge recognized his physical incapacity to have committed the alleged offences. The outcome of the Public Prosecutor's Office appeal against his release was awaited at the end of the year.

## JOURNALISTS AND HUMAN RIGHTS DEFENDERS

Ten journalists were murdered and many others received threats, reportedly in reprisal for their work. Those investigating organized crime networks were at particular risk. Investigations conducted by a Special Federal Prosecutor failed to result in prosecutions of any of those responsible. There were continued reports of intimidation and judicial harassment of human rights defenders in a number of states.

In September the National Supreme Court broadened an investigation into the misuse of the criminal justice system which led to the prosecution of journalist and women's rights defender Lydia Cacho on defamation charges in December 2005. The investigation was continuing at the end of the year.

In January Martín Barrios of the Labour Rights Commission of Tehuacán Valley (Comisión de Derechos Humanos y Laborales del Valle de Tehuacán) in Tehuacán, Puebla State, was released following national and international concern at his continued detention after unfounded blackmail charges against him were dropped. A month later, he and other members of the Labour Rights Commission were reportedly warned that their lives were at risk because of their human rights work.

## IMPUNITY FOR PAST ABUSES

As widely expected, the Special Federal Prosecutor's Office (FEMOSPP), established to secure justice for grave human rights violations committed during Mexico's "dirty war" (1960s-1980s), failed to deliver results. The military reportedly continued to show limited co-operation and the FEMOSPP did not challenge military jurisdiction, which has repeatedly assured impunity for military officials accused of serious human rights violations. Nevertheless, the Fox government stated that the work of the FEMOSPP was complete and ordered its closure in November.

In February, a draft report compiled by the historical truth unit of the FEMOSPP was leaked to an Internet website. It identified more than 700 cases of enforced disappearance, more than 100 extrajudicial executions and more than 2,000 cases of torture committed by the armed forces and security agencies during the "dirty war". In the final days of the administration, a weakened version of the report was officially circulated on the Internet, but the government failed to endorse it, publicize its findings or ensure victims and their relatives would have access to truth, justice or reparations.

In November, a federal court determined on appeal that the statute of limitations had not expired on the genocide charges faced by former President, Luis Echeverría, in connection with the 1968 Tlatelolco Square massacre.

In May, the prosecution of Miguel Nazar Haro, former head of the Federal Directorate of Security, and other former security officials accused of the 1976 enforced disappearance of Jesús Piedra Ibarra, was halted. In September, a judge ordered the end of Miguel Nazar Haro's house arrest as the other case against him for human rights violations committed during the 1970s collapsed.

## ECONOMIC, SOCIAL AND CULTURAL RIGHTS

The UN Committee on economic, social and cultural rights noted that, despite the government's efforts, 40 million people continued to live in poverty, particularly Indigenous communities and other socially disadvantaged groups.

Indigenous and peasant farming communities threatened with eviction by the proposed construction of the Parota dam in Guerrero State, despite a successful legal challenge freezing its construction, continued to face intimidation.

## AI COUNTRY REPORTS/VISITS

### Reports

Mexico: Human rights - an unavoidable duty for candidates (AI Index: AMR 41/019/2006)

Mexico: "How can a life be worth so little?" - Unlawful killings and impunity in the city of Reynosa (AI Index: AMR 41/027/2006)

Mexico: Violence against women and justice denied in Mexico State (AI Index: AMR 41/028/2006)

**Visits**

AI delegates visited Mexico in June and November.

Region: Central America, Mexico





✉ Email    ■ Add to del.icio.us  (?)    digg  (?)    RSS  (?)



# Mexico

## Events of 2006

Among Mexico's most serious human rights problems are those affecting its criminal justice system. Persons under arrest or imprisonment face torture and ill-treatment, and law enforcement officials often neglect to investigate and prosecute those responsible for human rights violations. The presidency of Vicente Fox ended in 2006 with the ambitious human rights agenda that he had brought to office left largely unfulfilled. While the Fox administration succeeded in promoting greater transparency in government, including greater receptivity to international scrutiny of Mexico's human rights practices, the administration made little progress in curbing longstanding abusive practices. When Fox stepped down, the Special Prosecutor's Office that he created in 2001 to address past atrocities had yet to win a single conviction and his comprehensive 2004 proposal to reform the justice system had not been passed by Mexico's Congress.

### Police Brutality, Torture, and Pretrial Detention

Mexican police forces routinely employ excessive force when carrying out crowd–control operations. In April 2006, for example, during a police intervention to disperse a miner's strike in Lazaro Cardenas, police forces killed two workers and injured dozens. In May, while dispersing demonstrators in San Salvador de Atenco, police officers killed two people, including one teenager, and arbitrarily detained, beat, and kicked demonstrators. Police also sexually harassed women while they were being transported to a penitentiary.

Torture remains a widespread problem within the Mexican criminal justice system. One perpetuating factor of the practice is the acceptance by some judges of evidence obtained through torture and other mistreatment. Another is the failure to investigate and prosecute most cases of torture.

Over 40 percent of prisoners in Mexico have never been convicted of a crime. Rather, they are held in



Contribute to Human Rights Watch

**Also Available in**

**ESPAÑOL**

**Related Material**

More Information on Human Rights in Mexico
Country Page

Download PDF
World Report Chapter, January 11, 2007

World Report 2007
Report, January 11, 2007

Free Email Newsletter



pretrial detention, often waiting years for trial. The excessive use of pretrial detention contributes to overcrowding in prisons. Prison inmates are also subject to abuses, including extortion by guards and the imposition of solitary confinement for indefinite periods of time. Foreign migrants are especially vulnerable to such abuses.

The justice reform proposal presented by President Fox in 2004 included measures aimed at addressing these chronic abuses. Only a few reforms were adopted and at this writing Congress has yet to vote on most measures addressing the critical problems of torture and pretrial detention.

In a positive development, Congress passed a constitutional reform in December 2005 that forces all jurisdictions to make their juvenile justice systems compatible with human rights norms.

### Impunity

The criminal justice system routinely fails to provide justice to victims of violent crime and human rights abuses. The causes of this failure are varied and include corruption, inadequate training and resources, and a lack of political will.

The failure for over a decade to resolve the murders of hundreds of young women and girls in Ciudad Juarez, in Chihuahua state, offers a paradigmatic example of impunity in Mexico. Several individuals facing charges for some of the Juarez killings recanted confessions that they claim were coerced through torture. In one of these cases, David Meza, who in 2003 had confessed under torture that he had murdered his cousin, recanted and was acquitted in June 2006. His cousin's murder has not yet been solved. A shift in policy by the state prosecutor's office in 2004 has led to better investigations of these cases, however.

A major shortcoming of the Mexican justice system is that it leaves the task of investigating and prosecuting army abuses to military authorities. The military justice system is ill-equipped for such tasks. It lacks the independence necessary to carry out reliable investigations and its operations suffer from a general absence of transparency. The ability of military prosecutors to investigate army abuses is further undermined by a fear of the army, which is widespread in many rural communities and which inhibits civilian victims and witnesses from providing information to military authorities.

### The Special Prosecutor's Office

The Special Prosecutor's Office that President Fox established in 2001 to address past abuses has produced limited results. Its initial advances—such as the November 2003 landmark decision from the Mexican Supreme Court holding that statutes of limitations do not apply to old "disappearance" cases as long as the victims' bodies have not been found—have been counterbalanced by significant failures.

The special prosecutor has made only limited progress in uncovering the fate of hundreds of people who were "disappeared" in the 1970s. His most ambitious move—the indictment of former president Luis Echeverria for genocide—was thrown out by the courts. The few cases in which the special prosecutor managed to indict those responsible for forced disappearances were dismissed by courts after Congress modified the federal criminal code in June 2006. There have thus far been no convictions related to the crimes committed during Mexico's "dirty war."

The Special Prosecutor's Office produced a draft report on past abuses which shows there is extensive documentation in government archives implicating former officials and military officers in the "dirty war" crimes. However, far more information could have been collected if a more thorough investigation had been carried out. The draft was leaked to the press in February 2006, but the report still has not been officially published at this writing.

### Domestic Violence and Sexual Abuse

Mexican laws do not adequately protect women and girls against domestic violence and sexual abuse. Some laws on violence against women run directly counter to international standards, including provisions of Mexican law that define sanctions for some sexual offenses with reference to the "chastity" of the victim and provisions penalizing domestic violence only when the victim has been battered repeatedly. Legal protections that do exist are often not enforced vigorously. As a result, victims are often reluctant to report crimes and such underreporting in turn undercuts pressure for necessary legal reforms. The net effect is that sexual and domestic violence against women and girls continues to be rampant and shrouded in impunity.

Girls and women who report rape or violence to the authorities are generally met with suspicion, apathy, and disrespect. For pregnant rape victims who want to terminate their imposed pregnancy—as they are legally entitled to do in Mexico—this reaction is even more pronounced. They are ignored or actively silenced in disregard of their human dignity and their rights to nondiscrimination, due process, and equality under the law.

In 2006, both the United Nations Committee on Economic, Social and Cultural Rights and the United Nations Committee on the Elimination of Discrimination against Women reiterated previous calls on Mexico to prevent and punish violence against women, and to provide adequate access to safe abortion services for rape victims.

### Freedom of Expression

Journalists—particularly those who have investigated drug trafficking or have been critical of state governments—have occasionally faced harassment and attacks. In February 2006, unidentified individuals attacked the newspaper El Mañana in Nuevo Laredo, damaging the installations and wounding a journalist. A photographer was gunned down in Michoacan in March 2006, and a journalist was killed in Chihuahua in August 2006. In February 2006, the federal government created a special prosecutor's office to investigate crimes committed against journalists.

Mexican defamation laws continue to be excessively restrictive and tend to undermine freedom of expression. Besides monetary penalties, journalists are subject to criminal prosecution for alleged defamation of public officials. In December 2005, Lydia Cacho was arrested because she had supposedly failed to answer a court summons in a defamation case against her. Cacho is being criminally prosecuted for the publication of a book that describes a child prostitution ring that, according to her, operated with the complicity of local police and politicians. In March 2006, Isabel Arvide was convicted for defamation in relation to an article published in 2001 on the involvement of state government officials in a drug cartel in Chihuahua. She received a one-year prison sentence (which the judge suspended) and was ordered to pay a fine of approximately US$18,000.

### Access to Information

A 2002 federal law on transparency and access to information increased avenues for public scrutiny of the federal government. However, there is still considerable risk that secrecy will reassert itself in the future: the federal agency in charge of applying the law to the executive has not been granted autonomy from the executive branch, remains vulnerable to political interference, and has encountered resistance from several key government agencies. The progress made in promoting transparency within the executive branch has not been matched in other branches of government nor in the autonomous state institutions.

### Labor Rights

Legitimate labor–organizing activity continues to be obstructed by collective bargaining agreements negotiated between management and pro-management unions. These agreements often fail to provide worker benefits beyond the minimums mandated by Mexican legislation. Workers who seek to form independent unions risk losing their jobs, as inadequate laws and poor enforcement generally fail to protect them from retaliatory dismissals.

### Right to Education

A chronic concern in Mexico is the government's failure to ensure that tens of thousands of rural children receive primary education during the months that their families migrate across state lines to work in agricultural camps. A large number of parents decide to take their children to work with them in the fields rather than attend school during these months. This decision is largely due to economic conditions, as well as to the government's failure to enforce child labor laws. Although there is a federal program to provide primary schooling in the agricultural camps, the classes are generally offered in the evening, when children are too exhausted from their work to study.

### Key International Actors

As part of a Technical Cooperation Agreement signed by President Fox, the United Nations High Commissioner for Human Rights maintains an in–country office that, in December 2003, produced a comprehensive report which documented ongoing human rights problems and provided detailed recommendations for addressing them. Based on this report, the administration initiated a national human rights program. In December 2005, the administration established a committee with representatives from the government and civil society to monitor implementation of the program.

Along with the United States and Canada, Mexico is party to the North American Free Trade Agreement and its labor side accord. This accord commits the three countries to enforcing their laws protecting workers' rights, and creates a complaints mechanism whereby, in principle, each has the authority to hold the others accountable for any failures to do so. However, because the complaint process is convoluted and enforcement mechanisms are weak, the accord has had little impact on labor rights violations in Mexico.

Mexico has maintained its leading role in promoting human rights at the international level. In June 2006 Mexico became the first country to preside over the newly formed United Nations Human Rights Council.

**Suggest This Page to a Friend**

Your Email (required)

Your Friend's Name

Friend's Email (required)
Email addresses are not stored.

Your Message

Enter Security Code
(case sensitive)

zfr6jy

Please read the HRW Privacy Policy

Send URL to a Friend

| Africa | Americas | Asia | Europe & Central Asia | Middle East & North Africa |
|---|---|---|---|---|
| United States | | | | |